**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

| | |
|---|---|
| BANCO DO BRASIL, S.A., | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 1:09-cv-11343-NMG |
| | ) |
| 275 WASHINGTON STREET CORP., | ) |
| as it is the Trustee of the WASHINGTON | ) |
| STREET REALTY TRUST II, | ) |
|     Defendant. | ) |

_____)

**ANSWER AND COUNTERCLAIM OF**
**275 WASHINGTON STREET CORP.**

Pursuant to Fed. R. Civ. P. 8, Defendant 275 Washington Street Corp., as Trustee of the

Washington Street Realty Trust II ("the Trust") responds to the numbered paragraphs of the

Declaratory Judgment Complaint filed by Plaintiff Banco do Brasil, S.A. ("Bank") as follows:

1.      The Trust admits that the Bank has represented itself to be a Brazilian corporation

but is without information sufficient to admit or deny the remaining allegations of this paragraph.

2.      Admitted, except for the allegation that the declaration of trust has been amended,

which allegation is denied.

3.      This paragraph contains conclusions of law and not allegations of fact to which a

response is required.  To the extent a response is required, the Trust admits that this Court has

subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332, and is

without knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in this paragraph, if any, and therefore denies them.  The Trust specifically denies

that the Bank is entitled to the relief it seeks.

4.      Paragraph 4 contains a description of the declaratory relief sought by the Bank to which no response of the Trust is required.  To the extent that Paragraph 4 may be construed to contain factual allegations which require a response, the allegations are denied.

5.      The Trust admits that the term of the Lease has been terminated, that the Bank is without power to exercise the so-called "early termination option," and that the amount in controversy exceeds $75,000.  The remaining allegations contained in this paragraph purport to characterize a document and require no answer, but the Trust denies these remaining allegations to the extent they are contrary to or inconsistent with the document they purport to characterize.

6.      The Trust admits that the parties entered into a lease on or about August 29, 2008, and that Exhibit A to the complaint is a true and correct copy of that lease.  The remaining allegations contained in this paragraph purport to characterize a document and require no answer, but the Trust denies these remaining allegations to the extent they are contrary to or inconsistent with the document they purport to characterize.

7.      This paragraph purports to characterize and quote from a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with, or to the extent they misquote, that document.  The Trust denies all other factual allegations that may be contained in this paragraph.

8.      This paragraph purports to characterize and quote from a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with, or to the extent they misquote, that document.

9.      This paragraph purports to characterize a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with that document.

10.     This paragraph purports to characterize a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with that document.

11.     The Trust is without sufficient information to admit or deny the allegations contained in this paragraph and, consequently, denies them.

12.     Denied.

13.     This paragraph purports to characterize and quote from a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with, or to the extent they misquote, that document.

14.     This paragraph purports to characterize and quote from a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with, or to the extent they misquote, that document.

15.     This paragraph purports to characterize and quote from a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with, or to the extent they misquote, that document.

16.     The Trust admits that the Bank paid the first month's rent at or near the time the Lease was executed, but the Trust is without sufficient information to admit or deny the remaining allegations contained in the first sentence of this paragraph and, consequently, denies them.  The Trust admits that a rental payment was due on July 1, 2009, and that Plaintiff failed to timely make that payment.  To the extent that this paragraph purports to characterize the Lease, the Trust answers that the Lease is a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with the Lease.  The Trust denies the remaining allegations contained in this paragraph.

17.     Admitted.

18.     The Trust lacks sufficient information to admit or deny this allegation and, consequently, this allegation is denied.

19.     The first sentence of this paragraph purports to characterize a document that speaks for itself, and the Trust denies such allegations to the extent they are inconsistent with or mischaracterize that document.  The Trust lacks sufficient information to admit or deny the remaining allegations contained in the first sentence of this paragraph and, consequently, these allegations are denied.  The Trust admits that exhibit B is a true and correct copy of a letter dated July 16, 2009.

20.     The Trust admits the allegations contained in this paragraph but denies that they have any relevance.

21.     The Trust lacks sufficient information to admit or deny the allegations contained in this paragraph and, consequently, those allegations are denied.

22.     The Trust admits that it received a payment on July 21, 2009, in the amount of the check reproduced as exhibit C.  The Trust is without sufficient information to admit or deny the remaining allegations contained in this paragraph and, consequently, those allegations are denied.

23.     The Trust admits that it received the letter attached as exhibit D.  The letter is a document that speaks for itself, and the Trust denies the allegations contained in this paragraph to the extent they are inconsistent with or mischaracterize that document.  The Trust denies any other allegations that may be contained in this paragraph.

24.     This paragraph purports to characterize a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with that document.

25.     This paragraph purports to characterize a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with that document.

26.     The Trust admits that the listed individuals, and others, attended a meeting at the Bank's New York office on May 27, 2009, and that the Bank for the first time informed the Trust that it did not intend to pursue Regulatory Approval any further.  The Trust is without sufficient information to admit or deny the remaining allegations contained in this paragraph and, consequently, denies them.

27.     The Trust admits that it, through counsel, sent a letter dated July 28, 2009, and that exhibit E is a true and complete copy of that letter.  The letter is a document that speaks for itself, and the Trust denies the allegations contained in the second sentence of this paragraph to the extent they are contrary to or inconsistent with that document.  The Trust denies the remaining allegations contained in this paragraph.

28.     The allegations contained in this paragraph purport to characterize a document that speaks for itself, and the Trust denies those allegations to the extent they are contrary to or inconsistent with that document.

29.     The allegations contained in this paragraph purport to characterize a document that speaks for itself, and the Trust denies those allegations to the extent they are contrary to or inconsistent with that document.

30.     The Trust admits that it received a check in the amount of the check reproduced as exhibit F, but the Trust is without sufficient information to admit or deny the remaining allegations contained in this paragraph and, consequently, those allegations are denied.

31.     The allegations contained in this paragraph purport to characterize a document that speaks for itself, and the Trust denies the allegations to the extent they are contrary to or inconsistent with the document they purport to characterize.

32.     The Trust admits that it, through counsel, sent the August 4, 2009, letter by electronic mail and federal express delivery but denies all other allegations contained in this paragraph.

33.     Paragraph 33 consists of a conclusion of law that requires no answer.  To the extent that Paragraph 33 purports to allege facts, the allegations are denied.

34.     The Trust repeats its responses to the allegations contained in paragraphs 1 through 33 of the Verified Complaint and, by this reference, incorporates them herein.

35.     Paragraph 35 consists of a conclusion of law that requires no answer.  To the extent that Paragraph 35 purports to allege facts, the allegations are denied.

36.     Paragraph 36 consists of a conclusion of law that requires no answer.  To the extent that Paragraph 36 purports to allege facts, the allegations are denied.

37.     The Trust is without sufficient information to admit or deny the allegations contained in this paragraph and, consequently, those allegations are denied.

38.     The Trust is without sufficient information to admit or deny the allegations contained in this paragraph and, consequently, those allegations are denied.

39.     Paragraph 39 consists of a conclusion of law that requires no answer.  To the extent that Paragraph 39 purports to allege facts, the allegations are denied.

40.     Denied.


The remainder of the Verified Complaint consists of Prayers for Relief that require no answer.  To the extent a response is required, the allegations are denied.

## DEFENSES

The Trust hereby raises these defenses and reserves the right to bring any and all other defenses.  The Trust does not assume the burden of proof on any of these defenses unless required to do so by substantive law.

### First Defense

With respect to each and every Count of the Bank's Verified Complaint, the Bank has failed to state a claim for which relief may be granted.

### Second Defense

The Bank's claims are or may be barred in whole or in part by the doctrine of waiver.

### Third Defense

If the Bank has suffered any damages, which the Trust denies, its claims for relief are barred because such damages are a result of the Bank's own conduct.

### Fourth Defense

The Bank's claims are or may be barred in whole or in part because the Bank failed to use good-faith and reasonable efforts to secure the "Regulatory Approval" contemplated under the terms of the Lease.

The Trust reserves the right to assert additional defenses that may become available or apparent during the discovery proceedings in this matter.

WHEREFORE, the Trust requests that this Court:

a.      enter judgment in the Trust's favor on all counts of the Verified Complaint and enter a declaration that the Bank is not entitled to terminate the Lease pursuant to Section 6.5;

b.      award the Trust its attorneys' fees and costs of defending this action; and

c.      grant the Trust such other and further relief as this Court deems just and proper.

## COUNTERCLAIM

Defendant/Plaintiff-in-Counterclaim, 275 Washington Street Corp., as Trustee of the Washington Street Realty Trust II, by and through counsel, hereby states the following counterclaims against Banco do Brasil, S.A. (the "Bank").  Plaintiff-in-Counterclaim is referred to herein as the "Trust."

### NATURE OF THE ACTION

1.      This is a counterclaim for a declaratory judgment relating to the parties' respective rights and obligations under a lease entered into by the parties effective August 29, 2008 (the "Lease") and for breach of the Lease.  The Trust is entitled to and has terminated the Lease, and the Bank is liable for the full amount of the damages it agreed to in the Lease.

### PARTIES AND JURISDICTION

2.      275 Washington Street Corporation is a Massachusetts corporation with its principal place of business in Boston, Massachusetts, and it brings this counterclaim in its capacity as sole trustee of the Washington Street Realty Trust II, the record owner of the property located at 227-275 Washington Street in Boston.

3.      Upon information and belief, the Bank is a Brazilian corporation with its principal place of business in Brazil.

4.     This Court has diversity jurisdiction over this counterclaim pursuant to 28 U.S.C. § 1332(a) as the amount in controversy, exclusive of interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332.

## FACTS

### The Lease

5.     In a Lease dated August 29, 2008, the Trust leased to the Bank the premises located on the first floor of 227-225 Washington Street ("the Premises") for use as a "high quality, full service retail branch banking facility."

6.     The Bank said that it was eagerly pursuing approval from federal regulators to open in the United States and that it was "anxious" to obtain possession of the Premises as soon as possible.

7.     The parties were each represented by counsel during the Lease negotiations.  The Bank was represented by its co-counsel in this case, Peter Aufrichtig, who participated directly and substantially in the drafting of the Lease, inserting copious comments on and making substantial revisions to the drafts.

8.     The term of the Lease is ten years, with the Bank having the option to extend for an additional five years (subject to certain conditions) and the option to lease adjacent space to expand its branch (also subject to certain conditions).

### The Bank's Default

9.     Article 18 of the Lease pertains to the Trust's remedies if the Bank defaults. Section 18.1.A defines an "Event of Default" to include:

> "Failure on the part of the Tenant to make **payment of minimum rent and other charges** payable hereunder by the Tenant in equal monthly installments within three (3) business days (that is, for the purposes of this lease, non-holiday weekdays) **after the due date**, or failure on the part of

Tenant to make payment of any other monetary amount due under this lease within three (3) business days after the Landlord has sent to the Tenant and the Tenant has received  written notice of such default (or delivery thereof in accordance with the notice provision of this lease has been unsuccessfully attempted)."

(Emphasis added.)   In addition, Article 18.1.E provides that it is an Event of Default for the

Bank to "abandon or vacate the demised [P]remises."  The Bank's objections to the default

provisions of Section 18.1 were considered and discussed during the Lease negotiations, and the

resulting agreement of the parties is reflected in the language of the executed Lease.

10.    Section 18.2 allows the Trust to terminate the term of the Lease if there is an

Event of Default:

"Should any Event of Default occur then, notwithstanding any license of any former breach of covenant or waiver of the benefit hereof or consent in a former instance, subject to applicable Massachusetts law, the Landlord lawfully may, in addition to any remedies otherwise available to the Landlord, immediately or at any time thereafter, and without demand or notice (and the Tenant hereby expressly waives any notice to quit possession of the demised premises), enter into and upon the demised premises or any part thereof in the name of the whole and repossess the same as of the Landlord's former estate, and expel the Tenant and those claiming through or under it and remove its or their effects (forcibly if necessary) without being deemed guilty of any manner of trespass, and *without  prejudice to any remedies which might otherwise be used for arrears of rent or preceding breach of covenant and/or the Landlord may send written notice to the Tenant terminating the term of this lease*; and upon the first to occur of:  (i) entry as aforesaid; or (ii) the fifth (5th) day following mailing of such notice of termination, *the term of this lease shall terminate*."

(Emphasis added.)  The Bank commented on the eviction procedures during negotiations, and

inserted the reference to "applicable Massachusetts law," but interposed neither objection nor

comment to the Trust's right to terminate on an Event of Default.

11.    Section 18.3 describes the consequences of an Event of Default and states, in

relevant part:

"The Tenant covenants and agrees, notwithstanding any termination of this lease as aforesaid . . . to pay and be liable for on the days originally fixed herein for the payment thereof, amounts equal to the several installments of rent and other charges reserved as they would, under the terms of this lease, become due if this lease had not been terminated . . . , and whether the demised premises be relet or remain vacant, in whole or in part, or for a period less than the remainder of the term, and for the whole thereof; but in the event the demised premises be relet by the Landlord, the Tenant shall be entitled to a credit in the net amount of rent received by the Landlord in reletting, after deduction of all reasonable expenses incurred in reletting the demised premises (including, without limitation, remodelling costs, brokerage fees, and the like), and in collecting the rent in connection therewith. It is specifically understood and agreed that the Landlord shall not be required to prefer reletting the demised premises over other premises in the Building (or to relet all or any portion of the demised premises for any particular use), and the Landlord shall be entitled to take into account in connection with any reletting of the demised premises all relevant factors which would be taken into account by a sophisticated developer in securing a replacement tenant for the demised premises . . .; and the Tenant hereby waives, to the extent permitted by applicable law, any obligation the Landlord may have to mitigate the Tenant's damages. As an alternative, at the election of the Landlord, the Tenant will upon such termination pay to the Landlord, as damages, such a sum as at the time of such termination represents the amount of the excess, if any, of the then value of the total rent and other benefits which would have accrued to the Landlord under this lease for the remainder of the lease term if the lease terms had been fully complied with by the Tenant over and above the then cash rental value (in advance) of the premises for the balance of the term. To induce the Landlord to enter into this lease: (i) the Tenant confirms and agrees that this transaction is a commercial and not a consumer transaction; (ii) the Landlord and the Tenant each hereby each waives any right to trial by jury in any action, proceeding or counterclaim brought by one against the other on any matters whatsoever arising out of or in any way connected with this lease, the relationship of the Landlord and the Tenant, the Tenant's use or occupancy of the demised premises, and/or any claim of injury or damage; (iii) the Tenant agrees not to interpose any non-compulsory counterclaim of whatever nature or description (or take any action having substantially the same effect) in any proceeding commenced by the Landlord for nonpayment of rent, minimum rent, or any other amount due hereunder, provided the foregoing shall not be construed as a waiver of the right of the Tenant to assert and pursue such claims in such proceeding if they are mandatory to such proceeding and otherwise would be barred or in any separate action brought by the Tenant in good faith (and not to circumvent this clause or other express provisions of this lease); and (iv) the Tenant hereby grants and submits to personal and subject matter jurisdiction in

11

> any proceeding brought against the Tenant by or on behalf of Landlord in any Massachusetts Court or any United States federal Court and, with respect thereto, the Tenant expressly waives any right of immunity (political, diplomatic, sovereign or otherwise) to jurisdiction, prosecution and/or liability; and the Tenant hereby agrees to indemnify and hold harmless the Landlord and those claiming by, through or under the Landlord from and against any and all loss, cost, damage or expense arising from or relating to any lack of such jurisdiction or claim thereof and any such immunity or claim thereof."

Even though the Bank, through a supplementary Lease review by Massachusetts counsel, complained during negotiations that it thought these provisions were "non-standard," "[n]ot acceptable," "not commercially reasonable," and "should be revised," in fact the Bank accepted those provisions with minimal revision.

12.     Section 18.7 provides in relevant part:

> "Nothing in this lease shall limit any right that the Tenant might otherwise have to obtain injunctive relief against the Landlord in equity; but, except as specifically permitted in Articles XVII and XVIII or as specifically permitted (if at all) in any other express provision of this lease, the rent and charges hereunder shall not abate and Tenant shall not withhold or delay making any payment to be made hereunder; and, in no event shall the Tenant ever have the right to terminate or cancel this lease as a result of any default by Landlord or breach by Landlord of its covenants or any warranties or promises hereunder, except in the case of a breach of the quiet enjoyment covenant of this lease which constitutes a wrongful eviction of Tenant from the demised premises by Landlord continuing beyond the aforesaid notice and cure period. Without limiting the generality of the foregoing, the Tenant shall not assert any right to deduct the cost of repairs or any monetary claim against the Landlord from rent thereafter due and payable, but shall look solely to the Landlord for satisfaction of such claim."

13.     The Bank was required to make a payment of rent on July 1, 2009.

14.     The Bank failed to make a payment on July 1, 2009.

15.     On July 16, 2009, the Trust notified the Bank that it was in default and that the Trust was terminating the term of the Lease pursuant to Section 18.2.

12

16.     On July 20, the Bank acknowledged that it had actually received the July 16 letter the very next day, July 17.  It claimed that it had "inadvertently" failed to make a timely payment and was sending a payment the next day.

17.     The rental payment that was due on or before July 1, 2009, was not made by the Bank until July 21, 2009.

18.     The Bank's failure to make a timely payment of rent within three business days after the due date of July 1, 2009, constituted an Event of Default entitling the Trust to terminate the Lease.

## The Bank's Failure Obtain Regulatory Approval

19.     Because the Bank is a foreign bank and was not yet licensed to conduct its desired Federal Savings Bank ("FSB") business in this country, the parties negotiated special provisions describing the "Regulatory Approval" the Bank represented it needed before opening a branch for business.  Section 3.2 of the Lease describes this Regulatory Approval as approval "from the U.S. Treasury Office of Thrift Supervision for Tenant or its direct or indirect subsidiary, Banco do Brasil, FSB, to operate a branch bank in the demised premises as a federal savings bank."  The reason the Lease specifically references the federal Office of Thrift Supervision ("OTS") is that during the Lease negotiations the Bank stated that it was awaiting the official approval of OTS, which the Bank said it expected to be forthcoming: "For your information, the relevant regulator is OTS, the Office of Thrift Services [sic], the application was submitted many months ago and we are looking to get at least preliminary approval sometime in July."  The Bank repeatedly said that it was eagerly pursuing approval from OTS.

20.     The parties agreed to the following language in Section 19.16:

> "The Tenant specifically confirms and acknowledges that: (i) before entering into this lease, the Tenant has made its own

observations, studies, determinations and projections with respect to the Tenant's business in the demised premises and all other factors relevant to Tenant's decision to enter into this lease, including, without limitation, competition, market size, sales volume, profitability and general, so called 'demographics'—both present and prospective; and (ii) neither the Tenant nor any representative of Tenant has relied upon any representation by (or any 'conversation' with) the Landlord or any representative of the Landlord with respect to any of said factors."

21.     Section 19.3 of the Lease required the Bank to provide status reports to the Trust

within ten days of a request:

> "Recognizing that both parties may find it necessary to establish to third parties, such as accountants, banks, mortgagees, or the like, the then current status of performance hereunder, either party, on the written request of the other made from time to time, will within ten (10) days following receipt of such request furnish a written statement of the status of any matter pertaining to this lease. Without limiting the generality of the foregoing, the Tenant specifically agrees, promptly upon the commencement of the term hereof, to notify the Landlord in writing of the Commencement Date, and acknowledge satisfaction of the requirements with respect to construction and other matters by the Landlord, save and except for such matters as the Tenant may wish to set forth specifically in said statement."

22.     During Lease negotiations and continuing after the Lease was executed, the Trust

continued to inquire of the Bank as to its efforts to secure OTS approval, and seeking

information about these efforts.  The Bank responded with a series of excuses but no facts or

documentation.

23.     For example, on September 26, 2008, the Bank wrote to blame the delay on the

"sturm and drang" with the Federal Reserve.  The Bank offered no specifics, except to state that

it was pursuing regulatory approval and was "[o]bviously . . . as motivated to make this happen

as soon as possible as your side is . . . ."  Writing a month later, on October 20 the Bank again

did not explain its efforts with any specificity, vaguely blaming the "regulatory climate" and stating that it thought "pushing too hard at this point could have a negative effect."

24.     After the Trust again inquired about the status of the Bank's regulatory approval, the Bank wrote on December 2, 2008, that it had to revise its application in light of unspecified "responses" from OTS and the FDIC, and said that the revisions would be submitted within a week.  The Bank reported "good news," that it had obtained the recommendation of New York Federal Reserve officials that the Bank's application be approved, and that it expected "positive indications" from OTS in a few months.  Once those undefined "positive indications" were received, the Bank would begin construction.  The Bank concluded by representing that it was "quite upbeat about the prospects of the early approval and opening of the Banco do Brasil Federal Savings Bank. There is much excitement in the Bank, including by the individual already selected to be the Boston General Manager, that the project move forward as soon as possible. We are all doing whatever is possible to make that happen and share your impatience with the delays to date."

25.     The Bank repeated this tone when it wrote on January 13, 2009, that while it still had not received approvals, it had "selected the contractor and the plans are being finalized for filing by the contractor so that we have the permits in hand when we are able to go forward with the construction."  The Bank promised to forward the contractor's name.  Two weeks later, the Bank wrote that it and its architects were "moving forward with their contractor to file for the permits with Boston which should be submitted in the next 1-2 weeks."

26.     On February 19, the Bank wrote to say it was "moving forward with the plan filings."  However, there was still no "definitive" word from the regulators.

27.     Given the repeated delays, the Trust was increasingly concerned with the Bank's failure to make any progress on regulatory approval.  Consequently, on February 27, 2009, the Trust wrote to the Bank to request a meeting for the Bank to explain its situation.  The Bank made a deliberate effort thereafter to avoid providing the Trust with information concerning the Bank's efforts to obtain regulatory approval.

28.     On March 6, the Bank represented that it was in contact with OTS and was narrowing the issues but that progress was slow because of the financial crisis, and it agreed to consider giving the Trust some access to its consultants.

29.     When the Bank, however, did not respond as promised and the Trust was forced to make another request for more specific information on March 13, the Bank replied five days later that it was "peeved" that the Trust was suggesting the Bank was not doing all it could to get approval.  The Bank still did not provide specific information as to what particular efforts the Bank was undertaking to obtain Regulatory Approval.

30.     On March 18, the Bank sent the Trust a letter from its regulatory counsel, Kathleen A. Scott from Arnold & Porter LLP.  Scott offered some additional but vague details and left many questions unanswered.  Scott represented that the Bank had filed applications with three federal regulators, the Board of Governors of the Federal Reserve System ("FRB"), the FDIC, and OTS in March 2008.  According to Scott, the Bank's responses to the FDIC's "repeated questions" about the Bank's business plan and products led the FDIC to require the Bank to withdraw its application in the fall of 2008 and refile it with a revised business plan.  Scott did not explain the nature of the FDIC's questions or how the Bank's responses rendered the original application so insufficient or inaccurate that it must be withdrawn.  She did say, though, that the Bank had filed a revised application on January 7, 2009.  Scott also disclosed

that the application with OTS was delayed because the Bank had not included its pension plan, Caixa de Previdencia dos Funcionarios do Banco do Brasil, as a "control party" in its application, as she said the Bank was required to do because the plan owns 10.4% of the Bank's shares and has three of its nominees on the Bank's board.  The Bank's failure resulted in OTS' suspension of further processing of the Bank's application.  Scott offered no explanation as to why the Bank had failed to make that disclosure in its original application, when OTS had found the omission, and when OTS had notified the Bank of the application suspension.  According to Scott, OTS required that the Bank file a revised deposit insurance application to the FDIC and that the Bank explain in writing how the pension plan would comply with the restrictions that the Home Owners Loan Act imposes on a savings and loan holding company.  Again, Scott did not explain why the Bank had not made the explanation in its original application.  Scott said that the Bank planned to submit an explanatory letter to OTS, but had not yet done so because the letter was "under review" by the Bank.  Scott did not say how long the review of the explanatory letter would take or when it would be submitted to OTS, but she thought that once the Bank sent the letter, "OTS should be satisfied with the response and re-commence its processing of the application."  She offered no indication what she meant by "re-commence" processing or how long she thought it would take.  Finally, Scott said that even if OTS were otherwise satisfied, it would still not approve the application until it and the FRB determined that the Bank was subject to "comprehensive supervision on a consolidated basis" in Brazil.  She said that the FRB had to make the determination first and that it should come "soon," without further elaboration.

31.     Scott's letter did not provide the Trust with the information it needed and was entitled to under the Lease.  The Trust pressed its attempts to schedule the promised meeting with the Bank's representative.  These attempts superficially appeared to make progress, with

specific dates being discussed.  On March 30, 2009, however, the Bank abruptly nullified those attempts, saying that "the head of the FSB project" was traveling and that the Bank would "get back to [the Trust]" once his travel schedule was finalized.

32.     The Bank did not get back to the Trust, but began a period of "radio silence."  The Trust wrote to the Bank on April 13 asking for the meeting.  The Bank did not reply.  The Trust again wrote to the Bank on April 22.  The Bank did not reply.  Finally, on April 28 in response to the Trust's telephone call, the Bank represented that the reason for the silence was that its representative had had some "surgery" but that it would soon follow up with the Trust.

33.     Two weeks later, the Bank finally wrote to the Trust to schedule the meeting that the Trust had requested.  The meeting was scheduled for May 27.  At that meeting, the reason for the Bank's evasion and information blackout became clear.  Despite its repeated assurances that it was lining up contractors and expected regulatory approval soon, the Bank had in fact *withdrawn* its application with OTS.  In addition, FDIC had *twice* rejected the Bank's application, the second time on April 15, 2009.  By the time of the May 27 meeting, the Bank had in fact closed its White Plains, New York, office and laid off all staff except for essential personnel.  The representatives of the Trust who attended the meeting were completely shocked, as the Bank had previously given absolutely no indication that it was abandoning all efforts to secure Regulatory Approval and closing its offices.

34.     On information and belief, the Bank in fact withdrew its application to OTS in March 2009, approximately two months before disclosing this fact to the Trust

35.     It is clear to the Trust that the Bank's strategy throughout early 2009 was to avoid providing any substantive information to the Trust, with the intent to attempt to invoke Section 6.5 of the Lease on August 29, 2009.

36.     After the May 27 meeting, the Trust has repeatedly asked the Bank to disclose the letter from the FDIC that the Bank claimed to have received.  On Friday, June 26, 2009, the Bank finally agreed to provide the letter, in redacted form, but only if the Trust signed a nondisclosure agreement "restricting the use of the letter."  The Trust replied the following Monday, June 29, proposing the terms for a nondisclosure agreement.  The Bank never replied and never provided the FDIC letter.

## COUNT I
### (Declaratory Judgment)

37.     The Trust reasserts and reincorporates by reference paragraphs 1 through 36 of this Counterclaim as if fully set forth herein.

38.     The Lease was validly terminated by the Trust as a result of the Bank's failure to make a timely payment of rent within three business days of the July 1, 2009, due date, which is an Event of Default under the Lease.

39.     The Bank has breached the Lease by failing to make the timely payment of rent referred to above and by failing to disclose accurately and timely the status of its application to OTS.

40.     The Bank also breached the implied covenant of good faith and fair dealing by failing to use good-faith efforts to secure the Regulatory Approval as described in the Lease by, among other things, voluntarily withdrawing its application to OTS.

41.     As a consequence of the termination of the Lease and the Bank's breach thereof, the Bank is without power to exercise any rights pursuant to Section 6.5 of the Lease.

42.     An actual controversy exists between the Trust and the Bank regarding their respective rights and obligations pursuant to the Lease.

43.     Declaratory relief will resolve this controversy.

## COUNT II
### (Breach of Lease)

44.     The Trust reasserts and reincorporates by reference paragraphs 1 through 43 of this Counterclaim, as if fully set forth herein.

45.     The Bank's failure to make timely payment of rent, failing to provide sufficient, accurate, and timely information concerning its applications for regulatory approval, and failure to use good-faith efforts to secure approval constitute a breach or breaches of the Lease.

46.     As a result of the Bank's breach or breaches of the Lease, the Trust has sustained damages.

## COUNT III
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

47.     The Trust reasserts and reincorporates by reference paragraphs 1 through 46 of this Counterclaim, as if fully set forth herein.

48.     Implicit in every contract is a covenant that each party will act in good faith and fairly attempt to perform its obligations under the agreement.

49.     At all times in its dealings with the Bank, the Trust has acted reasonably and in good faith.

50.     The Bank breached the implied covenant of good faith and fair dealing by: failing to use good-faith efforts to secure Regulatory Approval and withdrawing its applications with OTS; failing to respond fully, truthfully, and timely to the Trust's requests for information about the status of the Bank's application for Regulatory Approval; and engaging in a deliberate attempt to keep the Trust in the dark rather than disclosing promptly and fully the status of the Bank's application to OTS.

51.     As a direct and proximate result of the Bank's breaches of the implied covenant of good faith and fair dealing, the Trust has suffered and continues to suffer substantial economic damages in an amount to be proved at trial.

## COUNT IV
### (Legal Fees and Expenses)

52.     The Trust reasserts and reincorporates by reference paragraphs 1 through 51 of this Counterclaim, as if fully set forth herein.

53.     Section 19.9 of the Lease provides in relevant part: "Unless prohibited by applicable law, the Tenant agrees to pay to the Landlord the amount of all legal fees and expenses incurred by the Landlord arising out of or resulting from any act or omission by the Tenant with respect to this lease or the demised premises . . . including without limitation, any breach by the Tenant of its obligations hereunder . . . ."

54.     The Trust is entitled to recover all legal fees and expenses incurred as a result of the Bank's failures, omissions, breaches, and actions described herein, including the attorneys' fees and costs associated with this action.

WHEREFORE, the Trust requests that the Court enter a declaration and order:

a.      that the Trust validly and effectively terminated the Lease by reason of the Event of Default that was the Bank's failure to make timely payment of rent;

b.      that the Bank is thereby not permitted to terminate the Lease under Section 6.5;

c.      that the Trust is entitled to the damages described in Section 18.3 of the Lease, namely, "such a sum as at the time of such termination represents the amount of the excess, if any, of the then value of the total rent and other benefits which would have accrued to the Landlord under this lease for the remainder of the lease term if the lease terms had been fully complied with by the Tenant over and above the then cash rental value (in advance) of the premises for the balance of the term";

d.      awarding the Trust all legal fees and expenses incurred as a result of the Bank's acts, omissions, and/or breaches of Lease, including the Trust's attorneys' fees and costs in defending this action and asserting its counterclaim;

e.      awarding the Trust such other relief as it deems just and proper.

275 WASHINGTON STREET CORP., as it is the Trustee of the WASHINGTON STREET REALTY TRUST II,

By its attorneys,


/s/ Martin F. Gaynor III
Martin F. Gaynor III, BBO No. 564384
Nicholas D. Stellakis, BBO No. 644981
COOLEY MANION JONES LLP
21 Custom House Street
Boston, MA  02110
(617) 737-3100
Email: mgaynor@cmjlaw.com

302765


## CERTIFICATE OF SERVICE

I hereby certify that the above document was filed through the ECF system for electronic service to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants (if any) on September 2, 2009.

/s/ Martin F. Gaynor III