THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| BANCO DO BRASIL, S.A.<br>　　Plaintiff,<br><br>v.<br><br>275 WASHINGTON STREET CORP.,<br>as it is the Trustee of the WASHINGTON<br>STREET REALTY TRUST II,<br>　　Defendant. | Civil Action No. 1:09-cv-11343 |

## AFFIDAVIT OF MILTON RODRIGUEZ, JR.
## IN SUPPORT OF BANCO DO BRASIL, S.A.'S MOTION FOR SUMMARY JUDGMENT

I, Milton Rodriguez, Jr., having been duly sworn, hereby depose and state as follows:

1. I am the Project Manager for the Federal Savings Bank related project of Banco do Brasil, S.A. ("Banco do Brasil").

2. I have personal knowledge of the facts described herein, which I believe to be true.

3. This Affidavit is being filed in support of Banco do Brasil's Motion for Summary Judgment.

4. Under the terms of the Lease, both the Landlord and Banco do Brasil have a unilateral right to terminate the Lease with the Landlord having the right to receive a termination payment equivalent to the rental value of the Premises for the time that the Premises had been off the market, and to move forward to re-let the premises. Landlord



specifically requested its own right to terminate on the same terms as were available to Banco do Brasil.

5. A termination pursuant to Section 6.5 by either Landlord or Banco do Brasil would not be without substantial cost to the Tenant.

6. The Lease sets forth a specific framework addressing defaults.

7. Pursuant to Section 18.1 of the Lease, a failure by the tenant to make monetary payments under the Lease within three business days of receiving a default notice from the Landlord constitutes an "Event of Default," but not a "Default." Banco do Brasil made the monetary payments claimed to be owing within three business days of its receipt of the July 16, 2009 letter from Landlord.

8. Section 18.2 of the Lease provides that upon the occurrence of an Event of Default, the Landlord may give written notice of default to the Tenant, which is only effective to terminate the Lease on the fifth day following the termination notice.

9. Thus, pursuant to Sections 18.1 and 18.2 of the Lease, the tenant has until the 5 day period under Section 18.2 within which to cure and avoid termination of the Lease. Landlord received payment of the amounts it claimed Banco do Brasil had not timely paid on July 21, 2009, 2 business days after the receipt of Landlord's July 16, 2009 letter.

10. The Landlord's July 16, 2009 Notice did not reference the 5 day period and did not allege a Landlord entry.

11. Ultimately, Banco do Brasil was unable to obtain Regulatory Approval within one year of the Lease's date, August 29, 2008. As a result, by letter dated August 31, 2009, Banco do Brasil exercised its option, pursuant to Section 6.5 of the Lease, to terminate the Lease effective October 31, 2009.

12. In accordance with Section 6.5 of the Lease, Banco do Brasil furnished its letter exercising the option to terminate accompanied by payment to the Landlord in the amount of $530,650.03, representing Banco do Brasil's "termination payment."

13. Banco do Brasil also enclosed a second check in the amount of $39,575.95 with its letter of August 31, 2009, which was intended to constitute payment of rent for September of 2009 (which would be owed even if the Landlord acknowledged the Section 6.5 termination and deposited Banco do Brasil's termination payment).

14. On September 9, 2009, the Landlord acknowledged receipt of Banco do Brasil's August 31, 2009 termination letter.

15. Although the Landlord expressed its disagreement with Banco do Brasil's position and "consider[ed] the conditions set forth in Banco do Brasil's August 31 letter to be of no effect," the Landlord indicated that it intended to deposit both payment checks furnished by Banco do Brasil.

16. By letter dated September 15, 2009, Banco do Brasil responded to the Landlord's September 9 letter, objecting to the Landlord's intention to negotiate the checks while disputing the validity of the Banco do Brasil's exercise of its early termination right.

17. Banco do Brasil undertook more than $11 million in contractual obligations and spent more than $5 million related to such obligations, in part to set up the FSB's corporate structure, hire personnel, acquire branch locations and equipment and pay professionals to assist in the Regulatory Approval process.

18. Banco do Brasil intended to, if possible, use the Premises as the Boston branch of a federal savings bank Banco do Brasil wished to establish.

19. Banco do Brasil paid the October 2009 rent to Landlord.

20. On October 28, 2009, Landlord proposed paying the Termination Payment into Court, pursuant to Local Rule 67.2(a)(1).

21. On or around September 10, 2007, Banco do Brasil filed for Financial Holding Company status.

22. After the Federal Deposit Insurance Corporation ("FDIC") returned the Bank's FDI application, as communicated in their letter to Banco do Brasil dated April 2, 2009, Banco do Brasil withdrew the Office of Thrift Supervision ("OTS") and the Federal Reserve System ("FRB") applications for the Banco do Brasil Federal Savings Bank ("FSB"), which could not be approved without the FDIC insurance.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 30th DAY OF OCTOBER, 2009.

_____
Milton Rodriguez, Jr.

## CERTIFICATE OF SERVICE

I, Eric F. Eisenberg, hereby certify that on this 30th day of October, 2009, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

_____