UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BANCO DO BRASIL, S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 09-11343-NMG |
| 275 WASHINGTON STREET CORP., | ) | |
| as it is the Trustee of the WASHINGTON | ) | |
| STREET REALTY TRUST II, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION ON
## BANCO DO BRASIL'S MOTION FOR SUMMARY JUDGMENT

September 7, 2010

DEIN, U.S.M.J.

## I.  INTRODUCTION

The plaintiff Banco do Brasil, S.A. (the "Bank"), as tenant, entered into a

commercial lease agreement with the defendant 275 Washington Street Corp., as Trustee

of the Washington Street Realty Trust II (the "Trust"), as landlord.  Both parties assert

that the lease has been terminated.  They disagree, however, as to whether the Trust

properly terminated the lease under its default and termination provisions due to the

Bank's failure to make a timely rent payment, or if the Bank properly terminated the lease

under an Early Termination provision due to the Bank's inability to obtain regulatory

approval to operate a branch office at the leased premises.  The Bank has different

obligations depending on the basis for the termination.

This matter is presently before the court on the Bank's Motion for Summary Judgment on Count I of its complaint and on the Trust's counterclaim.  (Docket No. 14). By this motion, the Bank is seeking a declaratory judgment in accordance with Count I of its complaint finding that the Trust's attempt to terminate the lease for non-payment of rent is null and void and that the Bank properly terminated the lease under its Early Termination provision.  In addition, the Bank is seeking judgment in its favor on the Trust's counterclaim by which the Trust claims that the Bank breached the lease and violated the covenant of good faith and fair dealing by not taking all necessary actions to obtain needed regulatory approvals.  The Trust contends that the lease was properly terminated for non-payment of rent, and that discovery is needed pursuant to Fed. R. Civ. P. 56(f) on the issue whether the Bank properly terminated the lease for lack of regulatory approval.

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Bank's motion be ALLOWED IN PART AND DENIED IN PART.  Specifically, this court recommends that a declaratory judgment be entered holding that the Trust's attempt to terminate the lease for non-payment is null and void as the breach was accidental and insignificant, and the Bank cured any untimely payment.  In addition, however, this court recommends that the Trust's Rule 56(f) request for discovery on the issue of the Bank's efforts to obtain regulatory approval be ALLOWED.  Accordingly, no declaratory judgment on the issue of the propriety of the

Bank's early termination efforts should be entered, and the Bank's motion for summary judgment on the Trust's counterclaim should be denied without prejudice.

## II.   STATEMENT OF FACTS[1]

The following facts are undisputed unless otherwise indicated.

The plaintiff Banco do Brasil (the "Bank" or the "Tenant") is a Brazilian bank affiliated with the Brazilian government.  (PR ¶ 2).  The defendant Trust (or "Landlord") is the trustee of Washington Street Realty Trust II, a Massachusetts realty trust based in Boston, Massachusetts, and is the record owner of the property located at 227-275 Washington Street, Boston, Massachusetts (the "Premises").  (PR ¶ 1; Lease at 1).

### The Lease

On August 29, 2008, after extensive negotiations between the parties, the Bank leased from the Trust, for a term of ten years, 4,742 square feet of office space located at 227-275 Washington Street in downtown Boston.  (Lease § 1.1; DF ¶¶ 3, 12).  The

---

[1]  The facts are derived from the following materials submitted by the parties: (1) Banco Do Brasil, S.A.'s Local Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment (Docket No. 16) ("PF"); (2) Defendant's Response to Plaintiff's Rule 56.1 Statement (Docket No. 24) ("DR"); (3) Defendant's Statement of Material Facts (Docket No. 24) ("DF"); and (4) Plaintiff Banco Do Brasil, S.A.'s Response to Defendant's Statement of Material Facts (Docket No. 29) ("PR").  In addition, and to the extent the information is not included in the above-referenced pleadings, the facts are derived from: (5) the Affidavit of Michael A. Hammer in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 26) ("Hammer Aff.") and Exhibits thereto ("Hammer Ex. __"); (6) the lease attached as Exhibit A to Plaintiff's Verified Complaint (Docket No. 1) ("Lease"); (7) the Affidavit of Counsel in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 27) ("Def. Aff.") and Exhibits thereto ("Def. Ex. __"); and (8) the Affidavit of Counsel in Support of Defendant's Sur-Reply in Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 38) ("Def. Sur-Reply Aff.") and Exhibits thereto ("Def. Sur-Reply Ex. __").

Premises were to be used as a "high quality, full service retail branch banking facility." (Lease § 1.1).  Both the Bank and the Trust were represented by experienced counsel in negotiating the lease, and in all related matters.  (DF ¶ 12; PR ¶ 12).  The disputes in this action arise out of the parties' relationship under the Lease.

## The Bank's Build-Out Obligations

As the Bank is a foreign entity, it was required to obtain regulatory approval from various U.S. agencies before opening and operating a branch in the United States as a federal savings bank.  (Lease § 3.2; DF ¶ 14).  Several provisions of the Lease relate to the Bank's need for regulatory approval.  For example, the term of the Lease was to begin when the Bank obtained regulatory approval, or opened for business, or on June 1, 2009, whichever came first.  (Lease § 3.2).  The Bank's obligation to build-out the leased premises was also tied into the granting of regulatory approval.  Thus, § 3.5 of the Lease provides that:

> Promptly after the demised premises are made ready for the Tenant's occupancy, the Tenant shall perform [build-out of the premises], and open for business as soon thereafter as possible. In the event the Tenant shall have failed to complete [build-out] and to have opened the demised premises for business within 120 days of obtaining Regulatory Approval, then all of the Tenant's charges shall nevertheless commence on the Commencement Date specified in this lease, except that minimum rent shall then commence and be payable at the rate of one-fifteenth (1/15th) of the monthly amount of the Tenant's initial minimum rent per day from and after the expiration of said 120 day period until the Tenant shall open for business.

(Lease § 3.5).  Pursuant to § 6.5 of the Lease which, as discussed infra, provided for the early termination of the Lease if regulatory approval was not obtained, the Bank was to

reimburse the Trust for "the cost to restore the demised premises to the condition it was delivered to Tenant on the Delivery Date" if the Lease was terminated pursuant to this provision.

Pursuant to § 19.3 of the Lease, entitled "Status Reports," the parties were to provide "a written statement of the status of any matter pertaining to the lease" to each other upon written request.  In an email dated January 13, 2009 updating the Trust "on the status of things for the . . . construction," the Bank represented that it had not "gotten the approvals yet," but had "selected the contractor," and was "finaliz[ing]" construction plans.  (Hammer Ex. E).  In a January 28, 2009 email to the Trust, the Bank stated that it had not yet begun construction, but that "its architects [were] moving forward with their contractor to file for the permits with Boston."  (Hammer Ex. F).  It is undisputed that the Bank did not build-out the leased premises.

The Trust contends that the Bank breached the Lease because it never began the build-out of the Premises.  It is the Bank's contention that there could not be a breach of the Lease due to a lack of build-out because regulatory approval to open the branch was never obtained.

### Obligation to Pay Rent

The parties agree that the Lease commenced on June 1, 2009.  (See Lease § 3.2; PF ¶ 22; DR ¶ 22).  The first rental payment was due on July 1, 2009.  (DR ¶¶ 21, 24; Lease § 3.2).  In addition, the Lease provided for a "late charge" if the rental payment

-5-

was not made in a timely manner.  Thus, § 4.1 of the Lease provides, in relevant part, that:

> [f]or and with respect to each installment of minimum rent that is not paid within three (3) business days after the date when due, the Tenant shall pay to the Landlord on demand, as additional rent, a late charge in an amount equal to one percent of the amount of such overdue payment for the purpose of defraying Landlord's administrative expenses relative to handling such overdue payment.

(Lease § 4.1).  The Lease also provided that taxes and operating expenses were payable under the Lease.  Such monetary payments "shall be deemed to be additional (but not minimum) rent, and in the event of non-payment thereof by the Tenant, the Landlord shall have all of the rights and remedies with respect thereto as would accrue to the Landlord for non-payment of minimum rent."  (Id. § 19.8).

As detailed below, the Bank did not make its rental payment by July 1, 2009 or within the three day grace period as provided for in § 4.1.  The issue in this case is whether the Trust could terminate the Lease for non-payment without giving the Bank notice and/or an opportunity to cure.  Article XVIII, entitled "Landlord's Remedies," lists, among others, the following which "shall be deemed an 'Event of Default'":

> A.  Failure on the part of the Tenant to make payment of minimum rent and other charges payable hereunder by the Tenant in equal monthly installments within three (3) business days (that is, for the purposes of this lease, non-holiday weekdays) after the due date, or failure on the part of the Tenant to make payment of any other monetary amount due under this lease within three (3) business days after the Landlord has sent to the Tenant and the Tenant has received written notice of such default (or delivery thereof in accordance with the notice provision of this lease has been unsuccessfully attempted).
>
> However, if: (i) the Landlord shall have sent to the Tenant a notice of such default, even though the same shall have been cured and this

lease not terminated; and (ii) during the same twelve (12) month period in which said notice of default has been sent by the Landlord to the Tenant, and the Tenant thereafter shall default twice more in any monetary payment - the second such additional default (and any further such additional default) shall be deemed to be an Event of Default upon the Landlord giving the Tenant written notice thereof, without the three (3) day grace period set forth above.

B.  With respect to a non-monetary default under this lease, failure of the Tenant to cure the same within the minimum time period reasonably required to cure the default after the Landlord has sent to the Tenant notice of such default....

However, if: (i) the Landlord shall have sent to the Tenant a notice of such default, even though the same shall have been cured and this lease not terminated; and (ii) during the same twelve (12) month period in which said notice of default has been sent by the Landlord to the Tenant, and the Tenant thereafter shall default twice more in any monetary payment - the second such additional default (and any further such additional default) shall be deemed to be an Event of Default upon the Landlord giving the Tenant written notice thereof, and the Tenant shall have no grace period within which to cure the same.

(Id. § 18.1).  It is the Bank's contention that it had 3 days after receiving notice of non-payment to pay the rent before being in default.  The Trust contends that the only grace period for rental payments is three days after rent was due, i.e., 3 business days after July 1, 2009, and that the Bank's failure to pay the rent by that date constituted an "Event of Default" under the Lease.

### Right to Cure

The Trust contends that there is no right to cure a default caused by the late payment of rent, while the Bank contends that such a right exists. Section 18.2 of the Lease provides, in relevant part, that:

> Should any Event of Default occur then ..., subject to applicable Massachusetts law, the Landlord lawfully may ..., immediately or at any time thereafter, and without demand or notice (and the Tenant hereby expressly waives any notice to quit possession of the desired premises), enter into and upon the demised premises or any part thereof in the name of the whole and repossess the same as of the Landlord's former estate, and expel the Tenant ... and/or the Landlord may send written notice to the Tenant terminating the term of this lease; and upon the first to occur of: (i) entry as aforesaid; or (ii) the fifth (5th) day following mailing of such notice of termination, the term of this lease shall terminate.

(Id. § 18.2). Section 18.3 of the Lease, among other things, creates post-termination obligations on the part of the Bank, including either the payment of regular installments of rent or damages calculated according to a specific formula, should the lease be terminated under Section 18.2. (Id. § 18.3).

### Early Termination

The Lease also provides for an early termination of the Lease by either party. Thus, § 6.5 states in relevant part:

> If Regulatory Approval has not been obtained within one (1) year from the date of this lease, then, subject to the following enumerated conditions, Landlord and Tenant each shall have the right to elect to terminate this lease by notice given to the other within sixty (60) days after the end of such one-year period and prior too obtaining Regulatory Approval.

-8-

(Lease § 6.5).  In the event of such early termination, the Bank remained liable for various payments.  (Id.).  However, that amount is significantly less than could be owed by the Bank if the Lease was properly terminated for non-payment.  At issue in this case is whether the Bank properly terminated the Lease pursuant to this provision.

### The Late Rental Payment

As noted above, § 6.5 of the Lease creates an early termination right for either party if regulatory approval was not obtained "within one (1) year from the date of this lease."  (Lease § 6.5; DF ¶ 6).  The Trust and the Bank met on May 27, 2009 to discuss the status of the Bank's regulatory approval, as well as the parties' rights and obligations under the lease.  (DF ¶ 29; PR ¶¶ 27-29).  At this meeting, the Bank informed the Trust that it had not obtained regulatory approval, that it did not anticipate obtaining regulatory approval by August 29, 2009, and that it intended to terminate the Lease under the early termination provisions of § 6.5.  (DF ¶ 30; PR ¶ 30).

Shortly thereafter, the Bank failed to make the first monthly payment of rent.  Specifically, the Bank did not make the rent payment due on July 1, 2009, nor did it make any payment within the next three business days, as referenced in § 18.1(A) of the Lease.  (DF ¶ 38, PR ¶ 38). On July 16, 2009, the Trust sent, via overnight courier, a letter notifying the Bank of its nonpayment of rent, and purporting to terminate the Lease.

(PR ¶ 39; Hammer Ex. O).[2]  No mention was made of the five day period before the termination would be effective as provided in § 18.2

The Bank sent the Trust a letter dated July 20, 2009, acknowledging receipt of the Trust's July 16, 2009 letter.  (PR ¶ 40; Hammer Ex. P).  In the July 20, 2009 letter, the Bank alleged that the nonpayment of rent was an inadvertent mistake, and claimed a right to cure the default within three business days of its receipt of notice.  (Id.).  Enclosed with this letter, the Bank sent the Trust a check for $40,030.40, the total amount of rent in arrears, plus fees and interest as specified by the Lease.  (DR ¶ 29-30; Hammer Ex. O).  The July 2009 rent payment was received by the Trust on July 21, 2009, the second business day after the Bank's receipt of the Landlord's July 16, 2009 letter.  (Id.; DF ¶ 41; PR ¶ 41).

On July 28, 2009, the Trust sent the Bank a letter confirming the receipt of the Bank's July 20, 2009 payment, but alleging once more that "the Trust ha[d] terminated the term of the Lease in accordance with Section 18.2," and purporting to deposit the check as payment on the Bank's post-termination obligations as specified in § 18.3 of the Lease.  (DR ¶ 36; PF ¶ 36; Def. Ex. J).  On July 31, 2009, the Trust received a check from the Bank in the amount of the minimum rent due for August 2009.  (DR ¶ 38; PF ¶ 38; Def. Ex. K).  On August 4, 2009, the Trust sent to the Bank a letter acknowledging receipt of the check, and maintaining once more that the Lease had been terminated due

---

[2]  Facts relating to whether the notice was sent in accordance with the Lease requirements are discussed below.

to the Bank's default, and that the Bank was responsible for post-termination payments under § 18.3 of the Lease.  (DR ¶ 39; PF ¶ 39; Def. Ex. K).

### The Bank's Purported Termination of the Lease

While the Trust was maintaining that the Lease had been terminated, the Bank took the position that any event of default caused by its inadvertent failure to pay rent had been cured.  However, as the Bank had forewarned the Landlord on May 27, 2009, it did not obtain regulatory approval within one year from the date of the Lease.  Therefore, on August 31, 2009, the Bank sent the Trust two checks along with a letter purporting to terminate the Lease pursuant to the early termination provision, § 6.5.  (PF ¶ 43-44, 46; DR ¶ 43-44, 46; Def. Ex. E).  In this letter, the Bank also stated that if the Trust deposited the first check, in the amount $530,650.03 – allegedly the amount of the Bank's post-termination obligation in the event of early termination under § 6.5 – it would be "agreeing that [the Bank] had the right to terminate the Lease pursuant to Section 6.5 of the Lease and has properly exercised that right . . . ."  (Id.).  A similar statement accompanied the second check, made out in the amount of $39,575.95, and which was intended to "constitute payment of September 2009 rent."  (Id.).

In a letter dated September 9, 2009, the Trust replied that it did not accept the Bank's termination under § 6.5 because it believed it previously had terminated the lease due to the Bank's late rent payment.  (PF ¶ 46-47; DR ¶ 46-47; Def. Ex. F).  The Bank responded on September 15, 2009 again claiming that the Trust could not negotiate the

check and then assert that the Lease had not been terminated.  (See DF ¶ 43; Def. Ex. L).

It appears that the checks have not been deposited by the Trust.

### Regulatory Approval[3]

In addition to claiming that the Bank could not terminate the Lease for failure to

obtain regulatory approval because the Trust had already terminated it, the Trust

challenges the Bank's contention that it had done all that was necessary under the Lease

to obtain regulatory approval.  The relevant facts are as follows.

The Bank claims it retained counsel, beginning in 2007, for the purpose of

obtaining regulatory approval from the Federal Reserve, the Office of Thrift Savings

("OTS"), and the FDIC for its Boston branch, as well as branches in New Jersey, Florida,

Connecticut, and New York.  (PF ¶ 50; Scott Aff. ¶¶ 7-14).  In March 2008, the Bank

submitted an application for regulatory approval to OTS.  (Def. Ex. I; Scott Aff. ¶ 19).

The Bank alleges it filed a concurrent application with the FDIC, and filed an application

with the Federal Reserve later that month.  (Scott Aff. ¶¶ 20-21).  The Bank further

alleges that, at a September 23, 2008 meeting attended by OTS and FDIC staff, "FDIC

staff strongly encouraged [the Bank] to withdraw the [FDIC] application."  (Scott Aff.

---

[3]  Many of the facts related to regulatory approval are disputed by the Trust, which has sought to take discovery pursuant to Fed. R. Civ. P. 56(f).  Information relating to these disputed claims is taken from the (1) Affidavit of Kathleen A. Scott (Docket No. 17) ("Scott Aff."), the (2) Affidavit of Milton Rodriguez, Jr. in Support of Banco Do Brasil, S.A.'s Motion for Summary Judgment (Docket No. 18) ("Rodriguez Aff."), and (3) Banco Do Brasil, S.A.'s Answer to Counterclaim (Docket No. 12) ("Pl.'s. Ans. to Countercl.").  The Trust disputes the assertions made in these Affidavits.  No discovery has yet occurred in this case.

¶ 24).  On September 26, 2008, the Bank communicated to the Trust that it was pursuing regulatory approval, and that it was seeking to obtain it "as soon as possible."  (Hammer Ex. B).  The Bank further alleges that, as a result of its discussions with regulators, it withdrew its application with the FDIC on October 1, 2008, and that it then filed new applications with the FDIC, OTS, and the Federal Reserve in January 2009.  (Scott Aff. ¶¶ 25-27).

Meanwhile, on October 20, 2008, in response to the Trust's requests for information regarding regulatory approval, the Bank notified the Trust that it was "still working on [obtaining regulatory approval] with the various regulators in an effort to get the approval as soon as possible," mentioning the "regulatory climate" as a possible source of delay.  (Hammer Ex. C; PR ¶ 18).  On December 2, 2008, in response to continued inquiries by the Trust, the Bank stated that "the bank has had to revise its application for the federal savings bank due to the changes in the mortgage market and responses from FDIC and OTS," and that the "revised submissions should be ready within the next week or so."  (Hammer Ex. D).  The Bank further stated that "Federal Reserve officials in NY have indicated that they have recommended to their head office that [the Bank's application] to the Fed be approved."  (Id.).

Beginning February 2009, the Trust requested a meeting with the Bank.  (Pl.'s Ans. to Countercl. ¶ 27).  No meeting was held until May 27, 2009, however, with the Bank repeatedly taking the position that the appropriate person who would participate in a meeting was unavailable.  (See Pl.'s Ans. to Countercl. ¶¶ 31, 32).  Meanwhile, the

Bank sent the Trust a letter from its regulatory counsel in March 2009 allegedly explaining the Bank's difficulties with the regulatory approval process.  (DF ¶ 26; PR ¶ 26).  This letter is not included in the record before this Court.  The Bank alleges that, in a March 26, 2009 conference call, the FDIC informed the Bank "that it was returning the deposit insurance application as incomplete" because of "concerns about [the Bank's] proposed business plan and products."  (Scott Aff. ¶¶ 28-29).  The Bank claims to have received a letter from the FDIC, dated April 2, 2009, "formally notifying [the Bank] that the application was being returned."  (Scott Aff. ¶ 30; Rodriguez Aff. ¶ 22).  The Bank alleges it withdrew its applications with OTS and the Federal Reserve after receiving the April 2, 2009 letter from the FDIC because "[those applications] could not be approved without FDIC insurance."  (Rodriguez Aff. ¶ 22).

The Bank and the Trust eventually agreed to meet on May 27, 2009 to discuss the status of regulatory approval.  (Hammer Exs. G-K).  The Trust alleges that, at the May 27, 2009 meeting, the Bank announced that it had "withdrawn its application from OTS." (DF ¶ 30).  The Bank "denies that it voluntarily withdrew applications seeking Regulatory Approval," and claims that the FDIC "had returned Banco's application . . . and suggested that Banco not resubmit [the application] at that time."  (PR ¶ 30).  After the May 27, 2009 meeting, the Trust requested disclosure of the FDIC letter the Bank had allegedly received.  (Hammer Ex. M).  The Bank has not disclosed the letter, but offered to allow limited disclosure of the letter subject to certain conditions.  (DF ¶ 32; Hammer

Exs. M, N).  The Bank "has not to date provided Washington Street with a copy of any letter it has received from the FDIC."  (Pl.'s Ans. to Countercl. ¶ 36).

Relying on news statements and other public documents, the Trust alleges that the Bank wilfully discontinued its applications for regulatory approval as a result of "a new business plan."  (DF ¶¶ 33-37).  The Bank denies these allegations.  (PR ¶¶ 33-37).  The Bank claims that it "undertook more than $11 million in contractual obligations and spent more than $5 million related to such obligations, in part . . . to assist in the Regulatory Approval process."  (Rodriguez Aff. ¶ 17).  Additionally, the Bank claims that it at all times complied with the requirements of the Lease's Status Report provision, § 19.3. (Pl.'s Ans. to Countercl. ¶ 21).

### The Lawsuit

On August 10, 2009, the Bank filed a complaint against the Trust seeking declaratory relief clarifying its rights and obligations under the Lease.  In particular, the Bank is seeking a declaration (1) that the Bank's late payment of the July 2009 rent is not an actionable "Event of Default" under the Lease; (2) that the Bank cured the default; (3) that the Trust's attempted termination of the Lease on July 16, 2009 is therefore ineffective; and (4) that the Lease remained in effect until the Bank terminated the Lease under § 6.5.  (Verified Compl. ¶ 35-40).  The Trust has filed a Counterclaim, alleging that the Bank breached the Lease and "the implied covenant of good faith and fair dealing by failing to use good-faith efforts to secure Regulatory Approval as described by the Lease."  (Countercl. ¶¶ 40, 45).  No discovery has been taken.  The Bank has moved for

summary judgment on its claim for declaratory judgment and on the Trust's counterclaim.

Additional facts will be provided below where appropriate.

## III.  ANALYSIS

### A.  Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The mere existence of *some* alleged factual dispute will not alone withstand an otherwise properly supported motion for summary judgment; rather, there must be genuine issues of material fact in dispute to defeat summary judgment.  See Sands v. Ridefilm Corp., 212 F.3d 657, 660-661 (1st Cir. 2000); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Tocci Bldg. Corp. v. Zurich Am. Ins. Co., 659 F. Supp. 2d 251, 256 (D. Mass. 2009) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation marks omitted).

-16-

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4-5 (1st Cir. 2010); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993) (citing Anderson, 477 U.S. at 256-57, 106 S. Ct. at 2514).  Moreover, in evaluating a motion for summary judgment, "the court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party."  Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Anderson, 477 U.S. at 255, 106 S. Ct. at 2513).  However, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation."  Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004).  "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate."  Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

Finally, as noted above, no discovery has been taken in this case.  The Trust contends that it needs discovery on the actions taken by the Bank in an effort to obtain regulatory approval and has moved for leave to take such discovery pursuant to Fed. R. Civ. P. 56(f).  Fed. R. Civ. P. 56(f) "comprises a procedural 'escape hatch' for a party who genuinely requires additional time to marshal 'facts essential to justify [its] opposi-

tion' when confronted by a summary judgment motion." <u>Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.</u>, 840 F.2d 985, 988 (1st Cir. 1988) (quoting <u>Herbert v. Wicklund</u>, 744 F.2d 218, 221 (1st Cir. 1984)).  These facts "must be foreseeably capable of breathing life into [the movant's] claim or defense." <u>Resolution Trust Corp. v. N. Bridge Assocs., Inc.</u>, 22 F.3d 1198, 1207 (1st Cir. 1998).  In considering the issue, "district courts should construe motions that invoke the rule generously, holding parties to the rule's spirit rather than its letter." <u>Id.</u> at 1203.  Refusal of summary judgment is appropriate "where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." <u>Anderson</u>, 477 U.S. at 250 n.5, 106 S. Ct. at 2511 n.5.

Applying these principles to the instant case, this court finds that summary judgment should enter in the Bank's favor on the issue whether the Trust properly terminated the Lease due to the Bank's late payment of rent.  However, the Trust's motion pursuant to Fed. R. Civ. P. 56(f) should be allowed, and the Trust should be given the opportunity to take discovery on the efforts undertaken by the Bank to obtain the necessary regulatory approvals.

### B. <u>Breach of the Lease Agreement - Obligation to Pay Rent</u>

The Trust contends that the Bank breached the Lease by failing to pay rent in a timely manner, and that the Bank was not entitled to cure this default.  As detailed below, this court agrees that pursuant to the Lease terms themselves, any grace period was limited to the 3 day period after July 1, 2009 and there was no right to cure.  However,

under well-established equitable principles applicable to commercial leases in

Massachusetts, the mistaken late payment does not support the termination of the Lease,

and the Bank was entitled to cure the default.

### Grace Period for Payment

The clear language of § 18.1(A) provides for two distinct types of default: the first

for failure to pay minimum rent and charges, which must be paid within 3 business days

after the due date, and the second for failure to pay "any other monetary amounts due

under this lease" which must be paid within 3 business days after "the Tenant has

received written notice of such default[.]"  (Lease § 18.1A).  The two types of defaults

are separated by an "or" and constitute different types of events.  Giving the clear and

unambiguous language of the Lease its ordinary meaning, the only logical conclusion that

an "Event of Default" occurs if minimum rent is not paid within 3 days after it is due.

The different treatment of non-payment events not only makes sense, but is

consistent with other provisions of the lease.  For example, § 19.8, entitled "Definition of

Additional Rent" clearly identifies taxes and operating expenses as monetary payments

which are "additional (but not minimum) rent[.]"  (Id. § 19.8).  Thus, the distinction in

§ 18.1A between the non-payment of minimum rent and the non-payment of "any other

monetary amount due under this lease" is consistent with the other Lease terms which

differentiate between minimum rent and other monetary obligations.  (Id. § 18.1A).

Moreover, unlike the Bank's obligation to pay minimum rent on a specific date

identified in the Lease, the obligation to pay an "other monetary amount" may be

triggered by a "statement, invoice or billing rendered by the Landlord[.]"  (See id. § 19.8).  Therefore, it is logical for them to have different grace periods, with the 3 day grace period for minimum rent to run from the fixed due date, and the 3 day grace period for additional monetary payments to run after a written notice of default.

The fact that the 3 day grace period runs from the date minimum rent was due is also made clear in § 4.1 of the Lease which defines minimum rent.  As that provision states, the "Tenant covenants and agrees to pay without notice, demand or offset to the Landlord" the minimum rent provided for in the Lease.  (Id. § 4.1).  Late charges are to be paid "to the Landlord on demand" for "each installment of minimum rent that is not paid within three (3) business days after the date when due[.]"  (Id.).  There is no mention in § 4.1 of a grace period which is triggered by a notice: rather it is set to run after the fixed due date for the rental payments.  In sum, the Bank's failure to pay the rent within 3 business days after July 1, 2009 constituted an "event of default" under § 18.1 of the Lease.  Therefore, the issue is whether the Bank had a right to cure the default after the three day period had expired.

## **Contractual Right to Cure**

A review of the Lease provisions also compels the conclusion that there is no contractual right to cure a default for non-payment of rent.  While the Landlord may elect to accept a late payment (see § 4.1), it was not obligated to do so.

Pursuant to § 18.2 of the Lease, following an Event of Default the Landlord may, "subject to applicable Massachusetts law," immediately enter and repossess the premises

or send a written notice of termination.  The Lease would then be terminated upon the earlier of entry onto the premises or the 5th day following mailing of the termination notice.  (Id.).  It is well established that a contractual provision providing for entry to terminate a lease, without notice to the tenant, is lawful and enforceable.  See, e.g., Zevitas v. Adams, 276 Mass. 307, 313-14, 177 N.E. 114, 117 (1931).

The Bank argues that the fact that the termination of the Lease was not effective until the 5th day following the mailing of the termination notice constitutes a grace period for the payment of rent.  This argument is not persuasive.  From the context of the provision it is clear that the 5 days is intended to give the tenant time to vacate the premises.  Termination is effective "upon the first to occur" – entry or 5 days after mailing.  It is undisputed that entry can be immediate upon default, without a right to cure.  A right to cure cannot simply be read into the provision allowing for termination by means of a written notice.  See Berman v. B.C. Assoc., 219 F.3d 48, 51 (1st Cir. 2000) (courts must "enforce the contract as written and are not free to revise or change it") (internal quotation omitted).  Thus, there is no right to cure under the Lease.

## Statutory Right to Cure

The Massachusetts statutes also do not provide a right to cure in the instant case.

Mass. Gen. Laws ch. 186, § 11A provides:

> Upon the neglect or refusal by the tenant to pay the rent due under a written lease of premises for other than dwelling purposes, the landlord shall be entitled to terminate the lease either (i) in accordance with the provisions of the lease or (ii) in the absence of such lease provisions, by at least fourteen days notice to quit, given

in writing to the tenant. <u>If a landlord terminates the lease by at least
fourteen days notice pursuant to clause (ii) of the preceding
sentence, the tenant shall be entitled to cure</u> on or before the day
the answer is due in any action by the landlord to recover possession
of the premises, by paying or tendering to the landlord or to his
attorney all rent then due, with interest and costs of such action.
<u>The right to cure provided herein, shall apply only to termination
pursuant to clause (ii) and shall not apply to termination in
accordance with the provisions of the lease.</u>

(Emphasis added). Thus, the statute entitles the landlord to terminate a lease with a

fourteen day notice to quit, along with a right to cure, but only "absent lease provisions

addressing the topic[.]" <u>Rockport Schooner Co., Inc. v. Rockport Whale Watch Corp.</u>, 58

Mass. App. Ct. 910, 910, 789 N.E.2d 151, 152 (2003). Since the Lease in the instant

case includes a termination provision, the statute has no application.[4]

## **<u>Equitable Right to Cure</u>**

The Landlord's rights following an event of default are "subject to applicable

Massachusetts law[.]" (Lease § 18.2). Consequently, despite the absence of a right to

cure in the Lease, under the undisputed facts of this case such a right will be implied. As

an initial matter, "Massachusetts case law disfavors forfeitures in landlord/tenant cases."

---

[4] During oral argument the Bank referred to Mass. Gen. Laws ch. 232A, § 1 which
provides, in part, that "[t]he payment or tender of payment of the whole amount due on a contract
for the payment of money after it is due and payable and before action is commenced shall, if
pleaded, have the same effect as if made at the time provided in the contract." This statute is
inapplicable to the instant case in light of the after-enacted ch. 186, § 11A, which specifically
addresses a right to cure in commercial leases. "The explicit terms of a later specific statute
supersede those of an earlier general one." <u>Case of Dalbec</u>, 69 Mass. App. Ct. 306, 316 n.10, 867
N.E.2d 792, 799 n.10 (2007), and cases cited. Moreover, the Bank has not addressed this
argument in its pleadings, and it is waived. <u>See</u> <u>United States v. Pulido</u>, 566 F.3d 52, 60 n.4 (1st
Cir. 2009) (argument raised for first time at oral argument deemed waived), and cases cited.

In re 29 Newbury St., Inc., 856 F.2d 424, 427 (1st Cir. 1988), and cases cited.  Therefore, as the court explained in DiBella v. Fiumara, 63 Mass. App. Ct. 640, 828 N.E.2d 534 (2005), "[i]f the breach is insignificant or accidental, even if there is a default clause, our courts will not allow termination."  Id. at 644, 828 N.E.2d at 538, and cases cited.  The "accidental failure to pay rent on time" is such an insignificant or accidental breach that it will not support the termination of a lease.  Id. (citing Judkins v. Charette, 255 Mass. 76, 82-83, 151 N.E. 81, 83 (1926) (noting that failure to pay rent, even if wilful, is not a ground for forfeiture)).  Massachusetts joins with "nearly all courts [which] hold that, regardless of the language of the lease, to justify forfeiture, the breach must be 'material,' 'serious,' or substantial.' . . . Forfeiture for a trivial or immaterial breach of a commercial lease should not be enforced."  Found. Dev. Corp. v. Loehmann's, Inc., 163 Ariz. 438, 445-46, 788 P.2d 1189, 1196-97 (1990) (internal punctuation omitted), cited with approval in DiBella, 63 Mass. App. Ct. at 644 n.6, 828 N.E.2d at 538 n.6.

In the instant case, the Bank paid the outstanding rent, plus late charges, immediately upon learning of its failure to pay the rent.  The Trust was not harmed by the delay in payment.  The facts establish that the inadvertent failure to pay rent in a timely manner was insignificant and accidental as a matter of law.  Therefore, the termination provision of the Lease should not be enforced.

The Trust argues that this case is different because the Bank did not intend to stay in the property but, rather, had already indicated its intention to terminate the Lease under the early termination provision.  This argument is without merit.  Fundamentally, the

Trust was not harmed by the few-week delay in receiving the rent payment.  The parties

negotiated an early termination provision in light of the need for regulatory approval.

The risks inherent in obtaining regulatory approval were not affected by the payment of

rent in a timely or untimely manner.  The Bank should not be foreclosed from exercising

its right to early termination due to an immaterial mistake, and the Trust is not entitled to

a windfall because of the Bank's error.  Under the facts of this case, the Trust's attempt to

terminate the Lease was ineffective, and a declaratory judgment in favor of the Bank

should enter to this effect on Count I of its complaint.  See also Howard D. Johnson Co.

v. Madigan, 361 Mass. 454, 456-58, 280 N.E.2d 689, 691-92 (1972) (refusing to allow

termination where tenant failed to submit gross sales figures needed to establish rent in a

timely and complete manner but cured the default and landlord suffered no harm); ENO

Sys., Inc. v. ENO, 311 Mass. 334, 338, 41 N.E.2d 17, 19 (1942) (''Relief against

forfeiture has been granted although a lessee has failed to pay rent at the times and in the

manner designated by the lease and even if such failure has been wilful and intentional

. . . ."); HealthSouth Corp. v. HRSE1 Props. Trust, No. 200404345, 2005 WL 2864247,

at *5 (Mass. Super. Ct. Sept. 25, 2005) ("If a breach is insignificant or accidental, that

breach may not serve as grounds for termination of the lease, regardless of whether the

parties negotiated for and included a default clause in the lease.").

### Sufficiency of Notice

The Bank further contends that the Trust's attempt to terminate the Lease was

ineffective due to a failure to give the notice required by the Lease.  This issue does not

need to be addressed in light of this court's conclusion that the termination notice should

be deemed null and void for equitable reasons.  If this issue is reached, however, this

court finds that the notice was technically sufficient.

Section 19.15 of the Lease, entitled "Notices" provides in part:

> Whenever by terms of his lease notice, demand, or other communi-
> cation shall or may be given either to the Landlord or to the Tenant,
> the same shall be in writing and <u>shall be sent by registered or
> certified mail</u>, postage prepaid, or <u>shall be delivered by a recognized
> overnight, common express carrier</u>, express charges paid by sender
> for next morning delivery:
>
> ....
>
> if intended for the Tenant, addressed to it <u>at the address set forth
> on the first page of this lease</u> (email: bernardorothe@bb.com.br)
> and a copy thereof address to the Tenant, sent by mail or carrier,
> shall be sent to the Tenant c/o Peter D. Aufrichtig, Aufrichtig &
> Auftichtig, P.C., 300 East 42nd St., 5th Floor, New York, NY
> 10017 (email: peter@asape.com) (or to such other address or
> addresses as may from time to time hereafter be designated by
> the Tenant by like notice).
>
> Each such notice <u>shall be effective upon delivery or attempted
> delivery by the postal service or such overnight express carrier </u>at the
> address of the party for whom intended set forth above or theretofore
> established pursuant to the foregoing....

(Lease § 19.15) (emphasis added).  "[T]he address set forth on the first page of [the]

lease" is the Tenant's "present mailing address," which is listed as:

> 265 Washington Street, Boston, Massachusetts 02108; and, prior to
> the Delivery Date, 600 Fifth Avenue, 3rd Floor, New York, New
> York 10020.

(<u>Id.</u> § 1.1(b)).  Finally, the termination provision, as noted above, provides that "the

Landlord may send written notice to the Tenant terminating the term of this lease" which

will terminate the lease on "the fifth (5th) day following <u>mailing</u> of such notice[.]"  (<u>Id.</u> § 18.2) (emphasis added).

In the instant case, the Bank objects that it did not receive the notice at any email address, although it concedes that notice was mailed in accordance with the provisions of the Lease and that it received the written notice.  This court recognizes that, to be effective, the notice had to comport with the requirements of the Lease.  <u>See</u> <u>In re Everest Crossing, LLC</u>, 416 B.R. 361, 364 (D. Mass. 2009) ("The Landlord was entitled to terminate the Lease in accordance with the provisions of the Lease, but to do so the Landlord was required to follow the procedures stated in the Lease . . . .").  Here, however, the Lease required that, to be effective, the notice had to be in a hard copy and either mailed or delivered.  Notice by email was irrelevant to the validity of the notice, thus making it apparent that the email addresses were simply provided for convenience. Consequently, the Trust's failure to send email notice of termination did not affect the validity of the termination notice.

### C.    Breach of the Lease Agreement - Build-Out Obligation

The Trust also claims that the Bank breached Section 3.5 of the Lease by failing to "begin build-out of the Premises '[p]romptly' after the premises were made ready for it, even if that was before the Bank received regulatory approval."  (Def.'s Mem. at 18; DF ¶ 20).[5]  The Trust argues that the premises were "made ready" for the Bank shortly after

---

[5]  It is unclear whether the Trust is claiming that the "breach" caused by the failure to build-out is an independent grounds for terminating the Lease or is a reason why equity should

execution of the Lease, and that the Bank should have begun build-out soon thereafter.

(Id.).  However, the Lease does not provide for any benchmarks in construction, and does

not impose any penalties if construction is not begun on a specific date.  The only time

that the status of construction becomes significant under the Lease is if the build-out was

not completed "120 days after obtaining regulatory approval."  (Lease § 3.5).  If that were

to occur, the Lease provides how much rent and other charges the Bank would have to

pay.  (Id.).  Therefore, the failure to begin the build-out is irrelevant unless it was not

completed in a timely manner.  The Bank's failure to begin the build-out at any given

time does not constitute a breach of the Lease.

   This court notes that the Lease also provides that if regulatory approval was not

obtained and the Lease was terminated as a result, the Bank would have to Pay to the

Landlord "the cost to restore the demised premises to the condition it was delivered to

Tenant on the Delivery Date[.]"  (Id. § 6.5).  It makes no sense to charge the Bank with a

default for failure to undertake construction which would, in any event, have to be

undone if and when the lease was terminated.  In short, the status of the build-out is not

relevant to the issue before this court, i.e., whether the Lease could properly be

terminated by either party.

---

allow the Trust to terminate the Lease.  There is no evidence that the Trust gave the Bank notice
of an intent to terminate for this reason.  Under § 18.1(B) of the Lease, the Landlord would have
to give the Bank written notice and an opportunity to cure such a "non-monetary default."  (See
Def.'s Opp. (Docket No. 23) at 3 ("the Trust did not act on the breach [for failure to begin the
build-out] on the belief that the Bank was acting in good faith prosecuting its application for
Regulatory Approval.")).

### D.      The Validity of the Bank's Purported Early Termination

Assuming, as this court has concluded, that the Lease could not be terminated for non-payment, the Trust contends that the Bank's early termination notice was invalid because the Bank did not take all necessary actions to obtain regulatory approval, and because the Bank did not fulfill the Lease's requirements for early termination by making an unequivocal payment of rent.  As detailed herein, this court concludes that the Trust's request pursuant to Fed. R. Civ. P. 56(f) for discovery about these issues should be allowed.

### Implied Obligation of Good Faith and Fair Dealing

"Every contract implies good faith and fair dealing between the parties to it.  The implied covenant of good faith and fair dealing provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471, 583 N.E.2d 806, 820 (1991) (internal punctuation, citations and quotation omitted).  See also Liss v. Studeny, 450 Mass. 473, 477, 879 N.E.2d 676, 680 (2008).  "A party may breach the covenant of good faith and fair dealing implicit in every contract without breaching any express term of that contract."  Speakman v. Allmerical Fin. Life Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005).  However, because "[t]he requirement of good faith performance is . . . circumscribed by the obligations of the contract . . . the covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship."  Id.  "Nor does the covenant

apply where the defendant has exercised an express contractual power in good faith --
that is, in a manner that comports with the parties' reasonable expectations as to
performance." Id., and cases cited.

When a contract calls for a party to obtain government approval, "that party has an
obligation to make the necessary applications in a reasonable effort to obtain the required
approval." Trans Canada Power Mkt. Ltd. v. Narragansett Elec. Co., 542 F. Supp. 2d
127, 135 (D. Mass. 2008).  See also Sechrest v. Safiol, 383 Mass. 568, 571-72, 419
N.E.2d 1384, 1385 (1981) (purchase and sale agreement allows for termination if
necessary approvals are not obtained.  "Necessarily implied in the provision is an
obligation to use reasonable efforts to obtain town approval.").  In the instant case, the
Lease's implied obligation of good faith and fair dealing required the Bank to use
reasonable efforts to obtain the required regulatory approvals to open the bank branch.

This court finds that the Bank has not met its burden of establishing that there are
no genuine issues of material fact relating to its failure to obtain regulatory approval.  It
has not fully disclosed the evidence relating to why its application with the FDIC was
denied,[6] why it withdrew its other applications, nor why it did not re-apply.  In particular,
but without limitation, the Bank has not even disclosed the April 2, 2009 letter from the

---

[6] For example, the Trust has alleged that the Bank informed it, through counsel, that the
initial application was returned because it "had not included its pension plan ... as a 'control party'
in its application, as [the Bank] was required to do[.]"  (Countercl. ¶ 30).  The Bank, however,
has maintained that its application was first returned due to the FDIC's "numerous questions"
about Banco's "proposed business plan."  (PF ¶ 66).

FDIC, upon which it bases its claims that regulatory approval would have been unavailing.  (DF ¶ 32; PR ¶ 32).  The Bank maintains that the letter has not been disclosed because it contains "statements by the FDIC which Banco believed were incorrect" as well as confidential and other information that "Banco believed the FDIC did not wish to become public."  (Pl.'s Opp. (Docket No. 39) at 3).  While the Bank has offered to produce the letter for the court's *in camera* review, this would not be sufficient since the court does not have enough information to evaluate the letter in context.  While the details of regulatory approval are undoubtedly known to the Bank, they have not been included in the summary judgment record.  The present record is therefore not clear enough for this court to determine whether the circumstances under which the Bank sought regulatory approval satisfied its obligations under the Lease.

### The Need for Discovery

The Trust has raised sufficient facts to require discovery on the issue of the Bank's efforts to obtain regulatory approval.  For example, but without limitation, the Trust has cited to a number of published statements indicating that the Bank had a new business model which was based on acquiring existing banks instead of opening new ones.  (See, e.g., DF 33-37; Def. Sur-Reply Ex. C).  In addition, it has pointed out a number of seeming inconsistencies in the information provided by the Bank as to the progress of its applications, and has raised a number of questions about the sufficiency of the general information the Bank has provided to the court.  (See, e.g., Def.'s Opp. (Docket No. 23) at 2-5, 19-20).  No discovery has been taken to date.  The Trust should be permitted to

explore the veracity of the information the Bank has submitted, and to develop additional facts on the critical issue whether the Bank fulfilled its obligation of good faith and fair dealing in seeking the necessary regulatory approval to open the bank.

### Sufficiency of the Early Termination Notice

The Trust also contends that the Bank did not properly exercise the early termination provision because it required that the Trust waive its claim that the Trust had previously terminated the Lease before cashing the Bank's early termination payments. (See Def's Opp. (Docket No. 23) at 20-23). In contrast, the Bank asserts that its letters and statements accompanying the checks "did not constitute a condition which Banco sought to place upon Landlord's acceptance of the Termination Payment." (Pl. Opp. (Docket No. 39) at 16). It is clear that the early termination provision must be "enforced according to its terms." Loitherstein v. IBM Corp., 11 Mass. App. Ct. 91, 94, 413 N.E.2d 1149, 1148-49 (1980). In light of the fact that further discovery is to take place in connection with the issue of the Bank's effort to obtain regulatory approval, this court recommends that the parties be allowed to further develop the factual record related to the events surrounding the Bank's early termination notice and related payments as well.

### IV.  CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Bank's motion for summary judgment (Docket No. 14) be ALLOWED IN PART AND DENIED IN PART. Specifically, this court recommends that a declaratory judgment be entered holding that the Trust's attempt to

terminate the lease for non-payment is null and void as the breach was accidental and insignificant, and the Bank cured any untimely payment. In addition, however, this court recommends that the Trust's Rule 56(f) request for discovery on the issue of the Bank's efforts to obtain regulatory approval be ALLOWED. Accordingly, no declaratory judgment on the issue of the propriety of the Bank's early termination efforts should be entered, and the Bank's motion for summary judgment on the Trust's counterclaim should be denied without prejudice.[7]

    / s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge

---

[7]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).