THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| BANCO DO BRASIL, S.A. )<br><br>Plaintiff, )<br><br>v. )<br><br>275 Washington Street Corp., )<br>as it is the Trustee of the WASHINGTON )<br>STREET REALTY TRUST II, )<br><br>Defendant. )<br>_____ ) | Civil Action No. 1:09-cv-11343-NMG |

### AFFIDAVIT OF CHARLES G. BERRY IN OPPOSITION TO MOTION OF DEFENDANT / PLAINTIFF-IN-COUNTERCLAIM TO COMPEL PRODUCTION OF PRIVILEGED DOCUMENTS

I, Charles G. Berry, having been duly sworn, hereby depose and state as follows:

1.      I am a member of the firm of Arnold & Porter LLP and attorney *pro hac vice* for Plaintiff / Defendant-in-Counterclaim, Banco do Brasil (the "Bank"). I submit this affidavit in opposition to the motion of Defendant / Plaintiff-in-Counterclaim, 275 Washington Street Corp., as it is the Trustee of the Washington Street Realty Trust II (the "Landlord") to compel production by the Bank of attorney-client privileged documents relating to its efforts to obtain regulatory approval for its planned *de novo* Federal Savings Bank (FSB) project.

2.      I have personal knowledge of the facts set forth herein, which I believe to be true.

3.      Attached as Exhibit ("Ex.") 1 hereto is a copy of the Landlord's Answer and Counterclaim, dated September 2, 2009.

4.      Attached as Ex. 2 is a copy of the Bank's Answer to Counterclaim, dated September 25, 2009.

5.      Attached as Ex. 3 is a copy of the Report and Recommendation of Chief Magistrate Judge Dein, filed September 7, 2010, allowing the Bank's motion for summary judgment in part and denying it in part without prejudice to renewal and allowing the Landlord's request for Rule 54(f) discovery on the issue of whether the Bank pursued regulatory approval of its Federal Savings Bank project in good faith.

6.      As noted in the Landlord's motion to compel, it served document requests on October 1, 2010 (copy attached to Defendant's Memorandum of Law dated May 25, 2011 ("Def. Mem.") as Ex. B), and the Bank served responses and objections on December 10, 2010, objecting to producing documents covered by the attorney-client privilege (*id.* Ex. C).

7.      The Bank made an initial production of documents on December 10, 2010 and a more substantial production on March 8, 2011, one day after the Court entered a stipulated protective order.  The latter production included most of the applications filed with the regulators and correspondence exchanged with them.  The Bank continued document production on a rolling basis, producing documents in several installments, so that upon substantial completion last month more than 90,000 pages had been produced.

8.      The Bank prepared and produced to the Landlord two privilege logs:  the first, served March 14, 2011 listed 851 documents (*id.* Ex. D); the second, served May 31, 2011, consists of 1,103 pages and lists 15,230 privileged documents.  Because of the large size of the second log, we attach only the first and last pages thereof, to show its scope and manner of presentation (Ex. 4).  A full copy will be furnished to the Court if needed.

9.      Attached as Ex. 5 is a copy of a letter dated April 29, 2011 in which the Landlord's counsel raised for the first time the contention that the Bank waived the attorney-

client privilege of its communications with its attorney, Kathleen A. Scott, concerning the Bank's efforts to obtain Regulatory Approval.

        10.    I respectfully submit that the Landlord's motion to compel production of attorney-client privileged documents be denied in its entirety.

SIGNED UNDER THE PENALTIES OF PERJURY ON JUNE _10_, 2011.

                                                               CHARLES G. BERRY

<u>CERTIFICATE OF SERVICE</u>

I, Eric F. Eisenberg, hereby certify that on this 10th day of June, 2011, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

**EXHIBIT 1**

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| BANCO DO BRASIL, S.A., <br>     Plaintiff, <br><br> v. <br><br> 275 WASHINGTON STREET CORP., <br> as it is the Trustee of the WASHINGTON <br> STREET REALTY TRUST II, <br>     Defendant. | ) <br> ) <br> ) <br> )   Civil Action No. 1:09-cv-11343-NMG <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## ANSWER AND COUNTERCLAIM OF
## 275 WASHINGTON STREET CORP.

Pursuant to Fed. R. Civ. P. 8, Defendant 275 Washington Street Corp., as Trustee of the Washington Street Realty Trust II ("the Trust") responds to the numbered paragraphs of the Declaratory Judgment Complaint filed by Plaintiff Banco do Brasil, S.A. ("Bank") as follows:

1.    The Trust admits that the Bank has represented itself to be a Brazilian corporation but is without information sufficient to admit or deny the remaining allegations of this paragraph.

2.    Admitted, except for the allegation that the declaration of trust has been amended, which allegation is denied.

3.    This paragraph contains conclusions of law and not allegations of fact to which a response is required.  To the extent a response is required, the Trust admits that this Court has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332, and is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, if any, and therefore denies them.  The Trust specifically denies that the Bank is entitled to the relief it seeks.

4.      Paragraph 4 contains a description of the declaratory relief sought by the Bank to which no response of the Trust is required. To the extent that Paragraph 4 may be construed to contain factual allegations which require a response, the allegations are denied.

5.      The Trust admits that the term of the Lease has been terminated, that the Bank is without power to exercise the so-called "early termination option," and that the amount in controversy exceeds $75,000. The remaining allegations contained in this paragraph purport to characterize a document and require no answer, but the Trust denies these remaining allegations to the extent they are contrary to or inconsistent with the document they purport to characterize.

6.      The Trust admits that the parties entered into a lease on or about August 29, 2008, and that Exhibit A to the complaint is a true and correct copy of that lease. The remaining allegations contained in this paragraph purport to characterize a document and require no answer, but the Trust denies these remaining allegations to the extent they are contrary to or inconsistent with the document they purport to characterize.

7.      This paragraph purports to characterize and quote from a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with, or to the extent they misquote, that document. The Trust denies all other factual allegations that may be contained in this paragraph.

8.      This paragraph purports to characterize and quote from a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with, or to the extent they misquote, that document.

9.      This paragraph purports to characterize a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with that document.

10.    This paragraph purports to characterize a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with that document.

11.    The Trust is without sufficient information to admit or deny the allegations contained in this paragraph and, consequently, denies them.

12.    Denied.

13.    This paragraph purports to characterize and quote from a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with, or to the extent they misquote, that document.

14.    This paragraph purports to characterize and quote from a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with, or to the extent they misquote, that document.

15.    This paragraph purports to characterize and quote from a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with, or to the extent they misquote, that document.

16.    The Trust admits that the Bank paid the first month's rent at or near the time the Lease was executed, but the Trust is without sufficient information to admit or deny the remaining allegations contained in the first sentence of this paragraph and, consequently, denies them. The Trust admits that a rental payment was due on July 1, 2009, and that Plaintiff failed to timely make that payment. To the extent that this paragraph purports to characterize the Lease, the Trust answers that the Lease is a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with the Lease. The Trust denies the remaining allegations contained in this paragraph.

3

17.     Admitted.

18.     The Trust lacks sufficient information to admit or deny this allegation and, consequently, this allegation is denied.

19.     The first sentence of this paragraph purports to characterize a document that speaks for itself, and the Trust denies such allegations to the extent they are inconsistent with or mischaracterize that document.  The Trust lacks sufficient information to admit or deny the remaining allegations contained in the first sentence of this paragraph and, consequently, these allegations are denied.  The Trust admits that exhibit B is a true and correct copy of a letter dated July 16, 2009.

20.     The Trust admits the allegations contained in this paragraph but denies that they have any relevance.

21.     The Trust lacks sufficient information to admit or deny the allegations contained in this paragraph and, consequently, those allegations are denied.

22.     The Trust admits that it received a payment on July 21, 2009, in the amount of the check reproduced as exhibit C.  The Trust is without sufficient information to admit or deny the remaining allegations contained in this paragraph and, consequently, those allegations are denied.

23.     The Trust admits that it received the letter attached as exhibit D.  The letter is a document that speaks for itself, and the Trust denies the allegations contained in this paragraph to the extent they are inconsistent with or mischaracterize that document.  The Trust denies any other allegations that may be contained in this paragraph.

4

24.     This paragraph purports to characterize a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with that document.

25.     This paragraph purports to characterize a document that speaks for itself, and the Trust denies all allegations contained in this paragraph to the extent they are contrary to or inconsistent with that document.

26.     The Trust admits that the listed individuals, and others, attended a meeting at the Bank's New York office on May 27, 2009, and that the Bank for the first time informed the Trust that it did not intend to pursue Regulatory Approval any further. The Trust is without sufficient information to admit or deny the remaining allegations contained in this paragraph and, consequently, denies them.

27.     The Trust admits that it, through counsel, sent a letter dated July 28, 2009, and that exhibit E is a true and complete copy of that letter. The letter is a document that speaks for itself, and the Trust denies the allegations contained in the second sentence of this paragraph to the extent they are contrary to or inconsistent with that document. The Trust denies the remaining allegations contained in this paragraph.

28.     The allegations contained in this paragraph purport to characterize a document that speaks for itself, and the Trust denies those allegations to the extent they are contrary to or inconsistent with that document.

29.     The allegations contained in this paragraph purport to characterize a document that speaks for itself, and the Trust denies those allegations to the extent they are contrary to or inconsistent with that document.

30.     The Trust admits that it received a check in the amount of the check reproduced as exhibit F, but the Trust is without sufficient information to admit or deny the remaining allegations contained in this paragraph and, consequently, those allegations are denied.

31.     The allegations contained in this paragraph purport to characterize a document that speaks for itself, and the Trust denies the allegations to the extent they are contrary to or inconsistent with the document they purport to characterize.

32.     The Trust admits that it, through counsel, sent the August 4, 2009, letter by electronic mail and federal express delivery but denies all other allegations contained in this paragraph.

33.     Paragraph 33 consists of a conclusion of law that requires no answer.  To the extent that Paragraph 33 purports to allege facts, the allegations are denied.

34.     The Trust repeats its responses to the allegations contained in paragraphs 1 through 33 of the Verified Complaint and, by this reference, incorporates them herein.

35.     Paragraph 35 consists of a conclusion of law that requires no answer.  To the extent that Paragraph 35 purports to allege facts, the allegations are denied.

36.     Paragraph 36 consists of a conclusion of law that requires no answer.  To the extent that Paragraph 36 purports to allege facts, the allegations are denied.

37.     The Trust is without sufficient information to admit or deny the allegations contained in this paragraph and, consequently, those allegations are denied.

38.     The Trust is without sufficient information to admit or deny the allegations contained in this paragraph and, consequently, those allegations are denied.

39.     Paragraph 39 consists of a conclusion of law that requires no answer.  To the extent that Paragraph 39 purports to allege facts, the allegations are denied.



40.     Denied.

The remainder of the Verified Complaint consists of Prayers for Relief that require no answer. To the extent a response is required, the allegations are denied.

## DEFENSES

The Trust hereby raises these defenses and reserves the right to bring any and all other defenses. The Trust does not assume the burden of proof on any of these defenses unless required to do so by substantive law.

### First Defense

With respect to each and every Count of the Bank's Verified Complaint, the Bank has failed to state a claim for which relief may be granted.

### Second Defense

The Bank's claims are or may be barred in whole or in part by the doctrine of waiver.

### Third Defense

If the Bank has suffered any damages, which the Trust denies, its claims for relief are barred because such damages are a result of the Bank's own conduct.

### Fourth Defense

The Bank's claims are or may be barred in whole or in part because the Bank failed to use good-faith and reasonable efforts to secure the "Regulatory Approval" contemplated under the terms of the Lease.

The Trust reserves the right to assert additional defenses that may become available or apparent during the discovery proceedings in this matter.

WHEREFORE, the Trust requests that this Court:

a.     enter judgment in the Trust's favor on all counts of the Verified Complaint and enter a declaration that the Bank is not entitled to terminate the Lease pursuant to Section 6.5;

b.     award the Trust its attorneys' fees and costs of defending this action; and

c.     grant the Trust such other and further relief as this Court deems just and proper.

## COUNTERCLAIM

Defendant/Plaintiff-in-Counterclaim, 275 Washington Street Corp., as Trustee of the Washington Street Realty Trust II, by and through counsel, hereby states the following counterclaims against Banco do Brasil, S.A. (the "Bank").  Plaintiff-in-Counterclaim is referred to herein as the "Trust."

### NATURE OF THE ACTION

1.     This is a counterclaim for a declaratory judgment relating to the parties' respective rights and obligations under a lease entered into by the parties effective August 29, 2008 (the "Lease") and for breach of the Lease.  The Trust is entitled to and has terminated the Lease, and the Bank is liable for the full amount of the damages it agreed to in the Lease.

### PARTIES AND JURISDICTION

2.     275 Washington Street Corporation is a Massachusetts corporation with its principal place of business in Boston, Massachusetts, and it brings this counterclaim in its capacity as sole trustee of the Washington Street Realty Trust II, the record owner of the property located at 227-275 Washington Street in Boston.

3.     Upon information and belief, the Bank is a Brazilian corporation with its principal place of business in Brazil.

8



4.      This Court has diversity jurisdiction over this counterclaim pursuant to 28 U.S.C.

§ 1332(a) as the amount in controversy, exclusive of interest and costs, exceeds the sum or value

specified by 28 U.S.C. § 1332.

### FACTS

### The Lease

5.      In a Lease dated August 29, 2008, the Trust leased to the Bank the premises

located on the first floor of 227-225 Washington Street ("the Premises") for use as a "high

quality, full service retail branch banking facility."

6.      The Bank said that it was eagerly pursuing approval from federal regulators to

open in the United States and that it was "anxious" to obtain possession of the Premises as soon

as possible.

7.      The parties were each represented by counsel during the Lease negotiations.  The

Bank was represented by its co-counsel in this case, Peter Aufrichtig, who participated directly

and substantially in the drafting of the Lease, inserting copious comments on and making

substantial revisions to the drafts.

8.      The term of the Lease is ten years, with the Bank having the option to extend for

an additional five years (subject to certain conditions) and the option to lease adjacent space to

expand its branch (also subject to certain conditions).

### The Bank's Default

9.      Article 18 of the Lease pertains to the Trust's remedies if the Bank defaults.

Section 18.1.A defines an "Event of Default" to include:

> "Failure on the part of the Tenant to make *payment of minimum rent and other charges* payable hereunder by the Tenant in equal monthly installments within three (3) business days (that is, for the purposes of this lease, non-holiday weekdays) *after the due date*, or failure on the part of

> Tenant to make payment of any other monetary amount due under this lease within three (3) business days after the Landlord has sent to the Tenant and the Tenant has received written notice of such default (or delivery thereof in accordance with the notice provision of this lease has been unsuccessfully attempted)."

(Emphasis added.)  In addition, Article 18.1.E provides that it is an Event of Default for the Bank to "abandon or vacate the demised [P]remises."  The Bank's objections to the default provisions of Section 18.1 were considered and discussed during the Lease negotiations, and the resulting agreement of the parties is reflected in the language of the executed Lease.

10.     Section 18.2 allows the Trust to terminate the term of the Lease if there is an Event of Default:

> "Should any Event of Default occur then, notwithstanding any license of any former breach of covenant or waiver of the benefit hereof or consent in a former instance, subject to applicable Massachusetts law, the Landlord lawfully may, in addition to any remedies otherwise available to the Landlord, immediately or at any time thereafter, and without demand or notice (and the Tenant hereby expressly waives any notice to quit possession of the demised premises), enter into and upon the demised premises or any part thereof in the name of the whole and repossess the same as of the Landlord's former estate, and expel the Tenant and those claiming through or under it and remove its or their effects (forcibly if necessary) without being deemed guilty of any manner of trespass; and *without prejudice to any remedies which might otherwise be used for arrears of rent or preceding breach of covenant and/or the Landlord may send written notice to the Tenant terminating the term of this lease*; and upon the first to occur of:  (i) entry as aforesaid; or (ii) the fifth (5th) day following mailing of such notice of termination, *the term of this lease shall terminate*."

(Emphasis added.)  The Bank commented on the eviction procedures during negotiations, and inserted the reference to "applicable Massachusetts law," but interposed neither objection nor comment to the Trust's right to terminate on an Event of Default.

11.     Section 18.3 describes the consequences of an Event of Default and states, in relevant part:

"The Tenant covenants and agrees, notwithstanding any termination of this lease as aforesaid . . . to pay and be liable for on the days originally fixed herein for the payment thereof, amounts equal to the several installments of rent and other charges reserved as they would, under the terms of this lease, become due if this lease had not been terminated . . . , and whether the demised premises be relet or remain vacant, in whole or in part, or for a period less than the remainder of the term, and for the whole thereof; but in the event the demised premises be relet by the Landlord, the Tenant shall be entitled to a credit in the net amount of rent received by the Landlord in reletting, after deduction of all reasonable expenses incurred in reletting the demised premises (including, without limitation, remodelling costs, brokerage fees, and the like), and in collecting the rent in connection therewith.  It is specifically understood and agreed that the Landlord shall not be required to prefer reletting the demised premises over other premises in the Building (or to relet all or any portion of the demised premises for any particular use), and the Landlord shall be entitled to take into account in connection with any reletting of the demised premises all relevant factors which would be taken into account by a sophisticated developer in securing a replacement tenant for the demised premises . . .; and the Tenant hereby waives, to the extent permitted by applicable law, any obligation the Landlord may have to mitigate the Tenant's damages.  As an alternative, at the election of the Landlord, the Tenant will upon such termination pay to the Landlord, as damages, such a sum as at the time of such termination represents the amount of the excess, if any, of the then value of the total rent and other benefits which would have accrued to the Landlord under this lease for the remainder of the lease term if the lease terms had been fully complied with by the Tenant over and above the then cash rental value (in advance) of the premises for the balance of the term.  To induce the Landlord to enter into this lease: (i) the Tenant confirms and agrees that this transaction is a commercial and not a consumer transaction; (ii) the Landlord and the Tenant each  hereby each waives any right to trial by jury in any action, proceeding or counterclaim brought by one against the other on any matters whatsoever arising out of or in any way connected with this lease, the relationship of the Landlord and the Tenant, the Tenant's use or occupancy of the demised premises, and/or any claim of injury or damage; (iii) the Tenant agrees not to interpose any non-compulsory counterclaim of whatever nature or description (or take any action having substantially the same effect) in any proceeding commenced by the Landlord for nonpayment of rent, minimum rent, or any other amount due hereunder, provided the foregoing shall not be construed as a waiver of the right of the Tenant to assert and pursue such claims in such proceeding if they are mandatory to such proceeding and otherwise would be barred or in any separate action brought by the Tenant in good faith (and not to circumvent this clause or other express provisions of this lease); and (iv) the Tenant hereby grants and submits to personal and subject matter jurisdiction in

11

> any proceeding brought against the Tenant by or on behalf of Landlord in any Massachusetts Court or any United States federal Court and, with respect thereto, the Tenant expressly waives any right of immunity (political, diplomatic, sovereign or otherwise) to jurisdiction, prosecution and/or liability; and the Tenant hereby agrees to indemnify and hold harmless the Landlord and those claiming by, through or under the Landlord from and against any and all loss, cost, damage or expense arising from or relating to any lack of such jurisdiction or claim thereof and any such immunity or claim thereof."

Even though the Bank, through a supplementary Lease review by Massachusetts counsel, complained during negotiations that it thought these provisions were "non-standard," "[n]ot acceptable," "not commercially reasonable," and "should be revised," in fact the Bank accepted those provisions with minimal revision.

12.   Section 18.7 provides in relevant part:

> "Nothing in this lease shall limit any right that the Tenant might otherwise have to obtain injunctive relief against the Landlord in equity; but, except as specifically permitted in Articles XVII and XVIII or as specifically permitted (if at all) in any other express provision of this lease, the rent and charges hereunder shall not abate and Tenant shall not withhold or delay making any payment to be made hereunder; and, in no event shall the Tenant ever have the right to terminate or cancel this lease as a result of any default by Landlord or breach by Landlord of its covenants or any warranties or promises hereunder, except in the case of a breach of the quiet enjoyment covenant of this lease which constitutes a wrongful eviction of Tenant from the demised premises by Landlord continuing beyond the aforesaid notice and cure period. Without limiting the generality of the foregoing, the Tenant shall not assert any right to deduct the cost of repairs or any monetary claim against the Landlord from rent thereafter due and payable, but shall look solely to the Landlord for satisfaction of such claim."

13.   The Bank was required to make a payment of rent on July 1, 2009.

14.   The Bank failed to make a payment on July 1, 2009.

15.   On July 16, 2009, the Trust notified the Bank that it was in default and that the Trust was terminating the term of the Lease pursuant to Section 18.2.

12

16.     On July 20, the Bank acknowledged that it had actually received the July 16 letter the very next day, July 17.  It claimed that it had "inadvertently" failed to make a timely payment and was sending a payment the next day.

17.     The rental payment that was due on or before July 1, 2009, was not made by the Bank until July 21, 2009.

18.     The Bank's failure to make a timely payment of rent within three business days after the due date of July 1, 2009, constituted an Event of Default entitling the Trust to terminate the Lease.

## The Bank's Failure Obtain Regulatory Approval

19.     Because the Bank is a foreign bank and was not yet licensed to conduct its desired Federal Savings Bank ("FSB") business in this country, the parties negotiated special provisions describing the "Regulatory Approval" the Bank represented it needed before opening a branch for business.  Section 3.2 of the Lease describes this Regulatory Approval as approval "from the U.S. Treasury Office of Thrift Supervision for Tenant or its direct or indirect subsidiary, Banco do Brasil, FSB, to operate a branch bank in the demised premises as a federal savings bank."  The reason the Lease specifically references the federal Office of Thrift Supervision ("OTS") is that during the Lease negotiations the Bank stated that it was awaiting the official approval of OTS, which the Bank said it expected to be forthcoming: "For your information, the relevant regulator is OTS, the Office of Thrift Services [sic], the application was submitted many months ago and we are looking to get at least preliminary approval sometime in July."  The Bank repeatedly said that it was eagerly pursuing approval from OTS.

20.     The parties agreed to the following language in Section 19.16:

> "The Tenant specifically confirms and acknowledges that: (i) before entering into this lease, the Tenant has made its own

13

> observations, studies, determinations and projections with respect
> to the Tenant's business in the demised premises and all other
> factors relevant to Tenant's decision to enter into this lease,
> including, without limitation, competition, market size, sales
> volume, profitability and general, so called 'demographics'—both
> present and prospective; and (ii) neither the Tenant nor any
> representative of Tenant has relied upon any representation by (or
> any 'conversation' with) the Landlord or any representative of the
> Landlord with respect to any of said factors."

21.     Section 19.3 of the Lease required the Bank to provide status reports to the Trust

within ten days of a request:

> "Recognizing that both parties may find it necessary to establish to
> third parties, such as accountants, banks, mortgagees, or the like,
> the then current status of performance hereunder, either party, on
> the written request of the other made from time to time, will within
> ten (10) days following receipt of such request furnish a written
> statement of the status of any matter pertaining to this lease.
> Without limiting the generality of the foregoing, the Tenant
> specifically agrees, promptly upon the commencement of the term
> hereof, to notify the Landlord in writing of the Commencement
> Date, and acknowledge satisfaction of the requirements with
> respect to construction and other matters by the Landlord, save and
> except for such matters as the Tenant may wish to set forth
> specifically in said statement."

22.     During Lease negotiations and continuing after the Lease was executed, the Trust

continued to inquire of the Bank as to its efforts to secure OTS approval, and seeking

information about these efforts.  The Bank responded with a series of excuses but no facts or

documentation.

23.     For example, on September 26, 2008, the Bank wrote to blame the delay on the

"sturm and drang" with the Federal Reserve.  The Bank offered no specifics, except to state that

it was pursuing regulatory approval and was "[o]bviously . . . as motivated to make this happen

as soon as possible as your side is . . . ."  Writing a month later, on October 20 the Bank again

14

did not explain its efforts with any specificity, vaguely blaming the "regulatory climate" and

stating that it thought "pushing too hard at this point could have a negative effect."

24.     After the Trust again inquired about the status of the Bank's regulatory approval,

the Bank wrote on December 2, 2008, that it had to revise its application in light of unspecified

"responses" from OTS and the FDIC, and said that the revisions would be submitted within a

week. The Bank reported "good news," that it had obtained the recommendation of New York

Federal Reserve officials that the Bank's application be approved, and that it expected "positive

indications" from OTS in a few months. Once those undefined "positive indications" were

received, the Bank would begin construction. The Bank concluded by representing that it was

"quite upbeat about the prospects of the early approval and opening of the Banco do Brasil

Federal Savings Bank. There is much excitement in the Bank, including by the individual already

selected to be the Boston General Manager, that the project move forward as soon as possible.

We are all doing whatever is possible to make that happen and share your impatience with the

delays to date."

25.     The Bank repeated this tone when it wrote on January 13, 2009, that while it still

had not received approvals, it had "selected the contractor and the plans are being finalized for

filing by the contractor so that we have the permits in hand when we are able to go forward with

the construction." The Bank promised to forward the contractor's name. Two weeks later, the

Bank wrote that it and its architects were "moving forward with their contractor to file for the

permits with Boston which should be submitted in the next 1-2 weeks."

26.     On February 19, the Bank wrote to say it was "moving forward with the plan

filings." However, there was still no "definitive" word from the regulators.

27.     Given the repeated delays, the Trust was increasingly concerned with the Bank's failure to make any progress on regulatory approval.  Consequently, on February 27, 2009, the Trust wrote to the Bank to request a meeting for the Bank to explain its situation.  The Bank made a deliberate effort thereafter to avoid providing the Trust with information concerning the Bank's efforts to obtain regulatory approval.

28.     On March 6, the Bank represented that it was in contact with OTS and was narrowing the issues but that progress was slow because of the financial crisis, and it agreed to consider giving the Trust some access to its consultants.

29.     When the Bank, however, did not respond as promised and the Trust was forced to make another request for more specific information on March 13, the Bank replied five days later that it was "peeved" that the Trust was suggesting the Bank was not doing all it could to get approval.  The Bank still did not provide specific information as to what particular efforts the Bank was undertaking to obtain Regulatory Approval.

30.     On March 18, the Bank sent the Trust a letter from its regulatory counsel, Kathleen A. Scott from Arnold & Porter LLP.  Scott offered some additional but vague details and left many questions unanswered.  Scott represented that the Bank had filed applications with three federal regulators, the Board of Governors of the Federal Reserve System ("FRB"), the FDIC, and OTS in March 2008.  According to Scott, the Bank's responses to the FDIC's "repeated questions" about the Bank's business plan and products led the FDIC to require the Bank to withdraw its application in the fall of 2008 and refile it with a revised business plan. Scott did not explain the nature of the FDIC's questions or how the Bank's responses rendered the original application so insufficient or inaccurate that it must be withdrawn.  She did say, though, that the Bank had filed a revised application on January 7, 2009.  Scott also disclosed

that the application with OTS was delayed because the Bank had not included its pension plan, Caixa de Previdencia dos Funcionarios do Banco do Brasil, as a "control party" in its application, as she said the Bank was required to do because the plan owns 10.4% of the Bank's shares and has three of its nominees on the Bank's board. The Bank's failure resulted in OTS' suspension of further processing of the Bank's application. Scott offered no explanation as to why the Bank had failed to make that disclosure in its original application, when OTS had found the omission, and when OTS had notified the Bank of the application suspension. According to Scott, OTS required that the Bank file a revised deposit insurance application to the FDIC and that the Bank explain in writing how the pension plan would comply with the restrictions that the Home Owners Loan Act imposes on a savings and loan holding company. Again, Scott did not explain why the Bank had not made the explanation in its original application. Scott said that the Bank planned to submit an explanatory letter to OTS, but had not yet done so because the letter was "under review" by the Bank. Scott did not say how long the review of the explanatory letter would take or when it would be submitted to OTS, but she thought that once the Bank sent the letter, "OTS should be satisfied with the response and re-commence its processing of the application." She offered no indication what she meant by "re-commence" processing or how long she thought it would take. Finally, Scott said that even if OTS were otherwise satisfied, it would still not approve the application until it and the FRB determined that the Bank was subject to "comprehensive supervision on a consolidated basis" in Brazil. She said that the FRB had to make the determination first and that it should come "soon," without further elaboration.

31.    Scott's letter did not provide the Trust with the information it needed and was entitled to under the Lease. The Trust pressed its attempts to schedule the promised meeting with the Bank's representative. These attempts superficially appeared to make progress, with

specific dates being discussed. On March 30, 2009, however, the Bank abruptly nullified those attempts, saying that "the head of the FSB project" was traveling and that the Bank would "get back to [the Trust]" once his travel schedule was finalized.

32.     The Bank did not get back to the Trust, but began a period of "radio silence." The Trust wrote to the Bank on April 13 asking for the meeting. The Bank did not reply. The Trust again wrote to the Bank on April 22. The Bank did not reply. Finally, on April 28 in response to the Trust's telephone call, the Bank represented that the reason for the silence was that its representative had had some "surgery" but that it would soon follow up with the Trust.

33.     Two weeks later, the Bank finally wrote to the Trust to schedule the meeting that the Trust had requested. The meeting was scheduled for May 27. At that meeting, the reason for the Bank's evasion and information blackout became clear. Despite its repeated assurances that it was lining up contractors and expected regulatory approval soon, the Bank had in fact *withdrawn* its application with OTS. In addition, FDIC had *twice* rejected the Bank's application, the second time on April 15, 2009. By the time of the May 27 meeting, the Bank had in fact closed its White Plains, New York, office and laid off all staff except for essential personnel. The representatives of the Trust who attended the meeting were completely shocked, as the Bank had previously given absolutely no indication that it was abandoning all efforts to secure Regulatory Approval and closing its offices.

34.     On information and belief, the Bank in fact withdrew its application to OTS in March 2009, approximately two months before disclosing this fact to the Trust

35.     It is clear to the Trust that the Bank's strategy throughout early 2009 was to avoid providing any substantive information to the Trust, with the intent to attempt to invoke Section 6.5 of the Lease on August 29, 2009.

*basis ?
when did Bank
develop such
intent? basis
for such and*

18



36.     After the May 27 meeting, the Trust has repeatedly asked the Bank to disclose the letter from the FDIC that the Bank claimed to have received.  On Friday, June 26, 2009, the Bank finally agreed to provide the letter, in redacted form, but only if the Trust signed a nondisclosure agreement "restricting the use of the letter."  The Trust replied the following Monday, June 29, proposing the terms for a nondisclosure agreement.  The Bank never replied and never provided the FDIC letter.

## COUNT I
### (Declaratory Judgment)

37.     The Trust reasserts and reincorporates by reference paragraphs 1 through 36 of this Counterclaim as if fully set forth herein.

38.     The Lease was validly terminated by the Trust as a result of the Bank's failure to make a timely payment of rent within three business days of the July 1, 2009, due date, which is an Event of Default under the Lease.

39.     The Bank has breached the Lease by failing to make the timely payment of rent referred to above and by failing to disclose accurately and timely the status of its application to OTS.

40.     The Bank also breached the implied covenant of good faith and fair dealing by failing to use good-faith efforts to secure the Regulatory Approval as described in the Lease by, among other things, voluntarily withdrawing its application to OTS.

41.     As a consequence of the termination of the Lease and the Bank's breach thereof, the Bank is without power to exercise any rights pursuant to Section 6.5 of the Lease.

42.     An actual controversy exists between the Trust and the Bank regarding their respective rights and obligations pursuant to the Lease.

43.     Declaratory relief will resolve this controversy.

## COUNT II
### (Breach of Lease)

44.      The Trust reasserts and reincorporates by reference paragraphs 1 through 43 of this Counterclaim, as if fully set forth herein.

45.      The Bank's failure to make timely payment of rent, failing to provide sufficient, accurate, and timely information concerning its applications for regulatory approval, and failure to use good-faith efforts to secure approval constitute a breach or breaches of the Lease.

46.      As a result of the Bank's breach or breaches of the Lease, the Trust has sustained damages.

## COUNT III
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

47.      The Trust reasserts and reincorporates by reference paragraphs 1 through 46 of this Counterclaim, as if fully set forth herein.

48.      Implicit in every contract is a covenant that each party will act in good faith and fairly attempt to perform its obligations under the agreement.

49.      At all times in its dealings with the Bank, the Trust has acted reasonably and in good faith.

50.      The Bank breached the implied covenant of good faith and fair dealing by: failing to use good-faith efforts to secure Regulatory Approval and withdrawing its applications with OTS; failing to respond fully, truthfully, and timely to the Trust's requests for information about the status of the Bank's application for Regulatory Approval; and engaging in a deliberate attempt to keep the Trust in the dark rather than disclosing promptly and fully the status of the Bank's application to OTS.



51.     As a direct and proximate result of the Bank's breaches of the implied covenant of good faith and fair dealing, the Trust has suffered and continues to suffer substantial economic damages in an amount to be proved at trial.

## COUNT IV
### (Legal Fees and Expenses)

52.     The Trust reasserts and reincorporates by reference paragraphs 1 through 51 of this Counterclaim, as if fully set forth herein.

53.     Section 19.9 of the Lease provides in relevant part: "Unless prohibited by applicable law, the Tenant agrees to pay to the Landlord the amount of all legal fees and expenses incurred by the Landlord arising out of or resulting from any act or omission by the Tenant with respect to this lease or the demised premises . . . including without limitation, any breach by the Tenant of its obligations hereunder . . . ."

54.     The Trust is entitled to recover all legal fees and expenses incurred as a result of the Bank's failures, omissions, breaches, and actions described herein, including the attorneys' fees and costs associated with this action.


WHEREFORE, the Trust requests that the Court enter a declaration and order:

a.      that the Trust validly and effectively terminated the Lease by reason of the Event of Default that was the Bank's failure to make timely payment of rent;

b.      that the Bank is thereby not permitted to terminate the Lease under Section 6.5;

c.      that the Trust is entitled to the damages described in Section 18.3 of the Lease, namely, "such a sum as at the time of such termination represents the amount of the excess, if any, of the then value of the total rent and other benefits which would have accrued to the Landlord under this lease for the remainder of the lease term if the lease terms had been fully complied with by the Tenant over and above the then cash rental value (in advance) of the premises for the balance of the term";

d.      awarding the Trust all legal fees and expenses incurred as a result of the Bank's acts, omissions, and/or breaches of Lease, including the Trust's attorneys' fees and costs in defending this action and asserting its counterclaim;

e.      awarding the Trust such other relief as it deems just and proper.

                                275 WASHINGTON STREET CORP., as it is the
                                Trustee of the WASHINGTON STREET REALTY
                                TRUST II,

                                By its attorneys,


                                /s/ Martin F. Gaynor III
                                Martin F. Gaynor III, BBO No. 564384
                                Nicholas D. Stellakis, BBO No. 644981
                                COOLEY MANION JONES LLP
                                21 Custom House Street
                                Boston, MA  02110
                                (617) 737-3100
                                Email: mgaynor@cmjlaw.com

302765


## CERTIFICATE OF SERVICE

    I hereby certify that the above document was filed through the ECF system for electronic service to the registered participants as identified on the Notice of Electronic Filing, and paper copies will be sent to those indicated as non-registered participants (if any) on September 2, 2009.

                                /s/ Martin F. Gaynor III



22

**EXHIBIT 2**

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | | |
|---|---|---|
| BANCO DO BRASIL, S.A., | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 1:09-cv-11343 |
| v. | ) | |
| | ) | |
| 275 WASHINGTON STREET CORP., | ) | |
| as it is the Trustee of the WASHINGTON | ) | |
| STREET REALTY TRUST II, | ) | |
| Defendant. | ) | |
| | ) | |

## BANCO DO BRASIL, S.A.'S ANSWER TO COUNTERCLAIM

Plaintiff/Defendant-in-Counterclaim Banco do Brasil, S.A. (the "Bank") responds to the Counterclaims filed by Defendant/Plaintiff-in-Counterclaim 275 Washington Street Corp. ("Washington Street"), as follows:

### Nature of the Action

1.      The first sentence of this paragraph states conclusions of law to which no response is required.  The Bank denies the remaining allegations of this paragraph.

### Parties and Jurisdiction

2.      The Bank admits the allegations of this paragraph on information and belief.

3.      Admit.

4.      This paragraph contains conclusions of law and not allegations of fact to which a response is required.  To the extent a response is required, the Bank admits that this Court has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. §§1330 and 1332, and is without knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in this paragraph, if any, and therefore denies them.  The Bank specifically

denies that the Trust is entitled to the relief it seeks.

FACTS

     5.     Admit.

     6.     Admit.

     7.     The Bank admits that it and Washington Street were both represented by counsel

in connection with the negotiation of the Lease and that the Bank was represented by Attorney

Aufrichtig and by Massachusetts counsel.  The remaining allegations seek to characterize

documents (lease drafts exchanged by the parties) which documents speak for themselves.

Except as aforesaid, the allegations of this paragraph are denied.

     8.     The Bank admits that the Lease contemplated a ten year term with a tenant option

to extend for an additional five years (subject to certain conditions) and an option to expand into

adjacent space (subject to certain conditions).  The Bank further states that the Bank had the

option, pursuant to Section 6.5 of the Lease, to terminate the Lease early under certain

circumstances and that the Bank validly terminated the lease by Notice of Termination provided,

and $530, 650.03 termination payment tendered, on August 31, 2009.

The Bank's Default

     9.     This paragraph purports to characterize and quote a document that speaks for

itself, and the Bank denies all allegations contained in this paragraph to the extent they are

contrary to, or inconsistent with, said document, including portions thereof that are not quoted or

referred to by Washington Street. The Bank denies all other factual allegations that may be

contained in this paragraph.

#820025 v2



10.     This paragraph purports to characterize and quote a document that speaks for itself, and the Bank denies all allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, said document, including portions thereof that are not quoted or referred to by Washington Street.  The Bank denies all other factual allegations that may be contained in this paragraph

11.     This paragraph purports to characterize and quote a document that speaks for itself, and the Bank denies all allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, said document, including portions thereof that are not quoted or referred to by Washington Street.  The Bank denies all other factual allegations that may be contained in this paragraph.

12.     This paragraph purports to characterize and quote a document that speaks for itself, and the Bank denies all allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, said document, including portions thereof that are not quoted or referred to by Washington Street.  The Bank denies all other factual allegations that may be contained in this paragraph.

13.     Admit.

14.     Admit.

15.     The Bank admits that Washington Street sent a letter on or about July 16, 2009, which letter speaks for itself.  The Bank denies that Washington Street, by the sending of said letter, effectively terminated the Lease.

16.     The Bank admits that it sent Washington Street a letter on July 20, 2009, which letter speaks for itself and that the Bank inadvertently failed to make the required Lease payment on July 1, 2009.  Except as aforesaid, the allegations of this paragraph are denied.

#820025 v2

17.     The Bank admits that it made the July 2009 Lease payment to Washington Street on July 21, 2009.  Except as aforesaid, the allegations of this paragraph are denied.

18.     The Bank admits that it made the July 2009 Lease payment to Washington Street on July 21, 2009.  Except as aforesaid, the allegations of this paragraph, including such allegations as state conclusions of law, are denied.

<u>The Bank's Failure [sic] Obtain Regulatory Approval</u>

19.     This paragraph purports to characterize and quote documents that speak for themselves, and the Bank denies all allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, said document, including portions thereof that are not quoted or referred to by Washington Street.  The Bank admits that it was eagerly pursuing Regulatory Approval (as defined in the Lease) at the time the Lease was executed.  Except as aforesaid, the allegations of this paragraph are denied.

20.     This paragraph purports to characterize and quote selectively from the Lease, which speaks for itself.  The Bank denies the allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, portions of the Lease that are not quoted or referred to by Washington Street.

21.     This paragraph purports to characterize and quote selectively from the Lease, which speaks for itself.  The Bank denies all allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, portions of the Lease that are not quoted or referred to by Washington Street.  The Bank further denies that Section 19.3 of the Lease required the Bank to provide Washington Street with an unlimited number of status reports relating to Regulatory Approval or to provide Washington Street with such reports absent a request to Washington Street from its accountants, banks, mortgagees or the like requesting such a status report.

#820025 v2



22.    The Bank admits that Washington Street periodically requested information as to Regulatory Approval, which requests speak for themselves.  The Bank denies that it "responded with a series of excuses but no facts or documentation."

23.    This paragraph purports to characterize and quote documents that speak for themselves, and the Bank denies all allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, said documents, including portions thereof that are not quoted or referred to by Washington Street.  The Bank denies all other factual allegations that may be contained in this paragraph.

24.    This paragraph purports to characterize and quote documents that speak for themselves, and the Bank denies all allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, said documents, including portions thereof that are not quoted or referred to by Washington Street.  The Bank denies all other factual allegations that may be contained in this paragraph.

25.    This paragraph purports to characterize and quote documents that speak for themselves, and the Bank denies all allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, said documents, including portions thereof that are not quoted or referred to by Washington Street.  The Bank denies all other factual allegations that may be contained in this paragraph.

26.    This paragraph purports to characterize and quote documents that speak for themselves, and the Bank denies all allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, said documents, including portions thereof that are not quoted or referred to by Washington Street.  The Bank denies all other factual allegations that may be contained in this paragraph.

27.     The Bank admits that, on or about February 27, 2009 Washington Street requested a meeting with the Bank. The Bank denies knowledge and information sufficient to form a belief as to the truth or falsity of whether Washington Street was concerned about Regulatory Approval on or about February 27, 2009 and, if so, how concerned, and therefore denies same. The Bank denies making "a deliberate effort thereafter to avoid providing the Trust with information concerning the Bank's efforts to obtain regulatory approval." The Bank denies all other factual allegations that may be contained in this paragraph.

28.     The allegations of this paragraph are insufficiently precise to allow the Bank to respond to same. To the extent that a response is required, the Bank denies the allegations of this paragraph and calls upon Washington Street to prove same.

29.     The allegations of this paragraph are insufficiently precise to allow the Bank to respond to same. To the extent that a response is required, the Bank denies the allegations of this paragraph and calls upon Washington Street to prove same. The Bank further denies that it was required, under the Lease, to describe, in detail, "what particular efforts the Bank was undertaking to obtain Regulatory Approval."

30.     The Bank admits that it sent Washington Street a copy of a March 12, 2009 letter from its counsel Kathleen A. Scott. The remainder of this paragraph purports to characterize and selectively refer to portions of Attorney Scott's letter, which letter speaks for itself. The Bank denies all allegations contained in this paragraph to the extent they are contrary to, or inconsistent with, the text of Attorney Scott's letter, including portions thereof that are not quoted or referred to by Washington Street. The Bank denies all other factual allegations that may be contained in this paragraph.

31.     The Bank admits that on or about March 30, 2009, it informed Washington Street that the head of its FSB project was traveling and that the Bank would try to arrange a meeting around his schedule.  Except as aforesaid, the allegations and characterizations of this paragraph are denied.

32.     The Bank admits that on or about April 28, 2009, it informed Washington Street that the head of its FSB project had had surgery.  Except as aforesaid, the allegations and characterizations of this paragraph are denied.

33.     The Bank admits that on May 27, 2009, it met with Washington Street.  Except as aforesaid, the allegations and characterizations, including, without limitation, statements as to Washington Street's alleged "shock", contained in this paragraph are denied.

34.     Deny.

35.     Deny.

36.     The Bank denies that it was legally required to provide Washington Street with copies of letters it had received from the FDIC, with or without a confidentiality agreement.  On or about June 26, 2009, the Bank's counsel sent Washington Street's counsel an email and Washington Street's counsel  responded to the Bank on or about June 29, 2009.  Said emails speak for themselves.  The Bank has not to date provided Washington Street with a copy of any letter it has received from the FDIC.  Except as aforesaid, the allegations and characterizations of this paragraph are denied.

## COUNT I
### (Declaratory Judgment)

37.     The Bank repeats its responses to the allegations contained in paragraphs 1 through 36 of the Answer and Counterclaim of 275 Washington Street Corp., as if fully set forth herein.

#820025 v2

38.      Paragraph 38 consists of a conclusion of law that requires no answer.  To the extent that paragraph 38 purports to allege facts, the allegations are denied.

39.      Paragraph 39 consists of a conclusion of law that requires no answer.  To the extent that paragraph 39 purports to allege facts, the allegations are denied.

40.      Paragraph 40 consists of a conclusion of law that requires no answer.  To the extent that paragraph 40 purports to allege facts, the allegations are denied.

41.      Paragraph 41 consists of a conclusion of law that requires no answer.  To the extent that paragraph 41 purports to allege facts, the allegations are denied.

42.      Admit.

43.      Admit.

**COUNT II**
**(Breach of Lease)**

44.      The Bank repeats its responses to the allegations contained in paragraphs 1 through 43 of the Answer and Counterclaim of 275 Washington Street Corp., as if fully set forth herein.

45.      Paragraph 45 consists of a conclusion of law that requires no answer.  To the extent that paragraph 45 purports to allege facts, the allegations are denied.

46.      Denied.

**COUNT III**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

47.      The Bank repeats its responses to the allegations contained in paragraphs 1 through 46 of the Answer and Counterclaim of 275 Washington Street Corp., as if fully set forth herein.

48.      Paragraph 48 consists of a conclusion of law that requires no answer.



49.     Denied.

50.     Denied.

51.     Denied.

## COUNT IV
### (Legal Fees and Expenses)

52.     The Bank repeats its responses to the allegations contained in paragraphs 1

through 51 of the Answer and Counterclaim of 275 Washington Street Corp., as if fully set forth

herein.

53.     This paragraph purports to selectively quote from the Lease, which speaks for

itself.  The Bank denies the allegations contained in this paragraph to the extent they are contrary

to, or inconsistent with, portions of the Lease that are not quoted or referred to by Washington

Street.

54.     Denied.

### Prayers for Relief

The remainder of the Answer and Counterclaim of 275 Washington Street Corp. consists of

Prayers for Relief that require no answer.  To the extent a response is required, the allegations

contained therein are denied.

### Affirmative Defenses

### First Affirmative Defense

The allegations of Washington Street's Counterclaim fail to state claims against the Bank

upon which relief may be granted.

### Second Affirmative Defense

Washington Street is estopped from asserting the claims set forth in its Counterclaim.

#820025 v2

### Third Affirmative Defense

Washington Street's alleged damages, if any, were directly and proximately caused by the acts and/or omissions of third parties for which parties/acts/omissions the Bank is not responsible.

### Fourth Affirmative Defense

Washington Street has unclean hands and should not be permitted, in equity, to recover upon its claims.

### Fifth Affirmative Defense

Washington Street's claims are barred because the Lease was properly and effectively terminated, pursuant to its explicit terms, by notice given, and termination payment tendered, on August 31, 2009 pursuant to Section 6.5 of the Lease.

### Sixth Affirmative Defense

Washington Street is barred from demanding accelerated rent as claimed in its request for relief paragraph "c", as Washington Street has previously elected alternative relief pursuant to a different clause of Section 18.3 of the Lease.

### Seventh Affirmative Defense

Washington Street is or will be barred, in whole or in part, from recovering upon its claims due to Washington Street's failure to mitigate its damages, if any.

### Eighth Affirmative Defense

The Bank hereby gives notice that it intends to rely upon such other affirmative defenses as may become available or apparent during the course of discovery and it reserves its right to amend its answer to assert such defenses.



**WHEREFORE,** Banco do Brasil, S.A. requests that the Counterclaims in this action be dismissed and that Banco do Brasil, S.A. be awarded its costs incurred herein, reasonable attorney's fees and such other and further relief as the Court deems just and proper.

Respectfully submitted,

BANCO DO BRASIL, S.A.

By its attorneys,

/s/ Eric F. Eiseberg
Eric F. Eisenberg (BBO 544682)
Hinckley, Allen & Snyder LLP
28 State Street
Boston, Massachusetts 02109
(617) 345-9000
*and*
Peter D. Aufrichtig, Esq. (*Admitted Pro Hac Vice*)
McCarthy Fingar LLP
11 Martine Avenue, 12th Floor
White Plains, NY 10606-1934
(914)-385-1063

DATED:  September 25, 2009

<u>CERTIFICATE OF SERVICE</u>

I, Eric F. Eisenberg, hereby certify that on this 25th day of September, 2009, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/Eric F. Eisenberg

#820025 v2



**EXHIBIT 3**



# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| BANCO DO BRASIL, S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 09-11343-NMG |
| 275 WASHINGTON STREET CORP., | ) | |
| as it is the Trustee of the WASHINGTON | ) | |
| STREET REALTY TRUST II, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION ON
## BANCO DO BRASIL'S MOTION FOR SUMMARY JUDGMENT

September 7, 2010

DEIN, U.S.M.J.

## I. INTRODUCTION

The plaintiff Banco do Brasil, S.A. (the "Bank"), as tenant, entered into a

commercial lease agreement with the defendant 275 Washington Street Corp., as Trustee

of the Washington Street Realty Trust II (the "Trust"), as landlord. Both parties assert

that the lease has been terminated. They disagree, however, as to whether the Trust

properly terminated the lease under its default and termination provisions due to the

Bank's failure to make a timely rent payment, or if the Bank properly terminated the lease

under an Early Termination provision due to the Bank's inability to obtain regulatory

approval to operate a branch office at the leased premises. The Bank has different

obligations depending on the basis for the termination.





This matter is presently before the court on the Bank's Motion for Summary Judgment on Count I of its complaint and on the Trust's counterclaim. (Docket No. 14). By this motion, the Bank is seeking a declaratory judgment in accordance with Count I of its complaint finding that the Trust's attempt to terminate the lease for non-payment of rent is null and void and that the Bank properly terminated the lease under its Early Termination provision. In addition, the Bank is seeking judgment in its favor on the Trust's counterclaim by which the Trust claims that the Bank breached the lease and violated the covenant of good faith and fair dealing by not taking all necessary actions to obtain needed regulatory approvals. The Trust contends that the lease was properly terminated for non-payment of rent, and that discovery is needed pursuant to Fed. R. Civ. P. 56(f) on the issue whether the Bank properly terminated the lease for lack of regulatory approval.

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Bank's motion be ALLOWED IN PART AND DENIED IN PART. Specifically, this court recommends that a declaratory judgment be entered holding that the Trust's attempt to terminate the lease for non-payment is null and void as the breach was accidental and insignificant, and the Bank cured any untimely payment. In addition, however, this court recommends that the Trust's Rule 56(f) request for discovery on the issue of the Bank's efforts to obtain regulatory approval be ALLOWED. Accordingly, no declaratory judgment on the issue of the propriety of the



-2-



Bank's early termination efforts should be entered, and the Bank's motion for summary

judgment on the Trust's counterclaim should be denied without prejudice.

## II.  STATEMENT OF FACTS[1]

The following facts are undisputed unless otherwise indicated.

The plaintiff Banco do Brasil (the "Bank" or the "Tenant") is a Brazilian bank

affiliated with the Brazilian government.  (PR ¶ 2).  The defendant Trust (or "Landlord")

is the trustee of Washington Street Realty Trust II, a Massachusetts realty trust based in

Boston, Massachusetts, and is the record owner of the property located at 227-275

Washington Street, Boston, Massachusetts (the "Premises").  (PR ¶ 1; Lease at 1).

### The Lease

On August 29, 2008, after extensive negotiations between the parties, the Bank

leased from the Trust, for a term of ten years, 4,742 square feet of office space located at

227-275 Washington Street in downtown Boston.  (Lease § 1.1; DF ¶¶ 3, 12).  The



---

[1]  The facts are derived from the following materials submitted by the parties: (1) Banco Do Brasil, S.A.'s Local Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment (Docket No. 16) ("PF"); (2) Defendant's Response to Plaintiff's Rule 56.1 Statement (Docket No. 24) ("DR"); (3) Defendant's Statement of Material Facts (Docket No. 24) ("DF"); and (4) Plaintiff Banco Do Brasil, S.A.'s Response to Defendant's Statement of Material Facts (Docket No. 29) ("PR").  In addition, and to the extent the information is not included in the above-referenced pleadings, the facts are derived from: (5) the Affidavit of Michael A. Hammer in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 26) ("Hammer Aff.") and Exhibits thereto ("Hammer Ex. __"); (6) the lease attached as Exhibit A to Plaintiff's Verified Complaint (Docket No. 1) ("Lease"); (7) the Affidavit of Counsel in Support of Defendant's Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 27) ("Def. Aff.") and Exhibits thereto ("Def. Ex. __"); and (8) the Affidavit of Counsel in Support of Defendant's Sur-Reply in Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 38) ("Def. Sur-Reply Aff.") and Exhibits thereto ("Def. Sur-Reply Ex. __").



Premises were to be used as a "high quality, full service retail branch banking facility."
(Lease § 1.1).  Both the Bank and the Trust were represented by experienced counsel in
negotiating the lease, and in all related matters.  (DF ¶ 12; PR ¶ 12).  The disputes in this
action arise out of the parties' relationship under the Lease.

### The Bank's Build-Out Obligations

As the Bank is a foreign entity, it was required to obtain regulatory approval from
various U.S. agencies before opening and operating a branch in the United States as a
federal savings bank.  (Lease § 3.2; DF ¶ 14).  Several provisions of the Lease relate to
the Bank's need for regulatory approval.  For example, the term of the Lease was to begin
when the Bank obtained regulatory approval, or opened for business, or on June 1, 2009,
whichever came first.  (Lease § 3.2).  The Bank's obligation to build-out the leased
premises was also tied into the granting of regulatory approval.  Thus, § 3.5 of the Lease
provides that:



> Promptly after the demised premises are made ready for the Tenant's
> occupancy, the Tenant shall perform [build-out of the premises], and
> open for business as soon thereafter as possible. In the event the
> Tenant shall have failed to complete [build-out] and to have opened
> the demised premises for business within 120 days of obtaining
> Regulatory Approval, then all of the Tenant's charges shall neverthe-
> less commence on the Commencement Date specified in this lease,
> except that minimum rent shall then commence and be payable at the
> rate of one-fifteenth (1/15th) of the monthly amount of the Tenant's
> initial minimum rent per day from and after the expiration of said
> 120 day period until the Tenant shall open for business.

(Lease § 3.5). Pursuant to § 6.5 of the Lease which, as discussed <u>infra</u>, provided for the
early termination of the Lease if regulatory approval was not obtained, the Bank was to



-4-



reimburse the Trust for "the cost to restore the demised premises to the condition it was delivered to Tenant on the Delivery Date" if the Lease was terminated pursuant to this provision.

Pursuant to § 19.3 of the Lease, entitled "Status Reports," the parties were to provide "a written statement of the status of any matter pertaining to the lease" to each other upon written request. In an email dated January 13, 2009 updating the Trust "on the status of things for the . . . construction," the Bank represented that it had not "gotten the approvals yet," but had "selected the contractor," and was "finaliz[ing]" construction plans. (Hammer Ex. E). In a January 28, 2009 email to the Trust, the Bank stated that it had not yet begun construction, but that "its architects [were] moving forward with their contractor to file for the permits with Boston." (Hammer Ex. F). It is undisputed that the Bank did not build-out the leased premises.

The Trust contends that the Bank breached the Lease because it never began the build-out of the Premises. It is the Bank's contention that there could not be a breach of the Lease due to a lack of build-out because regulatory approval to open the branch was never obtained.

### Obligation to Pay Rent

The parties agree that the Lease commenced on June 1, 2009. (See Lease § 3.2; PF ¶ 22; DR ¶ 22). The first rental payment was due on July 1, 2009. (DR ¶¶ 21, 24; Lease § 3.2). In addition, the Lease provided for a "late charge" if the rental payment





was not made in a timely manner. Thus, § 4.1 of the Lease provides, in relevant part, that:

> [f]or and with respect to each installment of minimum rent that is not paid within three (3) business days after the date when due, the Tenant shall pay to the Landlord on demand, as additional rent, a late charge in an amount equal to one percent of the amount of such overdue payment for the purpose of defraying Landlord's administrative expenses relative to handling such overdue payment.

(Lease § 4.1). The Lease also provided that taxes and operating expenses were payable under the Lease. Such monetary payments "shall be deemed to be additional (but not minimum) rent, and in the event of non-payment thereof by the Tenant, the Landlord shall have all of the rights and remedies with respect thereto as would accrue to the Landlord for non-payment of minimum rent." (Id. § 19.8).

As detailed below, the Bank did not make its rental payment by July 1, 2009 or within the three day grace period as provided for in § 4.1. The issue in this case is whether the Trust could terminate the Lease for non-payment without giving the Bank notice and/or an opportunity to cure. Article XVIII, entitled "Landlord's Remedies," lists, among others, the following which "shall be deemed an 'Event of Default'":



> A. Failure on the part of the Tenant to make payment of minimum rent and other charges payable hereunder by the Tenant in equal monthly installments within three (3) business days (that is, for the purposes of this lease, non-holiday weekdays) after the due date, or failure on the part of the Tenant to make payment of any other monetary amount due under this lease within three (3) business days after the Landlord has sent to the Tenant and the Tenant has received written notice of such default (or delivery thereof in accordance with the notice provision of this lease has been unsuccessfully attempted).

> However, if: (i) the Landlord shall have sent to the Tenant a notice of such default, even though the same shall have been cured and this

-6-



lease not terminated; and (ii) during the same twelve (12) month
period in which said notice of default has been sent by the Landlord
to the Tenant, and the Tenant thereafter shall default twice more in
any monetary payment - the second such additional default (and any
further such additional default) shall be deemed to be an Event of
Default upon the Landlord giving the Tenant written notice thereof,
without the three (3) day grace period set forth above.

B.  With respect to a non-monetary default under this lease,
failure of the Tenant to cure the same within the minimum
time period reasonably required to cure the default after the
Landlord has sent to the Tenant notice of such default....

However, if: (i) the Landlord shall have sent to the Tenant a
notice of such default, even though the same shall have been
cured and this lease not terminated; and (ii) during the same
twelve (12) month period in which said notice of default has
been sent by the Landlord to the Tenant, and the Tenant
thereafter shall default twice more in any monetary payment -
the second such additional default (and any further such
additional default) shall be deemed to be an Event of Default
upon the Landlord giving the Tenant written notice thereof,
and the Tenant shall have no grace period within which to
cure the same.

(Id. § 18.1).  It is the Bank's contention that it had 3 days after receiving notice of non-

payment to pay the rent before being in default.  The Trust contends that the only grace

period for rental payments is three days after rent was due, i.e., 3 business days after July

1, 2009, and that the Bank's failure to pay the rent by that date constituted an "Event of

Default" under the Lease.



**Right to Cure**



The Trust contends that there is no right to cure a default caused by the late payment of rent, while the Bank contends that such a right exists.  Section 18.2 of the Lease provides, in relevant part, that:

> Should any Event of Default occur then ..., subject to applicable Massachusetts law, the Landlord lawfully may ..., immediately or at any time thereafter, and without demand or notice (and the Tenant hereby expressly waives any notice to quit possession of the desired premises), enter into and upon the demised premises or any part thereof in the name of the whole and repossess the same as of the Landlord's former estate, and expel the Tenant ... and/or the Landlord may send written notice to the Tenant terminating the term of this lease; and upon the first to occur of: (i) entry as aforesaid; or (ii) the fifth (5th) day following mailing of such notice of termination, the term of this lease shall terminate.

(Id. § 18.2).  Section 18.3 of the Lease, among other things, creates post-termination



obligations on the part of the Bank, including either the payment of regular installments of rent or damages calculated according to a specific formula, should the lease be terminated under Section 18.2.  (Id. § 18.3).

### Early Termination

The Lease also provides for an early termination of the Lease by either party.

Thus, § 6.5 states in relevant part:

> If Regulatory Approval has not been obtained within one (1) year from the date of this lease, then, subject to the following enumerated conditions, Landlord and Tenant each shall have the right to elect to terminate this lease by notice given to the other within sixty (60) days after the end of such one-year period and prior too obtaining Regulatory Approval.





(Lease § 6.5). In the event of such early termination, the Bank remained liable for various payments. (Id.). However, that amount is significantly less than could be owed by the Bank if the Lease was properly terminated for non-payment. At issue in this case is whether the Bank properly terminated the Lease pursuant to this provision.

### The Late Rental Payment

As noted above, § 6.5 of the Lease creates an early termination right for either party if regulatory approval was not obtained "within one (1) year from the date of this lease." (Lease § 6.5; DF ¶ 6). The Trust and the Bank met on May 27, 2009 to discuss the status of the Bank's regulatory approval, as well as the parties' rights and obligations under the lease. (DF ¶ 29; PR ¶¶ 27-29). At this meeting, the Bank informed the Trust that it had not obtained regulatory approval, that it did not anticipate obtaining regulatory approval by August 29, 2009, and that it intended to terminate the Lease under the early termination provisions of § 6.5. (DF ¶ 30; PR ¶ 30).

Shortly thereafter, the Bank failed to make the first monthly payment of rent. Specifically, the Bank did not make the rent payment due on July 1, 2009, nor did it make any payment within the next three business days, as referenced in § 18.1(A) of the Lease. (DF ¶ 38, PR ¶ 38). On July 16, 2009, the Trust sent, via overnight courier, a letter notifying the Bank of its nonpayment of rent, and purporting to terminate the Lease.





(PR ¶ 39; Hammer Ex. O).[2]  No mention was made of the five day period before the

termination would be effective as provided in § 18.2

The Bank sent the Trust a letter dated July 20, 2009, acknowledging receipt of the

Trust's July 16, 2009 letter.  (PR ¶ 40; Hammer Ex. P).  In the July 20, 2009 letter, the

Bank alleged that the nonpayment of rent was an inadvertent mistake, and claimed a right

to cure the default within three business days of its receipt of notice.  (Id.).  Enclosed

with this letter, the Bank sent the Trust a check for $40,030.40, the total amount of rent in

arrears, plus fees and interest as specified by the Lease.  (DR ¶ 29-30; Hammer Ex. O).

The July 2009 rent payment was received by the Trust on July 21, 2009, the second

business day after the Bank's receipt of the Landlord's July 16, 2009 letter.  (Id.; DF

¶ 41; PR ¶ 41).

On July 28, 2009, the Trust sent the Bank a letter confirming the receipt of the

Bank's July 20, 2009 payment, but alleging once more that "the Trust ha[d] terminated

the term of the Lease in accordance with Section 18.2," and purporting to deposit the

check as payment on the Bank's post-termination obligations as specified in § 18.3 of the

Lease.  (DR ¶ 36; PF ¶ 36; Def. Ex. J).  On July 31, 2009, the Trust received a check

from the Bank in the amount of the minimum rent due for August 2009.  (DR ¶ 38; PF

¶ 38; Def. Ex. K).  On August 4, 2009, the Trust sent to the Bank a letter acknowledging

receipt of the check, and maintaining once more that the Lease had been terminated due



---

[2] Facts relating to whether the notice was sent in accordance with the Lease requirements
are discussed below.



to the Bank's default, and that the Bank was responsible for post-termination payments

under § 18.3 of the Lease.  (DR ¶ 39; PF ¶ 39; Def. Ex. K).

### The Bank's Purported Termination of the Lease

While the Trust was maintaining that the Lease had been terminated, the Bank

took the position that any event of default caused by its inadvertent failure to pay rent had

been cured.  However, as the Bank had forewarned the Landlord on May 27, 2009, it did

not obtain regulatory approval within one year from the date of the Lease.  Therefore, on

August 31, 2009, the Bank sent the Trust two checks along with a letter purporting to

terminate the Lease pursuant to the early termination provision, § 6.5.  (PF ¶ 43-44, 46;

DR ¶ 43-44, 46; Def. Ex. E).  In this letter, the Bank also stated that if the Trust deposited

the first check, in the amount $530,650.03 – allegedly the amount of the Bank's post-

termination obligation in the event of early termination under § 6.5 – it would be

"agreeing that [the Bank] had the right to terminate the Lease pursuant to Section 6.5 of

the Lease and has properly exercised that right . . . ." (Id.).  A similar statement

accompanied the second check, made out in the amount of $39,575.95, and which was

intended to "constitute payment of September 2009 rent." (Id.).

In a letter dated September 9, 2009, the Trust replied that it did not accept the

Bank's termination under § 6.5 because it believed it previously had terminated the lease

due to the Bank's late rent payment.  (PF ¶ 46-47; DR ¶ 46-47; Def. Ex. F).  The Bank

responded on September 15, 2009 again claiming that the Trust could not negotiate the





check and then assert that the Lease had not been terminated.  (See DF ¶ 43; Def. Ex. L).
It appears that the checks have not been deposited by the Trust.

### Regulatory Approval[3]

In addition to claiming that the Bank could not terminate the Lease for failure to
obtain regulatory approval because the Trust had already terminated it, the Trust
challenges the Bank's contention that it had done all that was necessary under the Lease
to obtain regulatory approval.  The relevant facts are as follows.

The Bank claims it retained counsel, beginning in 2007, for the purpose of
obtaining regulatory approval from the Federal Reserve, the Office of Thrift Savings
("OTS"), and the FDIC for its Boston branch, as well as branches in New Jersey, Florida,
Connecticut, and New York.  (PF ¶ 50; Scott Aff. ¶¶ 7-14).  In March 2008, the Bank
submitted an application for regulatory approval to OTS.  (Def. Ex. I; Scott Aff. ¶ 19).
The Bank alleges it filed a concurrent application with the FDIC, and filed an application
with the Federal Reserve later that month.  (Scott Aff. ¶¶ 20-21).  The Bank further
alleges that, at a September 23, 2008 meeting attended by OTS and FDIC staff, "FDIC
staff strongly encouraged [the Bank] to withdraw the [FDIC] application."  (Scott Aff.



---

[3] Many of the facts related to regulatory approval are disputed by the Trust, which has
sought to take discovery pursuant to Fed. R. Civ. P. 56(f).  Information relating to these disputed
claims is taken from the (1) Affidavit of Kathleen A. Scott (Docket No. 17) ("Scott Aff."), the
(2) Affidavit of Milton Rodriguez, Jr. in Support of Banco Do Brasil, S.A.'s Motion for Summary
Judgment (Docket No. 18) ("Rodriguez Aff."), and (3) Banco Do Brasil, S.A.'s Answer to
Counterclaim (Docket No. 12) ("Pl.'s. Ans. to Countercl.").  The Trust disputes the assertions
made in these Affidavits.  No discovery has yet occurred in this case.





¶ 24).  On September 26, 2008, the Bank communicated to the Trust that it was pursuing regulatory approval, and that it was seeking to obtain it "as soon as possible."  (Hammer Ex. B).  The Bank further alleges that, as a result of its discussions with regulators, it withdrew its application with the FDIC on October 1, 2008, and that it then filed new applications with the FDIC, OTS, and the Federal Reserve in January 2009.  (Scott Aff. ¶¶ 25-27).

Meanwhile, on October 20, 2008, in response to the Trust's requests for information regarding regulatory approval, the Bank notified the Trust that it was "still working on [obtaining regulatory approval] with the various regulators in an effort to get the approval as soon as possible," mentioning the "regulatory climate" as a possible source of delay.  (Hammer Ex. C; PR ¶ 18).  On December 2, 2008, in response to continued inquiries by the Trust, the Bank stated that "the bank has had to revise its application for the federal savings bank due to the changes in the mortgage market and responses from FDIC and OTS," and that the "revised submissions should be ready within the next week or so."  (Hammer Ex. D).  The Bank further stated that "Federal Reserve officials in NY have indicated that they have recommended to their head office that [the Bank's application] to the Fed be approved."  (Id.).

Beginning February 2009, the Trust requested a meeting with the Bank.  (Pl.'s Ans. to Countercl. ¶ 27).  No meeting was held until May 27, 2009, however, with the Bank repeatedly taking the position that the appropriate person who would participate in a meeting was unavailable.  (See Pl.'s Ans. to Countercl. ¶¶ 31, 32).  Meanwhile, the



-13-



Bank sent the Trust a letter from its regulatory counsel in March 2009 allegedly explaining the Bank's difficulties with the regulatory approval process. (DF ¶ 26; PR ¶ 26). This letter is not included in the record before this Court. The Bank alleges that, in a March 26, 2009 conference call, the FDIC informed the Bank "that it was returning the deposit insurance application as incomplete" because of "concerns about [the Bank's] proposed business plan and products." (Scott Aff. ¶¶ 28-29). The Bank claims to have received a letter from the FDIC, dated April 2, 2009, "formally notifying [the Bank] that the application was being returned." (Scott Aff. ¶ 30; Rodriguez Aff. ¶ 22). The Bank alleges it withdrew its applications with OTS and the Federal Reserve after receiving the April 2, 2009 letter from the FDIC because "[those applications] could not be approved without FDIC insurance." (Rodriguez Aff. ¶ 22).

The Bank and the Trust eventually agreed to meet on May 27, 2009 to discuss the status of regulatory approval. (Hammer Exs. G-K). The Trust alleges that, at the May 27, 2009 meeting, the Bank announced that it had "withdrawn its application from OTS." (DF ¶ 30). The Bank "denies that it voluntarily withdrew applications seeking Regulatory Approval," and claims that the FDIC "had returned Banco's application . . . and suggested that Banco not resubmit [the application] at that time." (PR ¶ 30). After the May 27, 2009 meeting, the Trust requested disclosure of the FDIC letter the Bank had allegedly received. (Hammer Ex. M). The Bank has not disclosed the letter, but offered to allow limited disclosure of the letter subject to certain conditions. (DF ¶ 32; Hammer





Exs. M, N).  The Bank "has not to date provided Washington Street with a copy of any

letter it has received from the FDIC."  (Pl.'s Ans. to Countercl. ¶ 36).

Relying on news statements and other public documents, the Trust alleges that the

Bank wilfully discontinued its applications for regulatory approval as a result of "a new

business plan."  (DF ¶¶ 33-37).  The Bank denies these allegations.  (PR ¶¶ 33-37).  The

Bank claims that it "undertook more than $11 million in contractual obligations and spent

more than $5 million related to such obligations, in part . . . to assist in the Regulatory

Approval process."  (Rodriguez Aff. ¶ 17).  Additionally, the Bank claims that it at all

times complied with the requirements of the Lease's Status Report provision, § 19.3.

(Pl.'s Ans. to Countercl. ¶ 21).

### The Lawsuit

On August 10, 2009, the Bank filed a complaint against the Trust seeking

declaratory relief clarifying its rights and obligations under the Lease.  In particular, the

Bank is seeking a declaration (1) that the Bank's late payment of the July 2009 rent is not

an actionable "Event of Default" under the Lease; (2) that the Bank cured the default;

(3) that the Trust's attempted termination of the Lease on July 16, 2009 is therefore

ineffective; and (4) that the Lease remained in effect until the Bank terminated the Lease

under § 6.5.  (Verified Compl. ¶ 35-40).  The Trust has filed a Counterclaim, alleging that

the Bank breached the Lease and "the implied covenant of good faith and fair dealing by

failing to use good-faith efforts to secure Regulatory Approval as described by the

Lease."  (Countercl. ¶¶ 40, 45).  No discovery has been taken.  The Bank has moved for



-15-



summary judgment on its claim for declaratory judgment and on the Trust's counterclaim.

Additional facts will be provided below where appropriate.

## III.   ANALYSIS

### A.   Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The mere existence of *some* alleged factual dispute will not alone withstand an otherwise properly supported motion for summary judgment; rather, there must be genuine issues of material fact in dispute to defeat summary judgment. See Sands v. Ridefilm Corp., 212 F.3d 657, 660-661 (1ˢᵗ Cir. 2000); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." Tocci Bldg. Corp. v. Zurich Am. Ins. Co., 659 F. Supp. 2d 251, 256 (D. Mass. 2009) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1ˢᵗ Cir. 1996)). "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1ˢᵗ Cir. 2008) (internal quotation marks omitted).





The moving party bears the initial burden of establishing that there is no genuine

issue of material fact. See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4-5 (1st

Cir. 2010); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553,

91 L. Ed. 2d 265 (1986). If that burden is met, the opposing party can avoid summary

judgment only by providing properly supported evidence of disputed material facts that

would require trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993) (citing

Anderson, 477 U.S. at 256-57, 106 S. Ct. at 2514). Moreover, in evaluating a motion for

summary judgment, "the court views all facts and draws all reasonable inferences in the

light most favorable to the nonmoving party." Estrada v. Rhode Island, 594 F.3d 56, 62

(1st Cir. 2010) (citing Anderson, 477 U.S. at 255, 106 S. Ct. at 2513). However, the court

will not consider "conclusory allegations, improbable inferences, and unsupported

speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004). "If, after viewing the

record in the non-moving party's favor, the Court determines that no genuine issue of

material fact exists and the moving party is entitled to judgment as a matter of law,

summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134,

143 (D. Mass. 2006).

Finally, as noted above, no discovery has been taken in this case. The Trust

contends that it needs discovery on the actions taken by the Bank in an effort to obtain

regulatory approval and has moved for leave to take such discovery pursuant to Fed. R.

Civ. P. 56(f). Fed. R. Civ. P. 56(f) "comprises a procedural 'escape hatch' for a party

who genuinely requires additional time to marshal 'facts essential to justify [its] opposi-



-17-



tion' when confronted by a summary judgment motion." Paterson-Leitch Co., Inc. v.

Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 988 (1ˢᵗ Cir. 1988) (quoting Herbert v.

Wicklund, 744 F.2d 218, 221 (1ˢᵗ Cir. 1984)). These facts "must be foreseeably capable

of breathing life into [the movant's] claim or defense." Resolution Trust Corp. v. N.

Bridge Assocs., Inc., 22 F.3d 1198, 1207 (1ˢᵗ Cir. 1998). In considering the issue,

"district courts should construe motions that invoke the rule generously, holding parties to

the rule's spirit rather than its letter." Id. at 1203. Refusal of summary judgment is

appropriate "where the nonmoving party has not had the opportunity to discover informa-

tion that is essential to his opposition." Anderson, 477 U.S. at 250 n.5, 106 S. Ct. at 2511

n.5.

Applying these principles to the instant case, this court finds that summary

judgment should enter in the Bank's favor on the issue whether the Trust properly

terminated the Lease due to the Bank's late payment of rent. However, the Trust's

motion pursuant to Fed. R. Civ. P. 56(f) should be allowed, and the Trust should be given

the opportunity to take discovery on the efforts undertaken by the Bank to obtain the

necessary regulatory approvals.

**B.      Breach of the Lease Agreement – Obligation to Pay Rent**

The Trust contends that the Bank breached the Lease by failing to pay rent in a

timely manner, and that the Bank was not entitled to cure this default. As detailed below,

this court agrees that pursuant to the Lease terms themselves, any grace period was

limited to the 3 day period after July 1, 2009 and there was no right to cure. However,





under well-established equitable principles applicable to commercial leases in

Massachusetts, the mistaken late payment does not support the termination of the Lease,

and the Bank was entitled to cure the default.

### Grace Period for Payment

The clear language of § 18.1(A) provides for two distinct types of default: the first

for failure to pay minimum rent and charges, which must be paid within 3 business days

after the due date, and the second for failure to pay "any other monetary amounts due

under this lease" which must be paid within 3 business days after "the Tenant has

received written notice of such default[.]" (Lease § 18.1A). The two types of defaults

are separated by an "or" and constitute different types of events. Giving the clear and

unambiguous language of the Lease its ordinary meaning, the only logical conclusion that

an "Event of Default" occurs if minimum rent is not paid within 3 days after it is due.

The different treatment of non-payment events not only makes sense, but is

consistent with other provisions of the lease. For example, § 19.8, entitled "Definition of

Additional Rent" clearly identifies taxes and operating expenses as monetary payments

which are "additional (but not minimum) rent[.]" (Id. § 19.8). Thus, the distinction in

§ 18.1A between the non-payment of minimum rent and the non-payment of "any other

monetary amount due under this lease" is consistent with the other Lease terms which

differentiate between minimum rent and other monetary obligations. (Id. § 18.1A).

Moreover, unlike the Bank's obligation to pay minimum rent on a specific date

identified in the Lease, the obligation to pay an "other monetary amount" may be



-19-



triggered by a "statement, invoice or billing rendered by the Landlord[.]" (See id.

§ 19.8). Therefore, it is logical for them to have different grace periods, with the 3 day

grace period for minimum rent to run from the fixed due date, and the 3 day grace period

for additional monetary payments to run after a written notice of default.

The fact that the 3 day grace period runs from the date minimum rent was due is

also made clear in § 4.1 of the Lease which defines minimum rent.  As that provision

states, the "Tenant covenants and agrees to pay without notice, demand or offset to the

Landlord" the minimum rent provided for in the Lease.  (Id. § 4.1).  Late charges are to

be paid "to the Landlord on demand" for "each installment of minimum rent that is not

paid within three (3) business days after the date when due[.]"  (Id.).  There is no mention

in § 4.1 of a grace period which is triggered by a notice: rather it is set to run after the

fixed due date for the rental payments.  In sum, the Bank's failure to pay the rent within 3

business days after July 1, 2009 constituted an "event of default" under § 18.1 of the

Lease.  Therefore, the issue is whether the Bank had a right to cure the default after the

three day period had expired.

### Contractual Right to Cure

A review of the Lease provisions also compels the conclusion that there is no

contractual right to cure a default for non-payment of rent.  While the Landlord may elect

to accept a late payment (see § 4.1), it was not obligated to do so.

Pursuant to § 18.2 of the Lease, following an Event of Default the Landlord may,

"subject to applicable Massachusetts law," immediately enter and repossess the premises





or send a written notice of termination. The Lease would then be terminated upon the earlier of entry onto the premises or the 5th day following mailing of the termination notice. (Id.). It is well established that a contractual provision providing for entry to terminate a lease, without notice to the tenant, is lawful and enforceable. See, e.g., Zevitas v. Adams, 276 Mass. 307, 313-14, 177 N.E. 114, 117 (1931).

The Bank argues that the fact that the termination of the Lease was not effective until the 5th day following the mailing of the termination notice constitutes a grace period for the payment of rent. This argument is not persuasive. From the context of the provision it is clear that the 5 days is intended to give the tenant time to vacate the premises. Termination is effective "upon the first to occur" – entry or 5 days after mailing. It is undisputed that entry can be immediate upon default, without a right to cure. A right to cure cannot simply be read into the provision allowing for termination by means of a written notice. See Berman v. B.C. Assoc., 219 F.3d 48, 51 (1st Cir. 2000) (courts must "enforce the contract as written and are not free to revise or change it") (internal quotation omitted). Thus, there is no right to cure under the Lease.

## Statutory Right to Cure

The Massachusetts statutes also do not provide a right to cure in the instant case. Mass. Gen. Laws ch. 186, § 11A provides:

> Upon the neglect or refusal by the tenant to pay the rent due under a written lease of premises for other than dwelling purposes, the landlord shall be entitled to terminate the lease either (i) in accordance with the provisions of the lease or (ii) in the absence of such lease provisions, by at least fourteen days notice to quit, given



-21-

in writing to the tenant.  <u>If a landlord terminates the lease by at least
fourteen days notice pursuant to clause (ii) of the preceding
sentence, the tenant shall be entitled to cure</u> on or before the day
the answer is due in any action by the landlord to recover possession
of the premises, by paying or tendering to the landlord or to his
attorney all rent then due, with interest and costs of such action.
<u>The right to cure provided herein, shall apply only to termination
pursuant to clause (ii) and shall not apply to termination in
accordance with the provisions of the lease.</u>

(Emphasis added).  Thus, the statute entitles the landlord to terminate a lease with a

fourteen day notice to quit, along with a right to cure, but only "absent lease provisions

addressing the topic[.]"  <u>Rockport Schooner Co., Inc. v. Rockport Whale Watch Corp.</u>, 58

Mass. App. Ct. 910, 910, 789 N.E.2d 151, 152 (2003).  Since the Lease in the instant

case includes a termination provision, the statute has no application.[4]

### Equitable Right to Cure

The Landlord's rights following an event of default are "subject to applicable

Massachusetts law[.]"  (Lease § 18.2).  Consequently, despite the absence of a right to

cure in the Lease, under the undisputed facts of this case such a right will be implied.  As

an initial matter, "Massachusetts case law disfavors forfeitures in landlord/tenant cases."

---

[4] During oral argument the Bank referred to Mass. Gen. Laws ch. 232A, § 1 which
provides, in part, that "[t]he payment or tender of payment of the whole amount due on a contract
for the payment of money after it is due and payable and before action is commenced shall, if
pleaded, have the same effect as if made at the time provided in the contract."  This statute is
inapplicable to the instant case in light of the after-enacted ch. 186, § 11A, which specifically
addresses a right to cure in commercial leases.  "The explicit terms of a later specific statute
supersede those of an earlier general one."  <u>Case of Dalbec</u>, 69 Mass. App. Ct. 306, 316 n.10, 867
N.E.2d 792, 799 n.10 (2007), and cases cited.  Moreover, the Bank has not addressed this
argument in its pleadings, and it is waived.  <u>See</u> United States v. Pulido, 566 F.3d 52, 60 n.4 (1st
Cir. 2009) (argument raised for first time at oral argument deemed waived), and cases cited.





In re 29 Newbury St., Inc., 856 F.2d 424, 427 (1st Cir. 1988), and cases cited. Therefore, as the court explained in DiBella v. Fiumara, 63 Mass. App. Ct. 640, 828 N.E.2d 534 (2005), "[i]f the breach is insignificant or accidental, even if there is a default clause, our courts will not allow termination." Id. at 644, 828 N.E.2d at 538, and cases cited. The "accidental failure to pay rent on time" is such an insignificant or accidental breach that it will not support the termination of a lease. Id. (citing Judkins v. Charette, 255 Mass. 76, 82-83, 151 N.E. 81, 83 (1926) (noting that failure to pay rent, even if wilful, is not a ground for forfeiture)). Massachusetts joins with "nearly all courts [which] hold that, regardless of the language of the lease, to justify forfeiture, the breach must be 'material,' 'serious,' or substantial.' . . . Forfeiture for a trivial or immaterial breach of a commercial lease should not be enforced." Found. Dev. Corp. v. Loehmann's, Inc., 163 Ariz. 438, 445-46, 788 P.2d 1189, 1196-97 (1990) (internal punctuation omitted), cited with approval in DiBella, 63 Mass. App. Ct. at 644 n.6, 828 N.E.2d at 538 n.6.

In the instant case, the Bank paid the outstanding rent, plus late charges, immediately upon learning of its failure to pay the rent. The Trust was not harmed by the delay in payment. The facts establish that the inadvertent failure to pay rent in a timely manner was insignificant and accidental as a matter of law. Therefore, the termination provision of the Lease should not be enforced.

The Trust argues that this case is different because the Bank did not intend to stay in the property but, rather, had already indicated its intention to terminate the Lease under the early termination provision. This argument is without merit. Fundamentally, the



-23-



Trust was not harmed by the few-week delay in receiving the rent payment. The parties

negotiated an early termination provision in light of the need for regulatory approval.

The risks inherent in obtaining regulatory approval were not affected by the payment of

rent in a timely or untimely manner. The Bank should not be foreclosed from exercising

its right to early termination due to an immaterial mistake, and the Trust is not entitled to

a windfall because of the Bank's error. Under the facts of this case, the Trust's attempt to

terminate the Lease was ineffective, and a declaratory judgment in favor of the Bank

should enter to this effect on Count I of its complaint. See also Howard D. Johnson Co.

v. Madigan, 361 Mass. 454, 456-58, 280 N.E.2d 689, 691-92 (1972) (refusing to allow

termination where tenant failed to submit gross sales figures needed to establish rent in a

timely and complete manner but cured the default and landlord suffered no harm); ENO

Sys., Inc. v. ENO, 311 Mass. 334, 338, 41 N.E.2d 17, 19 (1942) ("Relief against

forfeiture has been granted although a lessee has failed to pay rent at the times and in the

manner designated by the lease and even if such failure has been wilful and intentional

. . . ."); HealthSouth Corp. v. HRSE1 Props. Trust, No. 200404345, 2005 WL 2864247,

at *5 (Mass. Super. Ct. Sept. 25, 2005) ("If a breach is insignificant or accidental, that

breach may not serve as grounds for termination of the lease, regardless of whether the

parties negotiated for and included a default clause in the lease.").



### Sufficiency of Notice

The Bank further contends that the Trust's attempt to terminate the Lease was

ineffective due to a failure to give the notice required by the Lease. This issue does not



need to be addressed in light of this court's conclusion that the termination notice should

be deemed null and void for equitable reasons. If this issue is reached, however, this

court finds that the notice was technically sufficient.

Section 19.15 of the Lease, entitled "Notices" provides in part:

> Whenever by terms of his lease notice, demand, or other communi-
> cation shall or may be given either to the Landlord or to the Tenant,
> the same shall be in writing and <u>shall be sent by registered or
> certified mail</u>, postage prepaid, or <u>shall be delivered by a recognized
> overnight, common express carrier</u>, express charges paid by sender
> for next morning delivery:
>
> ....
>
> if intended for the Tenant, addressed to it <u>at the address set forth
> on the first page of this lease</u> (email: bernardorothe@bb.com.br)
> and a copy thereof address to the Tenant, sent by mail or carrier,
> shall be sent to the Tenant c/o Peter D. Aufrichtig, Auftrichtig &
> Auftichtig, P.C., 300 East 42nd St., 5th Floor, New York, NY
> 10017 (email: peter@asape.com) (or to such other address or
> addresses as may from time to time hereafter be designated by
> the Tenant by like notice).
>
> Each such notice <u>shall be effective upon delivery or attempted
> delivery by the postal service or such overnight express carrier </u>at the
> address of the party for whom intended set forth above or theretofore
> established pursuant to the foregoing....

(Lease § 19.15) (emphasis added). "[T]he address set forth on the first page of [the]

lease" is the Tenant's "present mailing address," which is listed as:

> 265 Washington Street, Boston, Massachusetts 02108; and, prior to
> the Delivery Date, 600 Fifth Avenue, 3rd Floor, New York, New
> York 10020.

(<u>Id.</u> § 1.1(b)). Finally, the termination provision, as noted above, provides that "the

Landlord may send written notice to the Tenant terminating the term of this lease" which





will terminate the lease on "the fifth (5th) day following <u>mailing</u> of such notice[.]" (<u>Id.</u> § 18.2) (emphasis added).

In the instant case, the Bank objects that it did not receive the notice at any email address, although it concedes that notice was mailed in accordance with the provisions of the Lease and that it received the written notice. This court recognizes that, to be effective, the notice had to comport with the requirements of the Lease. <u>See</u> <u>In re Everest Crossing, LLC</u>, 416 B.R. 361, 364 (D. Mass. 2009) ("The Landlord was entitled to terminate the Lease in accordance with the provisions of the Lease, but to do so the Landlord was required to follow the procedures stated in the Lease . . . ."). Here, however, the Lease required that, to be effective, the notice had to be in a hard copy and either mailed or delivered. Notice by email was irrelevant to the validity of the notice, thus making it apparent that the email addresses were simply provided for convenience. Consequently, the Trust's failure to send email notice of termination did not affect the validity of the termination notice.



### C.   <u>Breach of the Lease Agreement – Build-Out Obligation</u>

The Trust also claims that the Bank breached Section 3.5 of the Lease by failing to "begin build-out of the Premises '[p]romptly' after the premises were made ready for it, even if that was before the Bank received regulatory approval." (Def.'s Mem. at 18; DF ¶ 20).[5] The Trust argues that the premises were "made ready" for the Bank shortly after

---

[5] It is unclear whether the Trust is claiming that the "breach" caused by the failure to build-out is an independent grounds for terminating the Lease or is a reason why equity should



execution of the Lease, and that the Bank should have begun build-out soon thereafter. (Id.). However, the Lease does not provide for any benchmarks in construction, and does not impose any penalties if construction is not begun on a specific date. The only time that the status of construction becomes significant under the Lease is if the build-out was not completed "120 days after obtaining regulatory approval." (Lease § 3.5). If that were to occur, the Lease provides how much rent and other charges the Bank would have to pay. (Id.). Therefore, the failure to begin the build-out is irrelevant unless it was not completed in a timely manner. The Bank's failure to begin the build-out at any given time does not constitute a breach of the Lease.

This court notes that the Lease also provides that if regulatory approval was not obtained and the Lease was terminated as a result, the Bank would have to Pay to the Landlord "the cost to restore the demised premises to the condition it was delivered to Tenant on the Delivery Date[.]" (Id. § 6.5). It makes no sense to charge the Bank with a default for failure to undertake construction which would, in any event, have to be undone if and when the lease was terminated. In short, the status of the build-out is not relevant to the issue before this court, i.e., whether the Lease could properly be terminated by either party.



---

allow the Trust to terminate the Lease. There is no evidence that the Trust gave the Bank notice of an intent to terminate for this reason. Under § 18.1(B) of the Lease, the Landlord would have to give the Bank written notice and an opportunity to cure such a "non-monetary default." (See Def.'s Opp. (Docket No. 23) at 3 ("the Trust did not act on the breach [for failure to begin the build-out] on the belief that the Bank was acting in good faith prosecuting its application for Regulatory Approval.")).



**D.      The Validity of the Bank's Purported Early Termination**

Assuming, as this court has concluded, that the Lease could not be terminated for

non-payment, the Trust contends that the Bank's early termination notice was invalid

because the Bank did not take all necessary actions to obtain regulatory approval, and

because the Bank did not fulfill the Lease's requirements for early termination by making

an unequivocal payment of rent.  As detailed herein, this court concludes that the Trust's

request pursuant to Fed. R. Civ. P. 56(f) for discovery about these issues should be

allowed.

**Implied Obligation of Good Faith and Fair Dealing**

"Every contract implies good faith and fair dealing between the parties to it.  The

implied covenant of good faith and fair dealing provides that neither party shall do

anything that will have the effect of destroying or injuring the right of the other party to

receive the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass.

451, 471, 583 N.E.2d 806, 820 (1991) (internal punctuation, citations and quotation

omitted).  See also Liss v. Studeny, 450 Mass. 473, 477, 879 N.E.2d 676, 680 (2008).  "A

party may breach the covenant of good faith and fair dealing implicit in every contract

without breaching any express term of that contract."  Speakman v. Allmerical Fin. Life

Ins., 367 F. Supp. 2d 122, 132 (D. Mass. 2005).  However, because "[t]he requirement of

good faith performance is . . . circumscribed by the obligations of the contract . . . the

covenant may not be invoked to create rights and duties not contemplated by the

provisions of the contract or the contractual relationship." Id.  "Nor does the covenant



apply where the defendant has exercised an express contractual power in good faith -- that is, in a manner that comports with the parties' reasonable expectations as to performance." Id., and cases cited.

When a contract calls for a party to obtain government approval, "that party has an obligation to make the necessary applications in a reasonable effort to obtain the required approval." Trans Canada Power Mkt. Ltd. v. Narragansett Elec. Co., 542 F. Supp. 2d 127, 135 (D. Mass. 2008). See also Sechrest v. Safiol, 383 Mass. 568, 571-72, 419 N.E.2d 1384, 1385 (1981) (purchase and sale agreement allows for termination if necessary approvals are not obtained. "Necessarily implied in the provision is an obligation to use reasonable efforts to obtain town approval."). In the instant case, the Lease's implied obligation of good faith and fair dealing required the Bank to use reasonable efforts to obtain the required regulatory approvals to open the bank branch.

This court finds that the Bank has not met its burden of establishing that there are no genuine issues of material fact relating to its failure to obtain regulatory approval. It has not fully disclosed the evidence relating to why its application with the FDIC was denied,[6] why it withdrew its other applications, nor why it did not re-apply. In particular, but without limitation, the Bank has not even disclosed the April 2, 2009 letter from the



---

[6] For example, the Trust has alleged that the Bank informed it, through counsel, that the initial application was returned because it "had not included its pension plan ... as a 'control party' in its application, as [the Bank] was required to do[.]" (Countercl. ¶ 30). The Bank, however, has maintained that its application was first returned due to the FDIC's "numerous questions" about Banco's "proposed business plan." (PF ¶ 66).



FDIC, upon which it bases its claims that regulatory approval would have been unavail-

ing. (DF ¶ 32; PR ¶ 32). The Bank maintains that the letter has not been disclosed

because it contains "statements by the FDIC which Banco believed were incorrect" as

well as confidential and other information that "Banco believed the FDIC did not wish to

become public." (Pl.'s Opp. (Docket No. 39) at 3). While the Bank has offered to

produce the letter for the court's *in camera* review, this would not be sufficient since the

court does not have enough information to evaluate the letter in context. While the

details of regulatory approval are undoubtedly known to the Bank, they have not been

included in the summary judgment record. The present record is therefore not clear

enough for this court to determine whether the circumstances under which the Bank

sought regulatory approval satisfied its obligations under the Lease.

### The Need for Discovery

The Trust has raised sufficient facts to require discovery on the issue of the Bank's

efforts to obtain regulatory approval. For example, but without limitation, the Trust has

cited to a number of published statements indicating that the Bank had a new business

model which was based on acquiring existing banks instead of opening new ones. (See,

e.g., DF 33-37; Def. Sur-Reply Ex. C). In addition, it has pointed out a number of

seeming inconsistencies in the information provided by the Bank as to the progress of its

applications, and has raised a number of questions about the sufficiency of the general

information the Bank has provided to the court. (See, e.g., Def.'s Opp. (Docket No. 23)

at 2-5, 19-20). No discovery has been taken to date. The Trust should be permitted to





explore the veracity of the information the Bank has submitted, and to develop additional facts on the critical issue whether the Bank fulfilled its obligation of good faith and fair dealing in seeking the necessary regulatory approval to open the bank.

## Sufficiency of the Early Termination Notice

The Trust also contends that the Bank did not properly exercise the early termination provision because it required that the Trust waive its claim that the Trust had previously terminated the Lease before cashing the Bank's early termination payments. (See Def's Opp. (Docket No. 23) at 20-23). In contrast, the Bank asserts that its letters and statements accompanying the checks "did not constitute a condition which Banco sought to place upon Landlord's acceptance of the Termination Payment." (Pl. Opp. (Docket No. 39) at 16). It is clear that the early termination provision must be "enforced according to its terms." Loitherstein v. IBM Corp., 11 Mass. App. Ct. 91, 94, 413 N.E.2d 1149, 1148-49 (1980). In light of the fact that further discovery is to take place in connection with the issue of the Bank's effort to obtain regulatory approval, this court recommends that the parties be allowed to further develop the factual record related to the events surrounding the Bank's early termination notice and related payments as well.

## IV.   CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Bank's motion for summary judgment (Docket No. 14) be ALLOWED IN PART AND DENIED IN PART. Specifically, this court recommends that a declaratory judgment be entered holding that the Trust's attempt to



-31-

terminate the lease for non-payment is null and void as the breach was accidental and

insignificant, and the Bank cured any untimely payment. In addition, however, this court

recommends that the Trust's Rule 56(f) request for discovery on the issue of the Bank's

efforts to obtain regulatory approval be ALLOWED. Accordingly, no declaratory

judgment on the issue of the propriety of the Bank's early termination efforts should be

entered, and the Bank's motion for summary judgment on the Trust's counterclaim

should be denied without prejudice.[7]

/ s / Judith Gail Dein
Judith Gail Dein
U.S. Magistrate Judge

---

[7] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).



**EXHIBIT 4**

*Banco do Brasil, S.A. v. 275 Washington Street Corp., as it is the Trustee of Washington Street Realty Trust II.,*
Civil Action No. 09-11323-NMG

Banco do Brasil's Second Privilege Log

| NO | DATE | FROM | TO | CC | DESCRIPTION | PRIVILEGE ASSERTED | DATE |
|---|---|---|---|---|---|---|---|
| 1 | 03/02/2009 | P. Aufrichtig | M. Leonardo | | Email reflecting legal advice regarding business plans. | AC | |
| 2 | 07/28/2008 | | | E. Baccarini; A. Pinheiro | Email reflecting legal advice regarding business plans. | AC | |
| 3 | 07/07/2008 | K. Scott* | M. Rodriguez | M. Rodriguez | Draft report prepared by and reflecting legal advice of K. Scott regarding OTS questions. | AC | |
| 4 | 04/15/2008 | K. Scott* | B. Rothe | M. Rodriguez | Email reflecting request for legal advice regarding OTS questions. | AC | |
| 5 | 04/09/2009 | | | | Email providing legal advice regarding OTS application. | AC | |
| 6 | 06/24/2008 | M. Rodriguez | K. Scott* | | Report reflecting legal advice of in-house counsel regarding business plans. | AC | |
| 7 | 09/18/2008 | B. Rothe; M. Rodriguez; A. Pinheiro; R. Wachotcz; L. Whyte; D. Collins; L. Alves | K. Scott* | K. Scott* | Email providing legal advice regarding OTS questions. | AC | |
| 8 | 09/18/2008 | B. Rothe; M. Rodriguez; A. Pinheiro; R. Wachotcz; L. Whyte; D. Collins; L. Alves | K. Scott* | K. Scott* | Email providing legal advice regarding FRB application. | AC | |
| 9 | 09/18/2008 | B. Rothe; M. Rodriguez; A. Pinheiro; R. Wachotcz; L. Whyte; D. Collins; L. Alves | K. Scott* | K. Scott* | Email providing legal advice regarding FRB application. | AC | |
| 10 | 11/15/2007 | M. Rodriguez | B. Rothe | | Email reflecting legal advice of K. Scott regarding OTS application. | AC | |

| ID# | DATE | FROM | TO | CC | DESCRIPTION | PRIVILEGE ASSERTED | BASIS |
|---|---|---|---|---|---|---|---|
| 15.223 | 07/25/2006 | B. Rothe; M. Rodriguez; A. Pinheiro; L. Alves; C. Pontes | K. Scott* | | Email providing legal advice regarding regulatory issues. | AC | |
| 15.224 | 08/16/2007 | R. Wachholz; M. Rodriguez | K. Scott* | | Email providing legal advice regarding OTS application. | AC | |
| 15.225 | 01/05/2009 | | R. Geluz* | | Draft report reflecting legal advice of in-house counsel regarding business plans. | AC | |
| 15.226 | 03/25/2008 | M. Rodriguez | B. Rothe | M. Munoz | Email conveying legal advice of K. Scott regarding OTS application. | AC | |
| 15.227 | 09/16/2008 | dfin.geral.redexp@bb.com.br | R. Wachholz | B. Rothe; M. Rodriguez | Email reflecting legal advice of in-house counsel regarding regulatory issues. | AC | |
| 15.228 | 04/29/2008 | B. Rothe | K. Scott* | M. Rodriguez; L. Whyte | Email providing legal advice regarding OTS questions. | AC | |
| 15.229 | 04/25/2008 | K. Gonzalez | K. Scott* | B. Rothe; L. Alves; A. Pinheiro | Email providing and seeking legal advice regarding regulatory issues. | AC | |
| 15.230 | 02/12/2009 | | | | Draft letter prepared by and reflecting legal advice of in-house counsel regarding Boston lease issues. | AC | |

**EXHIBIT 5**

# COOLEY MANION JONES LLP

Nicholas D. Stellakis
Attorney at Law
Direct Dial: (617) 670-8534
Direct Fax: (617) 670-8734
E-mail: nstellakis@cmjlaw.com

April 29, 2011

**Via Electronic and First-Class Mail**

Charles G. Berry
Arnold & Porter LLP
399 Park Avenue
New York, NY 10022-4690

RE:   Banco do Brasil, S.A. v. 275 Washington Street Corp.
      U.S.D.C. Civil Action No. 1:09-cv-11343-NMG

Dear Charles:

I am writing in advance of our discovery call and to supplement my letter to you of April 22, 2011, and also to respond to your letter sent yesterday.

I am glad that you agree that the Trust needs "a reasonable time to review the rest of the Bank's production." In my April 22 letter, the Trust asked for the Bank's assent to a 90-day extension of the scheduling order. That was before your more recent production of more than 33,000 additional pages, many of which (as the cover letter notes) are in Portuguese. In the last week, then, the Bank's production has increased from a little more than 16,000 pages to more than 65,000 pages. You mention the great effort the Bank was required to undertake to comply with the discovery order. This compliance obviously required counsel to have translated and then reviewed the Portuguese-language documents, a fact I believe you mentioned to me in December. The Trust appreciates these efforts, as well as the fact that the Bank produced the documents on a rolling basis—as you say, "to produce to [the Trust] as soon as possible documents that had been reviewed for responsiveness and privilege and were ready for production." The Trust notes, however, that the Portuguese-language documents have only recently been produced, all within the last month and the bulk within the last few weeks. Given the Bank's refusal, expressed in your letter, to assist the Trust to understand the content of these documents, by way of voluntarily providing the translation or otherwise, the Trust will need to have all those documents translated (5,662 pages by our count, not including your most recent production) before it can even begin to analyze them. You can be assured that the Trust has no interest in delay either, but the practicalities of the situation occasioned by the manner of the Bank's production—to reiterate, the Bank has more than quadrupled its production in the last week, providing documents mostly in Portuguese—compel us to amend our previous request and ask the Bank to assent to a six-month extension of the discovery schedule. Your offer of a 30-day

# COOLEY MANION JONES LLP

Charles G. Berry
April 29, 2011
Page 2

extension is, in light of the above, most unreasonable, and we do not believe the Court would look well on the Bank's insisting on such a schedule.

We disagree with your assertion that the Bank has produced all the relevant portions of its applications. We can discuss further, but our review of the documents the Bank has produced reveals that the regulators had substantial concerns about information missing from the applications, including information that should have been, but was not, disclosed by the Bank but was discovered through the regulators' independent research. I will not attempt a comprehensive list here, but as examples I point out the following: OTS expressed concern that a certain proposed officer or director answered "yes" to a question relating to a 1999 bankruptcy (see BB00001900); it raised serious concerns regarding potential felony charges and bankruptcy filings for another proposed director (see *id.*); it questioned various actions taken against the Bank in a number of instances (see BB00003292); it noted several incidents that the Bank had failed to disclose in its applications (see BB00000766); it noted that undocumented Brazilian and Mexican immigrants could make up a significant portion of the Bank's business (see BB00003266); it raised issues about a particular individual that were not disclosed in the Bank's applications (see BB00000650); and it raised questions about Previ, whose application has not been produced (see BB00000379). In all these instances, material information has been withheld that is necessary for the Trust to prepare its case and defense. Again, this list is by way of example only. We have not yet completed our review of the documents the Bank produced, including the recent, massive productions. It is imperative that we come to an understanding about delivery of the remainder of the applications, and the confidential attachments to letters summarized below, to enable us to complete discovery in a timely and efficient manner. I can assure you that the Trust has no interest in such things as individuals' fingerprint cards. However, it is quite different when the Bank withholds information that answers questions over which the regulators have expressed concerns. We have identified some of these concerns, and we may identify further concerns as we continue our review. As you know, one of the issues that the Court has identified and over which it has ordered discovery is whether the Bank used good faith, reasonable efforts to secure Regulatory Approval. You indicated a willingness to discuss particular portions of withheld materials that the Bank believes it is entitled to review. It seems to us more efficient to have a broader discussion about receiving the complete applications, perhaps with particular information (such as fingerprint cards) that the Bank identifies removed, and subject to designation as highly confidential if appropriate. We can discuss.

I will not respond to all the points in your letter, but the Trust does note the following additional issues with the Bank's document production and would like to discuss these during the call.

# COOLEY MANION JONES LLP

Charles G. Berry
April 29, 2011
Page 3

1. We believe that the Bank has waived its attorney-client privilege and forfeited the protection of the work-product doctrine for communications between the Bank and its attorney, Kathleen Scott, concerning the Bank's efforts to obtain Regulatory Approval, by introducing as issues in this case Scott's role in the process and her communications with the Bank. The First Circuit has noted: "Particularly in a civil case, a privileged party cannot fairly be permitted to disclose as much as he pleases and then to withhold the remainder to the detriment of the defendant." *Greater Newburyport Clamshell Alliance v. Pub. Serv. Co. of N.H.*, 838 F.2d 13, 20 (1st Cir. 1988); see *McLaughlin v. Lunde Truck Sales, Inc.*, 714 F. Supp. 916, 920 (N.D. Ill. 1989) ("the defendants have waived their attorney/client privilege through the assertion of their affirmative defense of 'good faith reliance' and Attorney Williams's affidavit").

2. Much of the correspondence in the production between the Bank and OTS, FRB, or FDIC contains redactions or omissions that are inappropriate. We believe the withheld information is necessary for our case and defense. We offer the following list (which we may supplement as we continue our review of your production):

   a. The April 9, 2008, letter from OTS (beginning at BB00001888) notes a number of documents that were in the Bank's application but that were not produced. In particular, we direct you to OTS question number 14 (discussing "various actions taken against" the Bank) and 71(d) (referring to an Applicant Certification by Mildred L. Harper).

   b. There is an April 25, 2008, email from Kathleen Scott to Karen Marcotte of OTS (beginning at BB00001866), but there is no responding email in the production, which leads us to question whether we have been given a full set of the electronic communications between the Bank and OTS, FRB, or FDIC.

   c. The May 8, 2008, letter from Scott to OTS (beginning at BB00003275) is missing all of its exhibits, both public and confidential.

   d. The July 8, 2008, letter from Scott to OTS (beginning at BB00003248) is similarly missing all exhibits, public and confidential.

   e. The July 10, 2008, letter from Scott to OTS (beginning at BB00001410) states that it enclosed two CDs, but these do not appear to be in the production.

   f. The August 21, 2008, letter from Scott to OTS (beginning at BB00002221) is missing the confidential exhibits.

   g. The October 27, 2008, letter from Scott to OTS (beginning at BB00002858) contains a completely redacted confidential exhibit E.

# COOLEY MANION JONES LLP

Charles G. Berry
April 29, 2011
Page 4

h. The December 10, 2008, letter from Scott to OTS (beginning at BB00000647) does not include confidential exhibits E and F.

i. The May 13, 2008, letter from Scott to FDIC (beginning at BB00002291) does not include the CD referenced in the letter, contains a completely redacted confidential exhibit A, does not include a complete confidential exhibit C (the Harper certification is missing), and is missing confidential exhibit E in its entirety.

j. The May 21, 2008, letter from Scott to FDIC (beginning at BB00002262) does not include the CD referenced in the letter.

k. The May 20, 2008, letter from Scott to FRB (beginning at BB00000964) is missing confidential exhibit A and contains a completely redacted confidential exhibit B, and we question whether confidential exhibits C and D are complete.

l. There is a July 1, 2008, letter from Scott to FRB that is missing entirely from your production, leading us to question whether the Bank has produced all correspondence with the relevant againcies.

m. The September 17, 2008, letter from Scott to FRB (beginning at BB00003001) references a September 8, 2008, email from Dinah Knight. That email is missing from the production. In addition, the exhibits to the letter are missing from the production.

n. The September 23, 2008, letter from Scott to FRB (beginning at BB00003009) does not include the confidential enclosure.

o. The December 20, 2007, letter from Scott to OTS and FDIC (beginning at BB00000581) is missing the enclosures referenced in the letter.

p. The January 9, 2008, letter from Scott to OTS and FDIC (beginning at BB00000583) completely redacts the attached exhibit.

q. The January 31, 2008, email from Scott to OTS (beginning at BB00000812) completely redacts the attachment.

r. The March 11, 2008, letter from Scott to OTS (beginning at BB00002109) references email correspondence from the day before, but no such correspondence is in the production.

s. There is a March 12, 2008, email from Scott to OTS (beginning at BB00002107), but there is no response in the production.

t. The March 26, 2008, letter from Scott to FRBNY (beginning at BB00006225) references two sets of CDs enclosed with the letter, but the contents of the CDs do not appear to be in the production.

# COOLEY MANION JONES LLP

Charles G. Berry
April 29, 2011
Page 5

    **u.** The April 4, 2008, letter from Scott to FRBNY (beginning at BB00006644) refers to a February 29, 2008, letter from FRBNY and a November 1, 2007, letter to FRBNY, but neither of these referenced letters is in the production.

    **v.** There is an April 4, 2008, email from Scott to OTS (beginning at BB00001978) but no response is in the production.

    **w.** The April 29, 2008, letter from Scott to FRBNY (beginning at BB00002424) contains a completely redacted confidential supplement.

    **x.** The May 14, 2008, letter from Scott to FRBNY (beginning at BB00006226) references enclosed CDs, but the contents of those CDs are not in the production.

    **y.** The May 27, 2008, letter from Scott to OTS, FDIC, and FRBNY (beginning at BB00002260) references enclosed CDs, but the contents of those CDs are not in the production.

    **z.** The May 27, 2008, email from Scott to FRBNY (beginning at BB00000944), which attaches a letter of the same date, references enclosures and a confidential supplement, which are either not produced or are redacted.

    **aa.** The June 4, 2008, letter from Scott to FRBNY (beginning at BB00002201) completely redacts the attachment.

    **bb.** There is a June 20, 2008, letter from Scott to OTS, FDIC, and FRBNY, that is entirely missing from your production.

    **cc.** There is an August 1, 2008, email from Scott to OTS (beginning at BB00001606), but there is no response in the production.

    **dd.** The August 27, 2008, letter from Scott to OTS (beginning at BB00006208) is missing its attachment.

We will certainly be prepared to discuss the Trust's production as well.

Sincerely,

Nicholas D. Stellakis

cc: Eric F. Eisenberg (by electronic mail)
    Martin F. Gaynor III