THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | |
|---|---|
| BANCO DO BRASIL, S.A. ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 1:09-cv-11343-NMG |
| v. ) | |
| ) | |
| 275 Washington Street Corp., ) | |
| as it is the Trustee of the WASHINGTON ) | |
| STREET REALTY TRUST II, ) | |
| ) | |
| Defendant. ) | |
| ) | |

### AFFIDAVIT OF KATHLEEN A. SCOTT IN OPPOSITION TO MOTION OF DEFENDANT / PLAINTIFF-IN-COUNTERCLAIM TO COMPEL PRODUCTION OF PRIVILEGED DOCUMENTS

I, Kathleen A. Scott, having been duly sworn, hereby depose and state as follows:

1. I am Counsel in the Financial Services Group at Arnold & Porter LLP and submit this affidavit in opposition to the motion of Defendant / Plaintiff-in-Counterclaim, 275 Washington Street Corp., as it is the Trustee of the Washington Street Realty Trust II (the "Landlord") to compel production by Plaintiff / Defendant-in-Counterclaim, Banco do Brasil (the "Bank") of attorney-client privileged documents.

2. I have personal knowledge of the facts set forth herein, which I believe to be true.

3. In particular, I seek in this affidavit to correct mischaracterizations of an affidavit of mine sworn to on October 30, 2009 (the "Scott 10/30/09 Affidavit"), which was submitted in support of the Bank's initial motion for summary judgment and is attached as Exhibit ("Ex.") A to the memorandum of law submitted by the Landlord on its motion to compel ("Def. Mem").

**The Scott 10/30/09 Affidavit Does Not Disclose Any Attorney-Client Communication.**

4. Contrary to the Landlord's conclusory assertions, my October 30, 2009 affidavit did not disclose any privileged communication. A simple reading of the affidavit shows that it sets forth communications with the bank regulatory agencies involved in the application process for a new (*de novo*) federal savings bank and not communications with my client, the Bank.

5. The purpose of the affidavit was to summarize the complex features of the application process.

6. I did not disclose or intend to disclose -- nor was I authorized to disclose -- any privileged communication with the Bank.

7. In fact, my affidavit did not disclose any communication at all with the Bank, privileged or otherwise.

**The Statements Quoted from the Scott 10/30/09 Affidavit Do Not Put "At Issue" Any Privileged Communication between the Bank and its Regulatory Counsel.**

A. **The Statements of Applicable Banking Law**

8. In describing the multi-faceted regulatory approval process for a *de novo* FSB to be owned by a foreign bank such as Banco do Brasil, my October 30, 2009 affidavit explained certain legal requirements under the International Banking Act, the Home Owners Loan Act and the Federal Deposit Insurance Act.

9. The Landlord's motion to compel quotes statements in my affidavit presenting those explanations of law (Def. Mem. 2) and suggests that they somehow put at issue my communications with the Bank about the regulatory process. That suggestion is mistaken.

10. The first three paragraphs the Landlord focuses on are paragraphs 11 through 13 of my affidavit, which stated as follows (paragraph 10 is included for context):

> 10. There were three U.S. federal regulatory agencies involved in the application process: the Board of Governors of the Federal Reserve System (the "FRB"), the office

> of Thrift Supervision (the "OTS") and the Federal Deposit Insurance Corporation (the "FDIC").
>
> 11. Pursuant to the International Banking Act, the FRB must approve Banco do Brasil, a non-U.S. bank, to own a U.S. federal saving bank (the "FRB Application").
>
> 12. Pursuant to the Home Owners Loan Act, the OTS must approve the establishment of a federal saving bank and approve a proposed federal savings bank's direct and indirect control parties as savings and loan holding companies (the "OTS Application").
>
> 13. Pursuant to the Federal Deposit Insurance Act, the FDIC must approve an application for deposit insurance for a federal savings bank (the "FDIC Application") . . . .

Scott 10/30/08 Aff. pp. 2-3 (Def. Mem. Ex. A)

11. The statements quoted do not disclose any communication between me and the Bank but are simple, undisputed and incontestable statements of the regulatory applications the Bank was required to file before it could operate the planned FSB.

12. These explanations cannot provide a wedge for the Landlord to pry into the extensive communications that I and other counsel had with the Bank about the regulatory approval process.

**B.     The General Descriptions of the Intensity of the Bank's Efforts**

13. The only other paragraphs of my October 30, 2009 affidavit the Landlord mentions in its motion are equally devoid of any attorney-client communication or confidence.

14. Those paragraphs are the last two paragraphs of the affidavit (Def. Mem. Ex. A, p. 5), which read as follows:

> 31. I worked intensively for over 18 months with many Banco do Brasil personnel to obtain the required regulatory approvals for Banco do Brasil in order to open the FSB.
>
> 32. In my opinion, Banco do Brasil made every reasonable effort in diligently working to obtain the required regulatory approvals in order to open the FSB.

15. The mere general statement that I "worked intensively" with Bank personnel to obtain the desired regulatory approval does not disclose or put "at issue" any attorney-client privileged communication, or any communication at all.

16. Nor is the Landlord entitled to disclosure of my extensive privileged communications with the Bank by the mere summary expression of my view that the Bank worked diligently (and in good faith, for that matter) to obtain regulatory approval.

17. I note, moreover, that the extent of my privileged communications with the Bank on the subject of the FSB project and efforts to obtain regulatory approval is not, as the Landlord suggests, confined to a "limited category of documents" that the Bank claims as privileged (Def. Mem. at 1). The enormous extent of those communications is apparent from the logs the Bank has prepared and produced in response to the Landlord's document requests served on October 1, 2010 (Def. Mem. Ex. C).

18. In addition to the Bank's initial privilege log produced on March 14, 2011 listing some 851 documents (Def. Mem. Ex. D), the Bank has now completed and produced its second (and expected to be final) privilege log, which consists of no less than 1,103 pages listing 15,230 privileged documents. (*See* accompanying affidavit of Charles G. Berry, sworn to June 10, 2010, at ¶ 7 and Ex. 3 (annexing first and last pages of second log).)

19. The quoted statements from paragraphs 31 and 32 of my October 30, 2009 affidavit, moreover, do not "introduce[] [my] interactions and dealings with the Bank's personnel" (Def. Mem. 3) as an issue in the case. They merely summarize what is amply evident from non-privileged documents and information available, and now produced, to the Landlord.

20. A showing of the intensity of the Bank's efforts, and mine on its behalf, does not entail or require disclosure of our privileged communications. Instead, it is established in the extensive communications the Bank had with the regulators, most of it conducted through me.

21. As the lawyer with primary responsibility for the day-to-day regulatory work in connection with the applications to all three of the FRB, OTS and FDIC, I am familiar with all

aspects of the Bank's interactions with those regulators on the FSB project. I am the person most knowledgeable about and best suited to testify concerning those interactions, and I expect to do so at the deposition that the Landlord's counsel have noticed of me.

22. My first-hand knowledge of relevant facts and my status as the Bank's primary lawyer interfacing with the regulators does not, however, put at issue any privileged communication with my client, the Bank.

23. Questioning at my deposition may seek, and I am prepared to provide, information about the applications the Bank filed with the regulators, their responses and questions and the communications that the Bank (and I on its behalf) had with them. The Landlord should not be permitted, however, to inquire into my privileged communications with the Bank, which are not "at issue" here.

### My March 12, 2009 Letter that the Bank Shared with the Landlord on the Understanding that There Was No Waiver of the Attorney-Client Privilege

24. The Landlord's belated effort to pry into the privileged communications that I and other counsel had with the Bank concerning the bank regulatory approval process is also inconsistent with the understanding between the Bank and the Landlord when, at the Landlord's request many months before this case began, the Bank shared with the Landlord a letter I prepared describing the chronology and status at the time of the different aspects of the ongoing regulatory approval process.

25. A copy of that letter is attached as Ex. 1. Also attached, as Ex. 2, is a string of emails between the parties' respective real estate counsel, Peter Aufrichtig for the Bank and Michael Hammer for the Landlord. The first page of this email string (bearing Bates nos. BB00090012-014) shows the transmittal email dated March 18, 2009 by which Mr. Aufrichtig sent my March 12, 2009 letter to Mr. Hammer and his clients. The earlier emails in the string

provide the context in which the letter was furnished, including revealing statements by the Landlord's counsel.

26. My March 12, 2009 letter contains virtually the same information as is in my October 30, 2009 affidavit, except for details that occurred after the date of the March 12 letter. Not only was it understood between the parties that providing this explanatory letter at the Landlord's request would not waive any attorney-client privilege or open the door to such a claim, but Mr. Aufrichtig's transmittal was explicit in stating:

> So there is no confusion, the Bank, by providing you with a copy of her letter, has not and is not authorizing you to speak directly with or contact Ms. Scott or Ms. Scott to provide you with any further information.

Ex. 2, first page.[1]

27. In light of the parties' understanding that the Bank's sharing of my March 12, 2009 letter did not open the door to any further disclosures from me, the Landlord cannot now argue that a waiver resulted from my later affidavit of October 30, 2009, which similarly set forth the regulatory requirements and reported on the chronology of the Bank's efforts to obtain regulatory approval without disclosing the substance of any communication with the Bank.

---

[1] Notably, Mr. Aufrichtig's March 18, 2009 email underscored the Bank's motivation in sharing the letter, explaining that "[t]he Bank is a[s] motivated as it can be to make the Federal Savings Bank approvals happen as soon as possible because of the significant funds and efforts it has expended on the project." (Id.)

Equally notable is the statement in an email from the Landlord's lawyer Mr. Hammer earlier that same day (3/18/2009 at 2:00:52 P.M.):

> . . . my clients are not suggesting that the Bank is not working diligently on obtaining its approvals; and, rather, . . . their concern is to be diligent to protect their own interest, which includes seeking to be kept abreast of the status so that they can determine (1) how, if at all, they might be helpful, and (2) whether they are comfortable continuing to sit it out or would be prudent to market the space for a replacement tenant.

(Ex. 2, second page) (emphasis added). It is clear from this that the Landlord wanted to be informed about the status of the process because, among other possibilities, it was considering exercising its own right under Section 6.5 of the Lease to terminate if "Regulatory Approval" were not obtained by the one-year anniversary of signing the Lease.

28.  I respectfully submit that the Landlord's motion to compel production of the extensive attorney-client communications between me (or any other lawyer) and the Bank on the subject of the Bank's efforts to obtain regulatory approval be denied in its entirety.

SIGNED UNDER THE PENALTIES OF PERJURY ON JUNE _10_, 2011.

*Kathleen A. Scott*
KATHLEEN A. SCOTT

## CERTIFICATE OF SERVICE

I, Eric F. Eisenberg, hereby certify that on this 10th day of June, 2011, this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

_____

**EXHIBIT 1**

# ARNOLD & PORTER LLP

Kathleen A. Scott
Kathleen.Scott@aporter.com
212.715.1799
212.715.1399 Fax

399 Park Avenue
New York, NY 10022-4690

March 12, 2009

Peter D. Aufrichtig
McCarthy Fingar LLP
11 Martine Avenue, 12th Floor
White Plains, NY 10606-1934

    Re:    Banco do Brasil, FSB

Dear Peter:

Mr. Brauna Pinheiro requested that I provide you with an update on the application process for establishing Banco do Brasil, FSB.

As you may know, there are three regulators involved in this application process: the Board of Governors of the Federal Reserve System (the "FRB"), the Office of Thrift Supervision (the "OTS") and the Federal Deposit Insurance Corporation (the "FDIC"). The FRB must approve under the International Banking Act Banco do Brasil S.A., a non-U.S. bank, owning a federal savings bank. The OTS must approve under the Home Owners Loan Act the establishment of the federal savings banks and the approval of the proposed federal savings bank's direct and indirect control parties as savings and loan holding companies. The FDIC must approve the application for deposit insurance for the federal savings bank.

We filed the OTS application on March 10, 2008, in Washington, DC, the FDIC application on March 7, 2008, in New York and the FRB application on March 20, 2008, with the Federal Reserve Bank of New York. Since then, we have answered numerous questions regarding the applications, and continue to respond to inquiries. All the regulators consult with each other so one will not approve until it knows what the other two are planning to do.

The regulators are proceeding very cautiously these days with any applications for new banks. We received repeated questions about the business plan and the proposed products, to the point where the FDIC required us to withdraw the deposit insurance application in the fall of 2008 and refile it with a revised business plan, which we did on January 7, 2009. To date, we have not received any additional requests for information and documentation, but we do expect to receive such requests. I have spoken with the New York case manager for the application, who, in our last conversation, said that the application was being reviewed by several offices within the FDIC and that the Washington, DC office is coordinating the questions. While we remain confident that the FDIC will process the application and ask us

# ARNOLD & PORTER LLP

Peter Auftrichg
March 12, 2009
Page 2

for additional information, we also are cognizant of the fact that the FDIC has been so slow in processing new deposit insurance applications over the past several months that some commentators in the press have noted that the FDIC has imposed an informal moratorium on new deposit insurance applications, a position which the FDIC to date has failed to take publicly.

With respect to the OTS, OTS staff required us to add the Banco do Brasil employee pension plan, Caixa de Previdencia dos Funcionarios do Banco do Brasil ("Previ"), as a control party because it owns 10.4% of the shares of Banco do Brasil and also has three of its nominees currently serving on the board of directors. These facts make Previ a "control party" under the applicable regulations under the Home Owners Loan Act. The OTS had suspended further processing of the application until we filed a revised deposit insurance application with the FDIC, which we did on January 7, 2009, and until we submit an explanation of how Previ would comply with the activities restrictions that the Home Owners Loan Act imposes on a savings and loan holding company. We have prepared a letter to the OTS explaining how Previ will be able to comply with those restrictions and the letter currently is under review by Banco do Brasil. Once we send that letter, the OTS should be satisfied with the response and re-commence its processing of the application.

Under the Home Owners Loan Act, the OTS must determine that Banco do Brasil, a non-U.S. savings and loan holding company, is subject to comprehensive supervision on a consolidated basis in its home country ("CCS"). In making such a determination, the OTS staff will look to see if the FRB has made a similar determination under the International Banking Act, which act has required, since 1991, that the FRB determine that a non-U.S. bank wishing to establish a banking office in the United States be subject to CCS. Banco do Brasil's presence in the United States far pre-dates this requirement and thus has not received a CCS determination. CCS encompasses two determinations: one, that the country has CCS, and two, that the bank in question is subject to CCS. Brazil has been determined to have CCS, but there has not yet been a determination that Banco do Brasil is subject to CCS. The OTS staff informed us that it has never made a CCS determination without the FRB having made such a determination first. Without the CCS determination, we should not expect to receive a conditional approval of our application, even if all of the other questions and issues that the OTS raised about the application have been addressed.

The FRB is reviewing the CCS question as part of a pending application before the FRB for Banco do Brasil to be treated as if it were a financial holding company (an "FHC"). Such a designation would allow Banco do Brasil to engage in a broader range of financial activities in the United States. In order for the FRB to approve the application, it must first find that Banco do Brasil is subject to CCS. Once the FRB makes its determination that there is CCS, then the OTS can make its determination that there is CCS and thus move forward with a

450123_1.doc

CONFIDENTIAL

BB00093446

# ARNOLD & PORTER LLP

Peter Auftrichg
March 12, 2009
Page 3

conditional approval of our application assuming all other questions and issues have been addressed.

This FHC application has been at the FRB for over a year and we have answered a number of questions regarding how Banco do Brasil is regulated. Banco do Brasil was created under a statute other than the general banking laws of Brazil and is majority owned by the Brazilian government and thus most of the questions focused on any differences between how Banco do Brasil is regulated and how other Brazilian banks are regulated. Because of the economic crisis in the United States, senior FRB officials who need to make decisions regarding this application have been focusing on more pressing matters. Moreover, the FRB staff wanted to present all the applications connected with the Banco do Brasil U.S. expansion project (which include, in addition to the FHC application, applications relating to the FSB and BB Money Transfers, Inc.) for approval as one package. We have argued repeatedly to them that these applications are separate and distinct and legally should not be linked together. Finally, the FRB staff agreed late last year to de-couple the three applications and proceed separately with the FHC and the money transmitter applications. After some questions regarding Previ's status under the International Banking Act were resolved recently, the FRB staff told us that there should be resolution of these two applications "soon." The FSB application to the FRB will not be acted on until the OTS and FDIC are ready to approve our applications.

I trust that this information will prove useful to you. I am happy to discuss these issues at greater length should you wish to do so. I may be reached at (212) 715-1799 or kathleen.scott@aporter.com.

Very truly yours,

Kathleen A. Scott

cc:   Mr. Augusto Brauna Pinheiro
      Banco do Brasil

450123_1.doc

**EXHIBIT 2**



**From:** Peter Aufrichtig [mailto:peter@MccarthyFingar.com]
**Sent:** Wednesday, March 18, 2009 4:00 PM
**To:** CHarwood@aol.com; mike@hammeresq.com
**Cc:** BrettHarwood@aol.com; MyronJBerman@cs.com
**Subject:** RE: Banco do Brasil Boston

Dear Craig, Brett, Mike and Mike:

I'm enclosing the letter received from the Bank's regulatory counsel, Kathleen Scott of Arnold & Porter. It's pretty self explanatory about what is happening and what we're doing to make this happen as expeditiously as possible. So there is no confusion, the Bank, by providing you with a copy of her letter, has not and is not authorizing you to speak directly with or contact Ms. Scott or Ms. Scott to provide you with any further information. The Bank is a motivated as it can be to make the Federal Savings Bank approvals happen as soon as possible because of the significant funds and efforts it has expended on the project. So you have a better understanding, the headquarters of the Federal Savings Bank in White Plains, NY is fully built and the staffs of the planned FSB head office and key executives for each of the first five branches have been in place for several months awaiting the approval so they can actually commence doing business. The New York branch is essentially completely constructed with minor punch list items still remaining. More details can be shared when we are together.

If you would suggest a few dates that would be convenient for your team to meet at the New York office(at 600 Fifth Avenue, 3rd Floor), since that's how I understand your request for the location of the meeting, I will check with the Bank and other team members as appropriate for availability and confirm a date that works for all of us.

Best personal regards,

Peter

http://www.mccarthyfingar.com
Email: peter@mccarthyfingar.com

Peter D. Aufrichtig
*Partner*
McCarthy Fingar LLP
11 Martine Avenue, 12th Floor
White Plains, NY 10606-1934
914-946-3700 Ext. 363
914-385-1063 (Direct Dial)
917-699-4597 (cell)
914-946-0134 (Facsimile)

This Electronic Mail transmission and any accompanying documents contain information belonging to the sender which are

CONFIDENTIAL                                                                                                                         BB00090012

confidential and legally privileged. This information is intended only for the use of the individual or entity to whom this transmission was sent as indicated above. If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this transmission is strictly prohibited. If you have received this transmission in error, please reply to the sender at (914) 946-3700 or peter@mccarthyfingar.com and delete this message and all attachments from your electronic storage files.

 Please consider the environment before printing this email.

[mailto:CHarwood@aol.com]
**Sent:** Wednesday, March 18, 2009 3:19 PM
**To:** mike@hammeresq.com; Peter Aufrichtig
**Cc:** BrettHarwood@aol.com; MyronJBerman@cs.com
**Subject:** Re: Banco do Brasil Boston

Peter, thank you for all your help. I'm sorry if the bank has found this a distraction, but we would still like to sit down for a meeting in NY if possible. We are pretty flexible about time.
Craig Harwood

In a message dated 3/18/2009 2:00:52 P.M. Eastern Daylight Time, mike@hammeresq.com writes:

Dear Peter –

We would like to have the regulatory counsel's letter today.

Also, I am sure you explained that my clients continue to be thrilled at the prospect of a continuing relationship with the Bank (and their counsel), and that my clients are not suggesting that the Bank is not working diligently on obtaining its approvals; and, rather, that their concern is to be diligent to protect their own interests, which includes seeking to be kept abreast of the status so that they can determine (1) how, if at all, they might be helpful, and (2) whether they are comfortable continuing to sit it out or would be prudent to market the space for a replacement tenant.

Frankly, "annoyed" at having to add another task to a full agenda would be understandable, but defensive and correspondingly "peeved," especially in light of the failure to date to respond to my clients' attempt now for a while to obtain some concrete information/backup for their comfort, would be wholly inappropriate.

Thank you,

Mike


Michael A. Hammer, Esq.
E-Mail: Mike@HammerEsq.com
Paragon Towers, Suite 510
233 Needham Street, Newton, MA 02464
Phone: (617) 658-2010
Fax: (617) 658-2011

This communication may contain information which is privileged and confidential. If you are not the intended recipient: please expunge; any use, dissemination, copying or disclosure of this communication is strictly prohibited. This communication is not intended and cannot be used for the purpose of avoiding any tax-related penalties under the Internal Revenue Code.

**From:** Peter Aufrichtig [mailto:peter@MccarthyFingar.com]
**Sent:** Wednesday, March 18, 2009 1:22 PM
**To:** Mike Hammer

**Subject:** Banco do Brasil Boston

Dear Mike:

I was away from last Thursday in Las Vegas, so I wasn't able to respond to you. The bank is willing to have a meeting with your clients either in NY or White Plains. I have received a letter from the Bank's regulatory counsel which may go some way to explaining what is happening, etc. I will say that the Bank was a bit peeved at the suggestion that it is not doing everything possible to get the regulatory approval as soon as possible. Paraphrasing, "we're spending millions of dollars to get this done as quickly as possible, who would have a greater interest than we in getting the approvals in order".

Let me know if you want to get the regulatory counsel letter in lieu of the meeting or at the meeting.

Peter



http://www.mccarthyfingar.
http://www.mccarthyfingar.com
Email:peter@mccarthyfingar.com

Peter D. Aufrichtig
*Partner*
McCarthy Fingar LLP
11 Martine Avenue, 12th Floor
White Plains, NY 10606-1934
914-946-3700 Ext. 363
914-385-1063 (Direct Dial)
917-699-4597 (cell)
914-946-0134 (Facsimile)

This Electronic Mail transmission and any accompanying documents contain information belonging to the sender which are confidential and legally privileged. This information is intended only for the use of the individual or entity to whom this transmission was sent as indicated above. If you are not the intended recipient, any disclosure, copying, distribution, or action taken in reliance on the contents of the information contained in this transmission is strictly prohibited. If you have received this transmission in error, please reply to the sender at (914) 946-3700 or peter@mccarthyfingar.com and delete this message and all attachments from your electronic storage files.

Please consider the environment before printing this email.

e grocery store? Make meals for under $10.