UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

*****************************
BANCO do BRASIL, S.A.,
          Plaintiff

vs.                                    Case No. 1:09-cv-11343-NMG

275 WASHINGTON STREET TRUST,
          Defendant
*****************************

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE JUDITH G. DEIN
AT BOSTON, MASSACHUSETTS
ON JUNE 28, 2011

APPEARANCES:

For the Plaintiff:
Arnold & Porter, LLP
399 Park Avenue
New York, New York 10022
212-715-1000
By Charles G. Berry, Esquire

Hinckley, Allen & Snyder, LLP
28 State Street
Boston, Massachusetts 02109
617-345-9000
By Eric F. Eisenberg, Esquire

For the Defendant:
Sugarman, Rogers, Barshak & Cohen, PC
101 Merrimac Street, 9th Floor
Boston, Massachusetts 02114
617-227-3030
By Paul E. White, Esquire and William F. Benson, Esquire

Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

-----------------------------------------------------

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**www.transcriptionplus.com**

1

P R O C E E D I N G S

2

3          THE CLERK:  The United States District Court for the

4   District of Massachusetts is now in session on June 28, the

5   year 2011, in the matter of Banco do Brasil versus 275

6   Washington Street Trust, Civil Action No. 2009-11343.

7          Could counsel please identify themselves for the

8   record.

9          MR. BERRY:  Charles Berry, Arnold & Porter, pro hoc,

10  for the plaintiff and the defendant on the counterclaim, Banco

11  do Brasil.

12         MR. EISENBERG:  Eric Eisenberg, Hinckley, Allen &

13  Snyder for Banco do Brasil, your Honor.

14         MR. WHITE:  Good afternoon, your Honor.  Paul White

15  from the law firm of Sugarman, Rogers, Barshak & Cohen.

16         MR. BENSON:  And Bill Benson, Sugarman, Rogers,

17  Barshak & Cohen, for the defendant.

18         THE COURT:  Okay.  So we're here on the defendant's

19  motion to compel?

20         MR. WHITE:  Yes, your Honor.

21         THE COURT:  Go ahead.  I'll hear you.

22         MR. WHITE:  Your Honor, it is, I submit, a relatively

23  simple motion, but let me start by telling you what is not at

24  issue.

25         What is not at issue is what Banco do Brasil puts in

1    their opposition, and that is that the trust is somehow relying

2    upon the advice of counsel; the fact that Attorney Scott

3    advised her client in some way and has referenced those

4    communications, or that the bank is relying on those

5    communications.  We don't say that at all.

6            This is a motion that seeks to compel the production

7    of attorney-client privileged communications and a limited

8    group, because this is a motion that is based on a specific

9    waiver of the attorney-client privilege, and that is the

10   so-called at-issue waiver.  And when an at-issue waiver takes

11   place, the waiver that follows is limited to essentially the --

12   rather the production that follows is limited to the scope of

13   the waiver.  So --

14           THE COURT:  And you're basing the waiver on the

15   affidavit?

16           MR. WHITE:  So we base the waiver entirely on the

17   affidavit of Attorney Scott, and my Brothers say in their

18   papers that it's merely one or two isolated paragraphs.  That's

19   really not what happened here at all.

20           The bank moved for summary judgment in this case and

21   it relied upon the affidavit of Attorney Scott, and the two

22   paragraphs that are the key paragraphs that we say give rise to

23   the at-issue waiver are the last two paragraphs.  And the

24   entire other paragraphs in her affidavit build up to and form

25   the basis for the statements that are in there.

1        THE COURT:  Well, that was my problem, I'll be honest

2   with you.  It seemed to me that in the first 27 paragraphs, 26

3   paragraphs, she explains all of these meetings, all of these

4   communications, which we all agree are not privileged, and that

5   they've produced, I presume, the correspondence that's

6   referenced therein, the applications that's referenced therein,

7   the notes of the meeting that are referenced therein.  I mean,

8   so those are not the issue.

9        So then you get to the end and it says, sort of in

10  summary, we did a whole lot of work, and then it gives her

11  opinion.

12       Now, I don't know that her opinion matters at all.  I

13  don't know if you have expert opinions on whether somebody did

14  due diligence or not.  But, you know, we're not up to that.

15       But why isn't she just a fact -- why isn't she just

16  limited to the facts that she's described in her affidavit?

17       MR. WHITE:  Well, if she had done that, your Honor, it

18  might have been a different matter, but she clearly didn't do

19  just that.  If she had stopped at that point, it might well

20  have been a different matter.

21       I'm not so sure that it would have been, but even if

22  that were the case, the fact is that what she did is she -- and

23  what the bank did is they presented to the Court in connection

24  with an effort to win this case, they presented her the person

25  with all of the knowledge, including the knowledge of the

1    dealings that she had with her own client, and said, "Look at

2    what my client has done.  My client did all of these wonderful

3    things.  You should find and conclude based upon what I am

4    telling you, that, in fact, my client did everything that you

5    could expect a client to do exercising good faith in trying to

6    meet its burden to open a bank"; and the fact is that once you

7    do that, once you let that cat out of the bag and rely upon a

8    lawyer to make those sorts of representations, and it is

9    fairness that it is absolutely at the root of the doctrine

10   of --

11           (There was a break in the audio.)

12           MR. WHITE:  -- waiver, of at-issue waiver.

13           Fairness dictates that the other side be given an

14   opportunity to rebut those statements, and in the circumstances

15   of a communication like this of assertions like this by a

16   lawyer, what that must mean is to determine and investigate and

17   do discovery on what the communications were between the lawyer

18   and the client, because in putting this lawyer forward at this

19   point, that lawyer is speaking for the client; and what the

20   cases say is that if you use an attorney's statements like this

21   as a sword -- this is absolutely a sword -- you cannot then

22   rely upon the attorney-client privilege as a shield to prevent

23   the other side from being able to challenge those assertions

24   and do that necessary discovery to say that isn't the whole

25   story.

1          And, your Honor, there is a case which is absolutely,

2     I think, on point with this case that --

3          THE COURT:  But just so I understand, I mean, we have

4     30 paragraphs that give you facts, that just give facts of the

5     meetings that she's had, of the communications that she's had,

6     of the preparations that she did, that her client did, to get

7     this application.

8          Now, you haven't deposed her yet, right?

9          MR. WHITE:  We don't want to until we get a ruling on

10    this, your Honor.

11         THE COURT:  And then it seems to me, and maybe I

12    misread it, but the summary is then I worked for the 18 months

13    that she's now described to get the regulatory approvals, and

14    this is the work that she did.

15         I don't see anything -- I mean, I have to tell you, I

16    understand that you've argued this with passion, I just am so

17    not seeing where the waiver is that I'm a little surprised.

18         MR. WHITE:  It's in Paragraph 32, your Honor.  And so

19    you've read --

20         THE COURT:  In my opinion --

21         MR. WHITE:  In my opinion --

22         THE COURT:  So you strike her opinion.

23         MR. WHITE:  Banco do Brasil made every reasonable

24    effort in diligently working to obtain the required regulatory

25    approvals in order to open the FSB, and the only way that she

1    can say that, and the basis for that statement, is her work

2    with the client, including all of her communications with the

3    client.

4          And let me, if I may, your Honor, explain what are the

5    types of things that we have questions about --

6          THE COURT:  Okay.

7          MR. WHITE:  -- because we have some very serious

8    questions in this case.

9          The history that she relates is the following, and so

10   it's not just these two paragraphs.  You do have to look at the

11   history.  The history that she relates is, and I'm not going to

12   go through every single paragraph, we don't need to do that,

13   but it is essentially as follows:  In March 2008, the bank

14   began the approval process.  She was retained as counsel and

15   she was the lawyer working with the bank to do that.  On

16   October 1st, 2008, approximately six months later, the bank

17   withdrew its application.

18         On January 6th, 2009, the bank filed a new application

19   with a revised business plan, and on March 26th, 2009, the

20   FDIC, in a conference call that she participated in, said that

21   it was returning the application and expressed concerns about

22   the business plan.  Those are the facts.

23         And then we have those last two paragraphs, Paragraphs

24   31 and 32.  The bank never submitted a new business plan.  Why

25   not?

1          Now, this is the lawyer who was working with them

2     and --

3          THE COURT:  Well, why do you get the attorney-client

4     communication for that fact?

5          Why don't you take the deposition of the person from

6     the bank who is responsible and you say to him, "Why didn't you

7     submit a new application?"

8          I mean, you're asking for attorney-client privileged

9     documents.

10         Now, you may have an argument -- what I don't know is

11    whether all of these documents are actually privileged, and at

12    what extent.  You know, is it just business advice and -- you

13    know, that's a whole other thing.  But that's not what the

14    motion is that you have in front of me.

15         The motion that you have in front of me is one that

16    says that these are the strategies, the thought processes, the

17    legal advice that the client gave without even knowing -- I

18    mean, it seems to me that the businessman is going to say -- if

19    the businessman says to you, "I relied on my advice of

20    counsel," you've got a different situation.  If he says we

21    didn't do it because the FDIC wanted funding of XY and Z and we

22    were not prepared to do it, or whatever reason he gives, then

23    you have a fact that excludes the attorney's thought process.

24         MR. WHITE:  Your Honor, they didn't submit an

25    affidavit from the business person, they submitted an affidavit

1    from the lawyer; and the lawyer is the person who, throughout

2    this process, was representing them and most knowledgeable

3    about it, and that, I submit, is the reason why we have an

4    affidavit from that person.  And I submit that what the cases

5    really say is if you choose to use that person --

6              (There was a break in the audio.)

7              MR. WHITE:  -- if you choose to use a lawyer, and

8    that's what the McLaughlin case says, even if you dress it up

9    with objective facts, once you do that you have used your

10   attorney as a sword and you cannot use the attorney-client

11   privilege as a shield.  You cannot from the moment you do that.

12             They had a choice, your Honor.  They could have done

13   exactly what you are suggesting.  They could have had that

14   businessperson, or whoever those businesspersons were, and they

15   could have said, "We submitted this application.  We had phone

16   calls with the FDIC.  This is what the FDIC did.  This is what

17   we decided to do."

18             That categorically and completely is not what they

19   have done.  They have submitted an affidavit from their

20   attorney with that attorney's opinion about their good faith

21   and how they progressed, and the case law says if you do that

22   you have opened that can of worms.

23             Your Honor, I would ask that the Court read the

24   McLaughlin case which we cite, and the McLaughlin case is a

25   very similar fact pattern to this, and that case was an

1   employment case in which the Secretary of Labor, I believe it

2   said, a case out of the Northern District of Illinois, the

3   Secretary of Labor had filed suit against some clients of an

4   attorney suggesting they had violated some fair labor standard

5   act and some provisions of that act, and the attorney submitted

6   an affidavit saying, "I had discussions with the Secretary of

7   Labor's offices and these are the representations that they

8   made, which caused my client to legitimately rely on them."

9        And the Department then filed a notice of deposition

10  of the attorney with some requests for documents, which were

11  resisted, and that's what gave rise to the motion which led to

12  the decision in the McLaughlin case.  And what the Court said

13  was, firstly, that the attorney and the attorney's client made

14  exactly the argument that is being made by the bank here, which

15  is we didn't rely upon any communications between the client

16  and the -- we just relied upon the objective facts of what

17  happened between the Department of Labor, and actually the

18  Department of Labor's representations, and me, and the Court

19  said, "No way, you can't do that," because you cannot put that

20  matter at issue when in fairness what the Department would then

21  want to do is depose your client and ask you questions about

22  what you said to your client.

23       And the court said the following, and it relied upon a

24  decision in another case, the Southwire against Essex case, in

25  which Essex had talked about the fact that the affidavit of

1    their lawyer was limited solely to these objective facts, and

2    the court said, "Even were we to view Essex's objective

3    evidence as entitling it to an inference or prima facie showing

4    of reliance, fairness dictates that Southwire, the plaintiff,

5    be permitted to rebut the showing.

6              The supposed objective subjective dichotomy is, in a

7    way, illusory.  Essex's objective evidence, which may include

8    proof of delay, unfulfilled threats or suits and the like, is

9    merely evidence which permits a trier of fact to infer that

10   Essex actually relied on those factors.

11             In short, Essex assert that it relied on Southwire's

12   delay in building the four plans.  Southwire says that Essex

13   relied on something else," and this is the important one.

14   "What Essex is arguing here is that Southwire is not entitled

15   to prove what Essex actually relied on, even though the court

16   should be entitled to infer actual reliance from Essex's own

17   proof.  The unfairness of Essex's position is manifest."

18             That's exactly what's happening here.  The bank says,

19   "We're entitled to put Attorney Scott forward, and the Court

20   should read that affidavit," which I'm sure the court did at

21   the motion for summary judgment stage, "and believe it."  But

22   Mr. White is not entitled to now seek to rebut the allegations

23   that are in that affidavit, but asking about what were the

24   communications with your client.

25             Did you say to your client when the FDIC returned that

1    application, "You need to get a move on and file something

2    again"?  Did the client say to Attorney Scott, "We've decided

3    we don't want to move forward anymore"?  You know, those are

4    the sorts of issues that we say are absolutely at issue in this

5    case, your Honor, and they are being concealed by an affidavit

6    that simply recites objective evidence, and that's what this is

7    about.

8              THE COURT:  Why isn't your issue whether or not they

9    decided to go forward because they wanted to or not?

10             Isn't the trial going to be on this point, what the

11   FDIC required?

12             Either you'll rely on her factually or you'll have

13   your own expert on the permitting --

14             (There was a break in the audio.)

15             THE COURT:  -- process.  But you will have a body of

16   facts that says the -- this was what was provided to the FDIC.

17   The FDIC will say this is sufficient or insufficient, and

18   they've either done it in writing or they've done it orally,

19   all of which is subject to discovery, and then somebody, the

20   fact finder, has to determine whether that's in breach of the

21   contract to exercise due diligence in doing it.

22             I mean, why is -- let's assume that the client said,

23   "I hate the FDIC.  I don't want to file another piece of paper.

24   I've had it with them.  I am done."  So what --

25             MR. WHITE:  Well, it wouldn't be that, your Honor, it

1  would be, "I've changed my mind.  I don't want to open a bank

2  anymore."

3         THE COURT:  But as long as the FDIC -- let's even

4  assume that they say that.  If the facts are that they've

5  provided the FDIC with everything that the FDIC asked for, or

6  the decision is not to provide the FDIC with whatever the FDIC

7  wants, don't you ultimately have the fact finder decide whether

8  that's enough or not?

9         Somebody's subjective state of mind is not the

10 criteria here.

11        MR. WHITE:  Well, your Honor, everything that you've

12 just said is absolutely true up to a point, and that is that

13 that would be one way of doing this.  That is one way of doing

14 it.  You could do it that way.  My client doesn't have to do it

15 that way.  I don't have to try the case that way.

16        The other way of trying the case is to say here's a

17 sophisticated bank represented by a sophisticated lawyer.  They

18 submit applications to the FDIC which are not sufficient.  The

19 FDIC returns the applications and no further application is

20 filed.

21        Now, why would that be?  Why is no further application

22 filed when you have a sophisticated bank that presumably knows

23 how to do this, and you have a sophisticated lawyer and law

24 firm that presumably knows how to advise a client as to how to

25 do it, and I'm entitled to ask a question to the person who is

1      at the heart of this whole problem, that's Attorney Kathleen

2      Scott, and say, "Isn't it true that your client said to you,

3      'We don't want to move forward with this anymore?'"

4            I'm entitled in these situations to ask those

5      questions.  They've opened the door to it.  I would actually

6      get an adverse inference if they refused to answer that

7      question at trial, I believe, your Honor, but what I'm --

8            THE COURT:  No.  Wouldn't you get an adverse -- if she

9      says -- you can say to her, "Why didn't you file anything

10     else?"  She can answer that.

11           Why does that give you the attorney -- I mean, she's

12     the spokesperson.  Somebody conveys something to the FDIC on

13     why we're not continuing.

14           Isn't she the one that does that?

15           MR. WHITE:  Your Honor, that's true.  Let me answer

16     your question.

17           Firstly, that's true, but what goes to the heart of

18     any analysis, of any examination of whether a party was acting

19     in good faith, is what was in their mind.  Sure they can put

20     applications together, but what matters when we are examining

21     whether or not a good faith effort was being made is what was

22     in their mind.  It's not just what did they do, it's what were

23     they thinking.

24           Now, we say --

25           THE COURT:  But you haven't even asked the client what

1   they were thinking.

2          I mean, disclosure of attorney-client, I have to tell

3   you, I take pretty seriously, all right.

4          MR. WHITE:  Your Honor, I do --

5          THE COURT:  So you haven't even asked them.

6          MR. WHITE:  I do too.  I do too.  But that's the

7   evidence that they have put before the Court on the summary

8   judgment record.  They put before the Court the opinion of an

9   attorney that opens that door, and that, I respectfully

10  suggest, is what the cases say.

11         But, your Honor, I have the impression that I am not

12  convincing you, and I believe I've said --

13         THE COURT:  But I'm going to read the cases.

14         MR. WHITE:  Your Honor, I believe I've said everything

15  that I can say and I don't want to take any more time of the

16  Court.

17         THE COURT:  No, I appreciate that.

18         Let me hear from counsel briefly.

19         MR. BERRY:  Your Honor, I think very simply the

20  at-issue doctrine does not apply here because nothing in

21  Ms. Scott's affidavit puts at issue any attorney-client

22  communication.  The doctrine that you can't use the

23  attorney-client privilege as a sword and then claim to use it

24  as a shield simply doesn't apply here, because there is no

25  attorney-client privilege whatsoever that is disclosed.

1        Mr. White, although initially he pointed to five

2   particular paragraphs, then he seemed to point to two, and then

3   at the end he said it all comes down to the one paragraph where

4   in a summary statement in her affidavit, Ms. Scott stated that

5   in her opinion the bank, you know, proceeded diligently.

6        She was the person who was charged with interfacing

7   with the regulatory authorities, and the proof of the bank's

8   due diligence and --

9        (There was a break in the audio.)

10       MR. BERRY:  -- efforts, in terms of trying to obtain

11   regulatory approval, is in those communications.  We have

12   produced 90,000 pages of documents, all of the communications

13   now which were not on the record in the prior summary judgment

14   motion, and Ms. Scott is available --

15       THE COURT:  I have more of a question.  I mean, I

16   think, seriously, the more complicated question is in what role

17   was she participating, you know, how much of this was an

18   attorney's role and how much of this was a business role.

19       MR. BERRY:  As the --

20       THE COURT:  But I think that's going to --

21       MR. BERRY:  She was the regulatory attorney, your

22   Honor, and that is really not a business role.  It's purely an

23   attorney's role, and she was the advocate for the bank in its

24   regulatory applications, and we have produced all of her

25   communications with the regulatory authorities:  The FDIC, the

1 | OTS and the Federal Reserve Bank.

2 | We have also gone to great trouble and expense to

3 | segregate out all of the attorney-client privileged documents.

4 | There are some 16,000 documents that we have identified.

5 | And I think the other point that Mr. White

6 | scrupulously avoided discussing is the untimeliness of his

7 | motion.  This affidavit of Ms. Scott was filed on October 30,

8 | 2009.  There wasn't any suggestion in the briefing on the

9 | summary judgment motion that by filing that the door was open

10 | to -- that it constituted a waiver of the attorney-client

11 | privilege, and it's been eight months since your Honor ruled on

12 | the summary judgment motion.  And October 1st they served their

13 | document request.  They knew that we would be going through the

14 | effort of segregating out privileged documents.

15 | It was only a week or so before Mr. White made his

16 | appearance in this matter that they raised for the very first

17 | time in a letter of April 29th, 2011, that there was any

18 | possibility of waiver of attorney-client privilege.  If there's

19 | any waiver in this overall situation, I would say it's their

20 | waiver of any claim of waiver.  They simply cannot wait so long

21 | to do that.

22 | We cited in our brief the Akamai decision from

23 | California which has a remarkably apt statement of exactly the

24 | kind of situation we're dealing with here.  The court there

25 | said if Akamai thought that it had such a waiver in-hand, it is

1    much more likely that they would have asserted it promptly.

2    That delay alone suggests that Mr. Benson did not think in

3    April that the privilege was waived.  The period of time they

4    were talking about there was eight months; here we're talking

5    about 19 months since Ms. Scott's affidavit.

6              THE COURT:  Do you know this McLaughlin case?

7              MR. BERRY:  Excuse me?

8              THE COURT:  Do you know the McLaughlin case?

9              MR. BERRY:  Yes, I do, and I wanted to address that as

10   well because Mr. White has placed such emphasis on it.

11             That is a distinguishable case because the party that

12   was asserting the privilege there had put in issue the advice

13   of its counsel.  It entailed an assessment of what the

14   standards are of the Department of Labor under the Fair Labor

15   Standards Act; and it wasn't simply a question of the party

16   that claimed the privilege asserting good faith reliance on the

17   Department of Labor's interpretation, but the attorney's advice

18   with respect to that interpretation had been put at issue, and

19   that was the basis for the court's decision there.

20             So it's utterly distinguishable because of the

21   proactive assertion of a privileged communication, the advice

22   there that the lawyer gave to the client about the meaning and

23   interpretation of the Department of Labor's standards.  So all

24   the cases that they discuss involve some affirmative act of

25   that kind.

1          I'm glad to hear that Mr. White has conceded that we

2     have not put at issue the advice of counsel.  A good number of

3     the cases that they cited in their brief depend on that.  It's

4     usually in a pleading or in a discovery response or something.

5     It could be an answer to a deposition question, as your Honor

6     posited, that somebody could put in issue the advice of

7     counsel.  We don't have --

8               (There was a break in the audio.)

9          MR. BERRY:  -- any of that here.  Ms. Scott is

10    available to testify.  They can ask her what the basis of

11    anything in her affidavit is, but they cannot ask her about

12    privileged communications when the bank has not put at issue

13    any of those.

14          So we're eager to have the full record developed.  I'm

15    sure that the landlord's counsel here, having now spent some

16    time looking at the papers that we have produced, have a full

17    understanding of the enormous effort that the bank put into

18    getting the regulatory approval here.

19          THE COURT:  Can I ask you about -- and maybe I'm

20    opening a can of worms, but if I understand it, there's a

21    contention that you've translated some documents and they don't

22    have the translations.

23          Is there a way to produce these?

24          MR. BERRY:  We have not translated documents, your

25    Honor.  We have reviewed with the aid of Portuguese speakers

1    documents prior to production, but it's not like we have some

2    list of documents, which they misunderstand and we've already

3    told them about that, and they can hardly be surprised when

4    they serve an enormously broad document request on a Brazilian

5    bank that a lot of the documents, the internal documents from

6    head office -- this was a huge project that was managed at the

7    very highest levels of the bank and required approvals at the

8    various highest levels -- have documents in Portuguese.  That's

9    their responsibility.  There's absolutely no obligation on our

10   part to translate them for them or for ourselves, and, you

11   know --

12            THE COURT:  I mean, they have copies?

13            I assume some of the operative documents, at least,

14   have been translated.

15            MR. BERRY:  We have rough translations of selected

16   documents, but to, you know, produce those rough translations

17   on selected documents would be effectively handing over work

18   product.

19            It's not for us to guide them.  I'm frankly eager to

20   get some of these documents on the record so they can show that

21   the bank consistently made every effort to obtain this retail

22   bank approval and federal savings bank approvals, and they will

23   be disappointed to find that that never changed.  But --

24            THE COURT:  Well, let me just throw out as a

25   suggestion that you may or may not want to take.  I have

1    nothing before me, but you don't want to end up in trial with a

2    contest over the accuracy or sufficiency of translations.

3           So to the extent that you can cooperate on that and

4    cost share or whatever you're going to do, let me strongly

5    suggest that that might be an approach, at least for some

6    identifiable set of documents that you all are going to want,

7    because I have been through the trial where we've spent months

8    figuring out which translation is accurate, and it's expensive

9    and unproductive time.

10          MR. BERRY:  Right.

11          No, I agree with that, your Honor, and I'm certainly

12   happy to consider some arrangement that we can make with the

13   landlord's counsel.  We do very much anticipate renewing the

14   summary judgment motion at the completion of discovery, and I

15   would assume that part of that would be to submit documents,

16   the originals of which are in Portuguese.  And, you know, those

17   are required, as I understand the rules, to be officially

18   translated, not just informally as we have, and that's a very

19   considerable expense.

20          So if there's some way that we can, you know, share

21   that, we're certainly happy to entertain that.

22          THE COURT:  Just a suggestion.  I mean, the Court

23   will -- my guess -- it's not my case, right?

24          It's just been referred to me for this.  So I can't

25   speak for Judge Gorton's session, but I would accept

1    agreed-upon translations -- let me put it that way -- whether

2    they were official or not.

3              MR. BERRY:  Yes.

4              THE COURT:  If they're agreed-upon, I don't really

5    care.

6              MR. BERRY:  Right.

7              THE COURT:  It's when you have a contest that's a

8    problem.

9              MR. BERRY:  No.  I think that would be an orderly and

10   efficient way to proceed.

11             THE COURT:  All right.

12             MR. BERRY:  Well, unless your Honor has any further

13   questions, I would just respectfully submit that --

14             THE COURT:  Let me just --

15             MR. BERRY:  -- their motion be dismissed in its

16   entirety.

17             THE COURT:  Let me just ask you to address the

18   timeliness and then anything else that you'd like to respond

19   to.

20             MR. WHITE:  Yes, your Honor.

21             Firstly, my understanding of a waiver is that it means

22   what it says.  If you've waived a privilege and that waiver

23   happened at the introduction of Attorney Scott's affidavit, and

24   I was not involved in the case at that time, so I can't speak

25   to --

1              (There was a break in the audio.)

2              MR. WHITE:  -- what the thought processes were, but

3      I'm sure it was a very busy time for counsel for the landlord

4      at that time.  But if there was a waiver, the waiver happened

5      there and then.  You know, the milk doesn't go back into the

6      bottle just because counsel for the other party doesn't raise

7      it immediately, so I think that's the answer to that.

8              I just want to make two very brief points.  One is

9      Attorney Berry said that the bank and -- I'm sorry, the

10     landlord can ask Attorney Scott anything they want about the

11     basis for opinion.  Well, the point is we can't.  This is

12     somebody who is giving an opinion based upon her dealings with

13     her client, and you can bet that when I say "Is part of the

14     basis of your opinion that you dealt with the client and you

15     spoke and you got instructions, and what did they say," there

16     is going to be an objection on the grounds of privilege.  So

17     that's simply not true.

18             And the second thing is, your Honor, as you have noted

19     just by your last question here, there is a -- and it's the

20     second limb of the test that we put forward, which is the

21     information available in a reasonable way from any other source

22     and it clearly isn't.  We're talking about 100,000 documents,

23     many of which are in Portuguese, and what instead we are

24     seeking to do is ask for a very limited investigation, which

25     will enable the truth to come out, of what it was that was

1    actually done by an American lawyer to an American regulatory

2    agency.

3          So I do think that there's a very significant fairness

4    issue that is raised by this motion, and I greatly appreciate

5    the Court's time this afternoon, and your willingness to read

6    the McLaughlin case and see what it says and the cases cited in

7    it on that issue.

8          THE COURT:  I will take the matter under advisement.

9    I will look at the cases.  I am obviously inclined to deny the

10   motion, but if it is denied, it would be without prejudice.

11         So I have a vision of what this deposition is going to

12   look like.  I could be wrong.  I mean, she could claim

13   privilege on a whole lot of things that maybe put a waiver into

14   consideration.  You know, I don't know.  So if I do deny the

15   motion, it will be without prejudice.

16         MR. WHITE:  May I raise one separate issue which

17   Attorney Berry and I have not spoken about, but is always of

18   concern to me when I'm in Federal Court in front of a

19   magistrate judge who becomes very familiar with the case, and

20   I'm sure that that has already happened, given that you

21   rendered that decision, your Honor.

22         THE COURT:  I remember it well.

23         MR. WHITE:  Yes.

24         If counsel in the case discussed and decided that it

25   made sense for the parties to ask that the case be referred to

1    you for trial, is there a procedure that we should follow to do

2    that?

3          THE COURT:  All you need to do is tell Mr. Quinn, and

4    there's a filing that goes on that -- or if all parties

5    consent.  You know, obviously I would be happy to take the

6    case, but it's up to you.

7          MR. WHITE:  Yes.

8          THE COURT:  And --

9          MR. WHITE:  Understood, your Honor.

10          THE COURT:  And the other thing, let me advise you, if

11   you do summary judgment motions as well, I mean, I would -- you

12   know, we're here and we try a lot of cases, but if you file

13   dispositive motions, you also have the option of consenting

14   just for that motion, if that makes sense, just to avoid the,

15   you know, objection period and you live with whatever that

16   decision is.

17          MR. WHITE:  Yes, your Honor.

18          THE COURT:  I leave it to you, but just let Mr. Quinn

19   know.

20          MR. WHITE:  Thank you very much, your Honor.

21          THE COURT:  Okay?

22          MR. EISENBERG:  Thank you, your Honor.

23          THE COURT:  Thank you.

24          MR. BERRY:  Thank you, your Honor.

25

1          (The hearing was concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 26 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

August 5, 2011

Date