UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BANCO DO BRASIL, S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 09-11343-NMG |
| 275 WASHINGTON STREET CORP., | ) | |
| as it is the Trustee of the WASHINGTON | ) | |
| STREET REALTY TRUST II, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION ON BANCO DO BRASIL'S RENEWED MOTION FOR SUMMARY JUDGMENT

July 10, 2012

DEIN, U.S.M.J.

## I. INTRODUCTION

The plaintiff Banco do Brasil, S.A. ("Banco" or the "Bank"), as tenant, entered into a commercial lease agreement (the "Lease") with the defendant 275 Washington Street Corp., as Trustee of the Washington Street Realty Trust II (the "Trust"), as landlord, for premises at 227-275 Washington Street in downtown Boston. The Lease contained an Early Termination provision allowing the Bank to terminate the Lease if it was unable to obtain regulatory approval to operate a branch office at the leased premises. It is undisputed that the approval was not obtained within the period defined by the Lease. At issue is whether the Bank's efforts to obtain such approval satisfied its contractual obligations under the Lease.

This matter is presently before the court on "Banco do Brasil, S.A.'s Renewed Motion for Summary Judgment" (Docket No. 94). By this motion, the Bank is seeking judgment in its favor on the Trust's counterclaims alleging that the Bank breached the Lease and violated the covenant of good faith and fair dealing by not taking all necessary actions to obtain needed regulatory approvals.[1] The Trust opposes this motion and asserts that summary judgment should be entered in its favor, even absent a motion, pursuant to Fed. R. Civ. P. 56(f).

The undisputed facts establish that the Bank pursued the necessary approvals diligently for an extended period of time, but withdrew its applications when it believed that approvals would not be forthcoming. However, there was no event which occurred which made obtaining the necessary approvals impossible per se before the expiration of the Lease period. In addition, there is evidence that the Bank could have followed a different path in seeking the approvals to open the branch office. Therefore, this court concludes that the fact finder should determine whether the efforts undertaken by the Bank satisfied its obligations under the Lease, and recommends to the District Judge to whom this case is assigned that the Renewed Motion for Summary Judgment, as well as the Trust's request for summary judgment, be DENIED.

---

[1] The court concluded that the Bank's original motion for summary judgment raising these issues was premature, and ordered discovery which has now been completed. (See Docket No. 46).

## II. <u>STATEMENT OF FACTS</u>[2]

The following facts are undisputed unless otherwise indicated.

### <u>The Lease</u>

On August 29, 2008, the Bank leased from the Trust, for a term of ten years, 4,742 square feet of office space located at 227-275 Washington Street in downtown Boston (the "Premises"). (Lease § 1.1; PF ¶ 1). The Premises were to be used as a "high quality, full service retail branch banking facility." (Lease § 1.1). The Lease contained two provisions relevant to the instant dispute about the need for regulatory approval. Specifically, § 3.2 provides as follows:

> <u>Section 3.2.</u>  The term hereof shall commence on the date (the "Commencement Date") which is the earliest to occur of the following dates: (i) the expiration of one hundred twenty (120) days after (a) the Delivery Date specified in Section 1.1 hereof [September 1, 2008] and (b) **regulatory approval ("Regulatory Approval") has been obtained from the U.S. Treasury Office of Thrift Super-**

[2]  The facts are derived from the following materials submitted by the parties: (1) Banco Do Brasil, S.A.'s Local Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment (Docket No. 98) ("PF"); (2) Defendant's Response to Plaintiff's Rule 56.1 Statement and Statement of Additional Material Facts (Docket No. 112) ("DR" and "DF"); (3) Banco Do Brasil, S.A.'s Response to Defendant's Rule 56.1 Statement of Additional Material Facts (Docket No. 125) ("PR"); and (4) the Lease attached as Exhibit A to Plaintiff's Verified Complaint (Docket No. 1). In addition, and to the extent the information is not included in the above-referenced pleadings, the facts are derived from: the affidavits and related exhibits submitted by the parties, including the Affidavit (Docket No. 96) and Reply Affidavit (Docket No. 122) of Kathleen A. Scott, the Bank's attorney involved in seeking the regulatory approvals; the Affidavit of Milton Rodriguez, Jr. (Docket No. 95), the Bank's Senior Advisor in North America; the Affidavit of Sara A. Kelsey (Docket No. 120), an expert retained by the Bank; the Affidavit of Thomas A. Barnes (Docket No. 121), another expert for the Bank; the Affidavit (Docket No. 97) and Reply Affidavit (Docket No. 123) of Charles G. Berry, litigation counsel for the Bank; the Affidavit of Kenneth F. Ehrlich (Docket No. 114), an expert for the Trust; and the Affidavit of William F. Benson (Docket No. 113), litigation counsel for the Trust.

**vision for Tenant or its direct or indirect subsidiary, Banco do Brasil, FSB, to operate a branch bank in the demised premises as a federal savings bank**; (ii) the date that the Tenant first opens for business in the demised premises; and (iii) June 1, 2009.

(Emphasis added). (<u>See also</u> PF ¶ 2). Section 6.5 states in relevant part:

> **If Regulatory Approval has not been obtained within one (1) year from the date of this lease,** then, subject to the following enumerated conditions, Landlord and Tenant each shall have the right to elect to terminate this lease by notice given to the other within sixty (60) days after the end of such one-year period and prior to obtaining Regulatory Approval.

(Lease § 6.5). The one year early termination period expired on August 29, 2009.

### Regulatory Framework

The parties agree that although the Lease only requires approval of the Office of Thrift Supervision ("OTS"), before actually opening a retail branch banking facility the Bank was going to need regulatory approval from OTS, the Federal Deposit Insurance Corporation ("FDIC"), and the Board of Governors of the Federal Reserve System ("FRB").[3] However, there is a dispute as to whether the Bank's actual application to the FRB was for broader authority than necessary, and whether, if the Bank had limited its application, it could have received the necessary approvals in a timely manner. There is also a dispute between the parties as to whether the Bank decided to terminate the application process prematurely. The relevant facts are as follows.

---

[3] Since the specific details of each agency's requirements are very complicated, they will only be described herein to the extent necessary for the pending motion.

It is undisputed that "[t]he Bank planned to use the Premises as the location for the Boston branch of a federal savings bank ("FSB") that the Bank intended to establish de novo – that is, as a newly created banking institution." (PF ¶ 5; DR ¶ 5). This facility was one of several that the Bank planned to establish in a number of cities, as part of a larger project designed to expand the Bank's presence in the United States. (PF ¶ 6, Scott Aff. ¶ 8). The project, known as Projeto Varejo ("Retail Project"), was approved by the Bank's Board of Directors on July 13, 2007. (PF ¶ 7).

As quoted above, the Lease referred only to the need to obtain the approval of OTS. (Lease § 3.2). Because the OTS does not charter uninsured banks, however, it is undisputed that before it could engage in banking activities, the Bank would have to obtain the approval of the FDIC, which provides federal deposit insurance for deposit accounts held by banking customers. (PF ¶ 13; DR ¶ 13). It is undisputed, as the Trust argues, that OTS technically could have approved the Bank's application subject to FDIC approval. (See DF ¶ 24; PR ¶ 24). However, there is evidence in the record that, in actuality, it was highly unlikely that the OTS would approve an application without prior FDIC approval. (See, e.g., Barnes Aff. ¶ 12). As detailed below, the Bank relies on an April 2, 2009 letter from the FDIC, returning the application for federal deposit insurance, as justification for its decision to withdraw its application with the OTS.

It is also undisputed that the approval of the FRB was required in order for the Bank, a foreign institution, to own a United States federal savings bank. (PF ¶ 14; DR

¶ 14; Ehrlich Aff. ¶ 14).  As detailed below, however, there is a dispute as to whether the Bank's application to the FRB was too broad, thereby delaying the application process.

As part of its responsibilities, the OTS must determine if the Bank was subject to comprehensive consolidated supervision by the Bank's home country regulatory and supervisory authority (the "CCS determination").  (See 12 U.S.C. § 1467(a)(e)(2)(D); PF ¶ 17; Ehrlich Aff. ¶ 9).  The OTS is obligated to make the CCS determination within 60 days from the date an application is deemed complete.  (Ehrlich Aff. ¶ 19).[4]  In the instant case, the Bank elected to apply to the FRB to become a Financial Holding Company ("FHC"), which would allow it to engage in a broader range of financial activities than could be offered by a federal savings bank approved by the OTS.  (DF ¶ 16; PF ¶ 15; Scott Aff. ¶ 16).  In connection with the FHC request, the FRB was required to make a CCS determination, without any limit on the amount of time it could take to make the determination.  (PF ¶¶ 15-16; Ehrlich Aff. ¶ 19).  Absent an FHC request, however, the FRB would not make a CCS determination — it would be left to OTS.  (See Scott Aff. ¶ 17; Ehrlich Aff. ¶ 18).  Moreover, FHC status was not required to establish a de novo federal savings bank.  (DF ¶ 17).

Where, as here, the FRB is going to make a CCS determination, it is customary for the OTS to defer to and await the FRB's decision before making its own CCS determina-

---

[4]  It does not appear that the OTS ever declared the Bank's application "complete" so as to start the clock running, but there is no clear statement in the record as to why that is so.  (See PR ¶ 27).

tion.  (E.g., Barnes Reply Aff. ¶ 22; Kelsey Reply Aff. ¶ 35).  As the Trust asserts, "[i]f

the Bank had not submitted its request to the FRB for a CCS determination in connection

with the Bank's financial holding company election, the OTS would have been the only

federal agency with the obligation or authority to make a CCS determination with respect

to the Bank."  (Ehrlich Aff. ¶ 18).  As detailed below, the Bank claims that the FRB's

failure to make its CCS determination in a timely manner led the FDIC to return its

application for federal deposit insurance and essentially made it impossible to obtain the

necessary regulatory approvals within the time specified in the Lease.

### The Bank's Applications

In September 2007, the Bank filed an application with the FRB to be treated as an

FHC.  (DF ¶ 7). On March 10, 2008, the Bank filed applications with the OTS and the

FDIC as part of the process to obtain regulatory approval for a de novo federal savings

bank in the United States.  (PF ¶¶ 20-21; DF ¶ 6; Scott Aff. ¶¶ 25-26, 30).  On March 20,

2008, it filed its application with the FRB to become a de novo federal savings bank.  (PF

¶ 23).  The Bank's application to the FRB for approval as an FHC was independent of its

application to become a de novo federal savings bank.  (DF ¶ 8).  It was important to the

Bank to be approved as an FHC even if it was not pursuing the establishment of a de

novo federal savings bank.  (DF ¶ 10).

Over the course of the next several months, from April to September 2008,

Kathleen Scott, the Bank's regulatory counsel, received and answered numerous

questions about the Bank's applications from the OTS, FDIC and FRB.  (PF ¶ 24).  On or

about September 3, 2008, the Bank provided the Trust with a two page document entitled "North American Expansion Plan – A Brief Overview of Pending Issues and Required Regulator Actions." (Scott Aff. Ex. B; PF ¶ 25). Therein, the Bank stated that it had applied to be treated by the FRB as an FHC, but did not suggest that there were alternative ways to proceed. (Ex. B at ¶ 2). The Bank also reported that the "FRB has indicated no problems but has not put together all their decision makers so that the approval can be provided. They have indicated vacation schedules, etc. as reasons for delay." (Id.). The Bank stated further that "it appears that OTS will not approve Banco do Brasil FSB until the FRB gives its approval. No substantive questions from FRB and only a few from FDIC." (Ex. B at p. 2). There is no indication in the Overview that the Bank could circumvent the need for at least the CCS determination by the FRB by electing to proceed without FHC status.

On September 23, 2008, Attorney Scott and other Bank personnel met with bank regulators from the OTS and FDIC. (PF ¶ 28). The regulators raised "questions and concerns about the Bank's business plan." (PF ¶ 29).[5] On September 30, 2008, Attorney Scott received an email from the FDIC identifying items which would need to be

_____

[5] It cannot be disputed that during this period there was a crisis in the banking industry, and that Lehman Brothers had filed for bankruptcy just a few days before the meeting. (See PF ¶ 29; DR ¶ 29). The Bank relies heavily on this situation to explain the regulators' reaction to its applications and to justify its decision not to proceed. Nevertheless, whatever the regulators' unstated motivations may have been, for purposes of the motion for summary judgment this court must focus on the objective facts as established by the record. Moreover, while the economic crisis may have been a factor in the Bank's decision not to pursue its applications, it does not answer the question whether the Bank fulfilled its contractual obligations by not pursuing its applications for the entire period provided in the Lease.

addressed by the Bank in any revised business plan.  (PF ¶ 32).  By letter dated October 1, 2008, the Bank withdrew its pending FDIC application with the stated intention of submitting a new application with a revised business plan.  (PF ¶ 31).  On December 22, 2008, the OTS notified the Bank that it had suspended consideration of the Bank's application due to open financial concerns and questions about the ownership structure of the new bank, but that it would "restart its processing of the applications" as soon as the requested information was provided.  (Scott Reply Aff. ¶ 2, Ex. H).

After receiving approval from the Bank's Board of Directors, the Bank prepared and filed a revised application with the FDIC on January 6, 2009, which included a revised business plan.  (PF ¶¶ 33-37).  Attorney Scott provided an update to the Trust's counsel on March 12, 2009.  (Scott Aff. ¶ 51, Ex. E).  By letter dated March 19, 2009 to the OTS, the Bank (through Attorney Scott) provided additional information and requested that the OTS "lift the suspension" on processing the Bank's applications. (Scott Reply Aff. ¶ 4, Ex. I).  Apparently the OTS never advised the Bank that it was restarting its review before the Bank withdrew its applications, as discussed below.  (See Scott Reply Aff. ¶ 3).

On March 26, 2009, Attorney Scott and other representatives of the Bank partici-pated in a brief telephone conference with the FDIC, in which the FDIC informed them that it was returning the Bank's application.  (PF ¶ 39).  On April 6, 2009, Attorney Scott received a letter from the FDIC dated April 2, 2009, formally returning the Bank's January 6, 2009 resubmitted application for federal deposit insurance.  (PF ¶ 40; Scott

Aff. Ex. F).  On April 30, 2009, the Bank withdrew its application with the OTS "in light of the impossibility of keeping it open indefinitely."  (Scott Aff. ¶ 75).  A significant issue in dispute is whether the FDIC's letter of April 2, 2009 was a sufficient indication that the Bank would not receive approval from the OTS to excuse the Bank from continuing with its application process.[6]  While the Bank contends that the FDIC's return of its revised application made it impossible to obtain the necessary approvals during the Lease period, the letter does not necessarily support such a conclusion.

According to the FDIC's letter, at the meeting of September 23, 2008 the Bank had been informed that its "application was substantially incomplete, with many threshold issues causing concern.  Based on the identified concerns and additional information requests, the applicant was given the opportunity to withdraw the application; a letter notifying the FDIC of withdrawal was received on October 1, 2008."  (Scott Aff., Ex. F at 1).  After the new application was received, according to the FDIC's letter, the FDIC "continue[d] to have significant concerns and material additional information needs[,]" as a result of which the application was being returned.  (Id.).  These concerns were listed

_____

[6]  In recommending that the Trust be permitted to take discovery in response to the Bank's initial motion for summary judgment, this court noted that the Trust did not have a copy of the April 2, 2009 letter.  The Bank argues strenuously now that the Trust did in fact have a copy of the letter although admittedly it was not a copy of the version received by the Bank and was not on FDIC letterhead.  (See DR ¶ 56).  This court continues to believe that discovery was appropriately ordered, and that the Trust was entitled to obtain a copy of the actual letter on which the Bank was relying.  It did not have to guess whether its copy corresponded with the Bank's version.

by the FDIC in numbered paragraphs.  The heading of each paragraph is quoted below,

with the critical paragraphs quoted in full.

> 1.  The projections and estimates included in the application materials rely on an unsupported business plan prepared by the organizers.

> 2.  There are significant concerns with the proposed management structure.

> 3.  There is uncertainty as to whether the proposed regulatory framework can be achieved or approved.  For example, the proposed thrift would be indirectly wholly-owned by Banco do Brasil through its wholly-owned subsidiary, Banco do Brasil AG, Vienna, Austria.  Approval must be granted by the Austrian Financial Market Authority.  Banco do Brasil SA must also receive the approval of the Board of Governors of the Federal Reserve System to acquire the shares of the proposed thrift pursuant to Section 4(c)(8) of the Bank Holding Company Act of 1956 and Section 225.22 of the Federal Reserve Board's Regulation Y.  **There is also a Consolidated Comprehensive Supervision determination that is pending with the Federal Reserve.**

> 4.  The proposed capital level may not be sufficient in light of the higher-risk profile.

> 5.  The proposed compliance staff is primarily located in Orlando, Florida.  In light of the potentially high-risk business plan regarding remittances, staff should be resident in New York.

> 6.  Additional detail is needed on the terms and conditions of the services to be provided for the bank by the affiliated BB USA Servicing Center; the New York Branch; and agents of BB Money Transfers.

(Emphasis added).  The concluding paragraphs of the letter are as follows:

> Due to a lack of a complete and comprehensive deposit insurance application, coupled with the proposed risk profile and absence of mitigating factors as articulated above, we are formally returning the

deposit insurance to you.  Given the related nature of the manage-
ment interlock application, that application is also being returned
herewith.

Effective on the date of this letter, the FDIC will no longer have
active applications from Banco do Brasil pending with the agency.
**We strongly encourage you to consider whether an additional
FDI submission is feasible in the current environment.**  Should an
additional submission be desired, we fully anticipate and expect that
additional efforts will be made to provide a complete and fully
supported application in the form acceptable to the FDIC.  If you
should have any questions regarding the foregoing, please contact
FDIC Case Manager....

(Emphasis added).

In describing its reaction to the letter, the Bank does not address the substantive

concerns that the FDIC had with the applications submitted to date.  Rather, the Bank

asserts that it understood from the letter "that the FDIC would not entertain any re-

submitted application unless or until (a) the 'current environment' had improved and

(b) the Bank had obtained the referenced approvals from the FRB."  (PF ¶ 43).  The

reasonableness of such a reading is disputed by the Trust on the grounds that the Bank

never discussed the content of the FDIC's letter with anybody at the FDIC, and the

reference to FRB approval "formed a very insignificant part of the letter or concerns

expressed in the letter, most of which focused on matters concerned with the Bank's

business plan."  (DR ¶¶ 42-43).  Moreover, there was testimony from Attorney Scott to

the effect that it would have taken around three months to gather the information that the

FDIC had requested, which would have been within the Lease period.  (See PR ¶ 31).

Thus, there is (disputed) evidence in the record that if the Bank had provided the

necessary information to the OTS and FDIC, it could have received the necessary

approvals by August 29, 2009.  (See Ehrlich Aff. ¶ 21).  It is undisputed that because the

Bank had decided that any further submission would have been pointless, no one from the

Bank had any discussions with the FDIC following the April 2, 2009 letter to determine if

or how the Bank could submit an application that would be viewed favorably by the

FDIC.  (See PR ¶¶ 32-38).

The Bank withdrew its OTS application on April 30, 2009.  (PF ¶ 30).  According

to Attorney Scott:

> Because the OTS does not charter uninsured banks the OTS applica-
> tion could not be held open indefinitely and might eventually have to
> be withdrawn or deemed withdrawn.

(Scott Aff. ¶ 74).  Thus, the Bank formally withdrew its application "in light of the

impossibility of keeping it open indefinitely."  (Scott Aff. ¶ 75).  "For the same reason"

the Bank also withdrew its FRB application on April 30, 2009.  (Scott Aff. ¶ 77).[7]  As

described by Milton Rodriguez, Jr., the Sr. Advisor in North America for Banco:

> The April 2, 2009 Letter and the FDIC's return of the Bank's
> application were understood to be highly negative developments that
> were likely to render it impossible to obtain all the necessary
> regulatory approvals for the FSB by the time of the one-year
> anniversary of the execution of the Lease.

(Rodriguez Aff. ¶ 67).  Moreover, the Bank understood the concluding paragraph of the

letter "to be a strong discouragement by the FDIC of any resubmission during the

---

[7]  After the withdrawal, the FRB approved a separate aspect of the Bank's Retail Project,
the establishment of a money transmittal business.  (Scott Aff. ¶ 78).

ongoing fiscal crisis." (Rodriguez Aff. ¶ 69). In addition, it was important to the Bank not to have its applications rejected by the regulators — while a withdrawal is usually without prejudice to renewal at a later date, a rejection must be reported in all future applications. (See Kelsey Reply Aff. ¶ 28; Scott Aff. ¶ 42).

For its part, the Trust challenges the need for the Bank to have withdrawn its applications when it did, pointing to the undisputed fact that the OTS could have approved the Bank's application subject to the Bank obtaining approval from the FDIC. (DR ¶ 45). In addition, the Trust argues that if the Bank had not pursued its application to be an FHC, the OTS would have had to make the CCS determination, and therefore may have been able to provide the approval anticipated by the Lease. (See DR ¶ 49; Ehrlich Aff. ¶ 21). There are also facts in the record that after the FDIC's letter of April 2, 2009, the OTS recommended that the Bank pursue the matter further with high level meetings with the FDIC, but the Bank declined. (DF ¶¶ 34-37; PR ¶¶ 34-37).

The Bank did not tell the Trust about the FDIC's April 2, 2009 letter, or about the withdrawal of the OTS and FRB applications until a meeting on May 27, 2009. (DF ¶ 66). The Bank contends that it continued to make efforts to get FRB approvals after its receipt of the letter of April 2, 2009, including "making inquiries at the FRB; attempting to engage senior officials in the Brazilian government to facilitate the regulatory approvals; and meeting and discussing the situation with the President of the Brazilian Central Bank, the Brazilian Minister of Finance, and the Brazilian ambassador to the United States." (PF ¶¶ 47-48). The Trust asserts that any further efforts undertaken by

the Bank, including the effort to get a CCS determination from the FRB, was in furtherance of the Bank's independent effort to obtain FHC status and not to be approved as a de novo bank. (DR ¶¶ 47-48). The Bank never withdrew its application from the FRB for FHC status, and did eventually get a CCS determination from the FRB on April 13, 2010. (PF ¶ 49). It did not, however, renew its efforts to obtain approval to operate a de novo bank.[8] (PF ¶ 53).

A meeting between the Bank and the Trust was held on May 27, 2009. At that time, the Bank informed the Trust that it had decided not to re-file its application at that time, and that the Trust could begin showing the property to others immediately. (See PR ¶¶ 47, 50). The Trust contends, based on Mr. Rodriguez's deposition testimony, that the Bank had decided to terminate the Lease on or about April 14 or 15, 2009, shortly after its receipt of the FDIC's letter. (DF ¶ 49). The Bank contends that the decision was not made until August 2009, pointing to other portions of Mr. Rodriguez's testimony. (See PR ¶ 49). The Bank sent the Trust a letter purporting to terminate the Lease on August 31, 2009, pursuant to § 6.5 of the Lease. (PF ¶ 54).

According to the Bank's experts, as of the time of the Bank's application, there was "effectively an unannounced but *de facto* moratorium on issuance of federal

---

[8] The Trust points to this as evidence that the Bank had changed its strategy after the April 2, 2009 letter and decided not to pursue the opening of a de novo bank at the premises. This is denied by the Bank. In support of its contention, the Trust asserts that the court should draw an adverse inference based on the Bank's assertion of the attorney-client privilege when questioned about its strategy. Since this issue does not need to be resolved in connection with the summary judgment motion, it will not be addressed herein.

approvals by the FDIC (and consequently on *de novo* federal thrift charters at the OTS) for applications of any significant complexity."  (Barnes Aff. ¶ 23; <u>see</u> <u>also</u> Kelsey Aff. ¶ 47).  However, there never was any formal moratorium.

Additional facts will be provided below where appropriate.

### III.  <u>ANALYSIS</u>

#### A.    <u>Summary Judgment Standard of Review</u>

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The mere existence of *some* alleged factual dispute will not alone withstand an otherwise properly supported motion for summary judgment; rather, there must be genuine issues of material fact in dispute to defeat summary judgment.  <u>See</u> <u>Sands v. Ridefilm Corp.</u>, 212 F.3d 657, 660-661 (1st Cir. 2000); <u>see</u> <u>also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party."  <u>Tocci Bldg. Corp. v. Zurich Am. Ins. Co.</u>, 659 F. Supp. 2d 251, 256 (D. Mass. 2009) (quoting <u>Sanchez v. Alvarado</u>, 101 F.3d 223, 227 (1st Cir. 1996)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation marks omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4-5 (1st Cir. 2010); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993) (citing Anderson, 477 U.S. at 256-57, 106 S. Ct. at 2514). Moreover, in evaluating a motion for summary judgment, "the court views all facts and draws all reasonable inferences in the light most favorable to the nonmoving party." Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (citing Anderson, 477 U.S. at 255, 106 S. Ct. at 2513). However, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

Finally, pursuant to Fed. R. Civ. P. 56(f)(1), summary judgment may be entered in favor of the nonmovant. Thus, the law in the First Circuit is "well established" that a party that moves for summary judgment runs the risk that "the court may grant summary

judgment *sua sponte* against the movant." <u>Rothschild v. Cree, Inc.</u>, 711 F. Supp. 2d 173, 195 (D. Mass. 2010).[9]

Applying these principles to the instant case compels the conclusion that both parties' requests for summary judgment be denied.

**B.** <u>**Standard for Obtaining Approvals**</u>

"[I]t is well- established that when a contractual payment depends on one party's application for government approval, that party has an obligation to make the necessary applications in a reasonable effort to obtain the required approval." <u>Transcanada Power Mktg. Ltd. v. Narragansett Elec. Co.</u>, 542 F. Supp. 2d 127, 135 (D. Mass. 2008).[10] What constitutes "reasonable efforts" is a question of fact that must be assessed in each

---

[9] While the 2010 amendments to Fed. R. Civ. P. 56(f)(1) make it clear that after notice and a reasonable time to respond, the court may "grant summary judgment for nonmovant" that was the practice in many courts before the amendment as well. <u>See</u> 10A Wright, Miller, Kane, <u>Federal Practice and Procedure</u> § 2720 (Supp. 2011).

[10] The Trust's counterclaim alleges a breach of the implied covenant of good faith and fair dealing which "provides that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." <u>Anthony's Pier Four, Inc. v. HBC Assocs.</u>, 411 Mass. 451, 471, 583 N.E.2d 806, 820 (1991) (internal punctuation, citations and quotation omitted). <u>See</u> also <u>Liss v. Studeny</u>, 450 Mass. 473, 477, 879 N.E.2d 676, 680 (2008). This general principle is closely related to the standard applied in assessing the efforts undertaken by a party to obtain regulatory approval. Therefore, this court's analysis will not include a separate discussion of the implied obligation of good faith. <u>See</u> <u>Speakman v. Allmerical Fin. Life Ins.</u>, 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (the implied covenant does not apply "where the defendant has exercised an express contractual power in good faith -- that is, in a manner that comports with the parties' reasonable expectations as to performance."), and cases cited. This court does note that although the Bank emphasizes its good intentions, the Trust does not need to establish that the Bank acted in bad faith to prevail on its claim. <u>See</u> <u>Noonan v. Wonderland Greyhound Park Realty LLC</u>, 723 F. Supp. 2d 298, 350 (D. Mass. 2010).

instance.  Stabile v. McCarthy, 336 Mass. 399, 404, 145 N.E.2d 821, 824 (1957).

"However, the plaintiff, in order to show that he has done enough to meet the condition precedent to his right to cancel, need prove not absolute impossibility, but merely activity reasonably calculated to obtain the approval by action or expenditure not disproportionate in the circumstances."  Id.

In the instant case, reasonable minds may differ as to whether the Bank's efforts were sufficient to meet this standard.  Therefore, this court recommends that the motion for summary judgment be denied.  See Huang v. BP Amoco Corp., 271 F.3d 560, 565 (3d Cir. 2001) (whether the lessee made "a diligent and good-faith effort to obtain the required approvals" is a question of fact: summary judgment reversed).

The letter of April 2, 2009 from the FDIC, while discouraging, did not absolutely preclude the Bank from resubmitting an application.  In fact, the FDIC expressly recognized that the Bank might elect to make another submission.  Rather than prohibiting another application, the last paragraph of the FDIC's letter can be read to caution the Bank that if it elected to resubmit another application, unlike its efforts with respect to its second application, the Bank should make "additional efforts" in connection with its third application "to provide a complete and fully supported application in the form acceptable to the FDIC."  (Scott Aff., Ex. F).  A fact finder may conclude that "[t]he evidence falls short of showing that filing and prosecution of [a revised application] . . . prepared with

reasonable ingenuity would not have resulted in eventual approval, and would have been an empty gesture.  <u>Stabile</u>, 145 N.E.2d at 825.[11]

The Bank argues that "[i]t was clear from the FDIC's April 2, 2009 Letter that the FDIC would not move forward or process any renewed application by the Bank for federal deposit insurance until the FRB and the OTS had made their respective required CCS determinations."  (Scott Aff. ¶ 69).  As an initial matter, a fact finder may conclude, as the Trust argues, that the reference to third party approvals was an insignificant part of the FDIC's letter.  Moreover, the Bank will have to convince a fact finder that proceeding with the request that the FRB make the CCS determination, instead of withdrawing the FHC request and letting the OTS make the determination, was reasonable.  While it very well may have been, the record is not so one-sided as to allow a ruling as a matter of law.

The Bank's decision to withdraw its applications from OTS and FRB further raises questions about whether its actions were reasonable.  Based on the Bank's own affidavits quoted above, the Bank decided that the applications should be withdrawn because they could not linger "indefinitely."  However, this does not explain why the applications

---

[11]  In <u>Chin v. Moraine Homes LLC</u>, 74 Mass. App. Ct. 74 Mass. App. Ct. 1116, 907 N.E.2d 266, 2009 WL 1586208 (unpub. op.), on which the Bank relies, the buyer pursued a mortgage application through the entire agreed-upon period, and even arranged to have the period extended, only to end up with a loan with terms which were not commercially reasonable. In that case, the court concluded that the buyer acted diligently.  In the instant case, the Bank did not pursue its application throughout the entire period and did not provide the FDIC with all the information it requested.  The fact finder will have to determine if the Bank's actions were sufficient.  The other cases relied on by the Bank are also factually distinguishable.

could not be pursued for the few months remaining under the Lease. This is especially true since the OTS could have given its approval subject to FDIC approval, and there was a way to circumvent the FRB needing to make the CCS determination.

There is a line of cases in other jurisdictions where, based on a "prevention doctrine," the courts "have concluded that where a party withdraws its application to a board or agency before a final determination can be made on that application, it has acted in a way that hinders the condition precedent requiring approval of that board or agency. Thus, the defendants in those cases were not permitted to rely on the failure of the condition as a basis to terminate their contracts." In re President Casinos, Inc., 419 B.R. 381, 390 (E.D. Mo. 2009). While the Trust has not identified any such specific cases in the First Circuit, this Circuit has recognized the "prevention doctrine," where "a contractual condition precedent is deemed excused when a promisor hinders or precludes fulfillment of a condition and that hindrance or preclusion contributes materially to the non occurrence of the condition." Ne. Drilling, Inc. v. Inner Space Servs., Inc., 243 F.3d 25, 40 (1st Cir. 2001) (citing Restatement (Second) of Contracts § 245 (1981)). In the instant case, it should be left to the fact finder to determine if withdrawal of the application contributed "materially" to the failure of the Bank to get its approval, and the Bank should not be estopped, as a matter of law, from arguing that its efforts were reasonable. On the other hand, the fact that the Bank did withdraw its applications without clearly being obligated to do so precludes the entry of summary judgment in the Bank's favor. See Cauff, Lippman & Co. v. Apogee Fin. Grp., Inc., 807 F. Supp. 1007, 1023 (S.D.N.Y.

1992) (after trial, court rules that "even if additional terms remained to be agreed upon

. . . and even though the deal could have fallen through due to genuine disagreement over

those terms, [defendant] cannot avoid its obligations under the contract with its refusal to

participate in further negotiations prevented any possibility of finalizing the agreement").

See also Wojtkun v. DeWolfe New England, 12 Mass. L. Rpt. 149, *6 (Essex Sup. Ct.

July 24, 2000) (court grants summary judgment allowing seller to retain deposit where

"the buyer's decision to withdraw the application prior to the deadline and then not to

resubmit it because he didn't think there was sufficient time falls short of his obligation to

act in good faith and with due diligence.").[12]

Finally, and for the same reasons, this court also recommends that the Trust's

request for summary judgment be denied. The complex regulatory scheme and the

significant expenditure of time and money by the Bank precludes a finding that the Bank

failed to fulfill its obligations as a matter of law. This is not a case where the Bank did

nothing in furtherance of its obligation to get agency approvals. Compare Sechrest v.

Safiol, 383 Mass. 568, 569-72, 419 N.E.2d 1384, 1385-86 (1981) (buyer's failure to

submit any building plans or applications for a building permit or any other necessary

approvals for construction "was insufficient to warrant a finding that [defendant] had

---

[12] Wojtkun presented a much less complicated regulatory scheme making summary judgment more appropriate. There, the buyer withdrew his zoning variance application and did not obtain a mortgage as required by the purchase and sale agreement. In the instant case, given the complex regulatory scheme and the multiple steps undertaken by the Bank, it should be up to the fact finder to determine if the Bank used reasonable efforts to obtain approval.

made reasonable efforts to obtain approval"). This court recommends that all relevant facts be evaluated by the fact finder.

## IV. CONCLUSION

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Bank's Renewed Motion for Summary Judgment (Docket No. 94), as well as the Trust's request for summary judgment, be DENIED.[13]

　　　/ s / Judith Gail Dein　　　　　　
Judith Gail Dein
U.S. Magistrate Judge

---

[13]The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).